**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JAMES F. HOLDERMAN III and ERIN COURTNEY HILL, individually and on behalf of their minor daughter, Baby H; PASTOR BRIAN BOUGHER and ANGELA BOUGHER, individually and on behalf of their minor daughter, Baby B; DR. JASON KOSEK and SARAH KOSEK, individually and on behalf of their minor daughter, Baby K; BRANDON LEITSCHUH and EMILY VUCKOVICH-LEITSCHUH, individually and on behalf of their minor daughter, Baby L; DANIELLE ANDERSON, individually and on behalf of her minor daughter, Baby G; KELLY METKE, individually and on behalf of her future Baby boy, Baby M, <br><br> *Plaintiffs,* <br><br> v. <br><br> B.J. WALKER, Former Acting Director of the Illinois Department of Children and Family Services, sued in her individual capacity; NORA HARMS-PAVELSKI, Former DCFS Deputy Director of Child Protection, sued in her individual Capacity; DR. JILL GLICK, sued in her individual capacity; THE ILLINOIS CHAPTER OF THE AMERICAN ACADEMY OF PEDIATRICS, an Illinois non-profit corporation; SILVER CROSS HOSPITAL AND MEDICAL CENTER, an Illinois non-profit corporation; ADVOCATE CHRIST HOSPITAL AND MEDICAL CENTER, an Illinois non-profit corporation; UNIVERSITY OF CHICAGO MEDICAL CENTER, an Illinois non-profit corporation; DR. SUZANNE G. SCHULTE, sued in her individual capacity; DR. MIROSLAW SKALSKI, sued in his individual capacity; DR. JOHN DOE (Silver Cross Hospital and Medical Center), sued in his individual capacity; DR. POJ LYSOUVAKON, sued in his individual capacity; MONIKA KOZUCH, a Silver Cross Hospital and Medical Center nurse, sued in her individual capacity; CASEWORKER GINA KITAKIS, a DCFS Caseworker, sued in her individual capacity; CASEWORKER SHEKEILA WILLIAMS, a DCFS Caseworker, sued in her individual capacity; CASEWORKER LYNETTE ALLEN, a DCFS Caseworker, sued in her individual capacity; CASEWORKER SHERINA, a DCFS Caseworker, sued in her individual capacity; MARC D. SMITH, DCFS Director, sued in his official capacity, <br><br> *Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) <br><br> **CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF** <br><br> **DAMAGES FOR INDIVIDUAL PLAINTIFFS (EXCEPT PLAINTIFF METKE)** <br><br><br> **JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

INTRODUCTION (¶¶ 1-23) .................................................................................................6

JURISDICTION AND VENUE (¶¶ 24-25) .....................................................................11

THE PARTIES (¶¶ 26-70).................................................................................................12

    Plaintiffs..................................................................................................................12

    Defendants ..............................................................................................................13

        High-Ranking DCFS Officials and Caseworkers .....................................13

        Organizations and Hospitals .....................................................................14

        Medical Professionals ...............................................................................15

        Official Capacity Claim for Injunctive Relief ..........................................17

BACKGROUND (¶¶ 71-450) ...........................................................................................17

    A.    Legal Rights at Issue (¶¶ 71-78) ............................................................17

    B.    The Refused Medical Procedures and Their Risks (¶¶ 79-122) .............20

        1.    *IM Vitamin K Shot* (¶¶ 79-92).................................................20

        2.    *Erythromycin Eye Ointment* (¶¶ 93-101)........................................23

        3.    *Hepatitis B Shot* (¶¶ 102-113) ........................................24

        4.    *Newborn Screening Tests* (¶¶ 114-122)........................................26

    C.    Illinois' Definition of "Medical Neglect" and "Temporary Protective Custody" (¶¶ 123-129)................................................................................27

    D.    The Formation of DCFS Procedures 300, Section H (¶¶ 130-202)............................29

        1.    *The Initial 2015 Policy and Subsequent Concern by Pediatricians* (¶¶ 130-188) ............................................29

        2.    *The Rescission of Procedures 300, Section H* (¶¶ 189-202)............42

    E.    The Incidents At Issue (Chronological) (¶¶ 203-450) ............................44

        1.    *Pastor Brian Bougher, Angela Bougher, and Baby B* (¶¶ 203-277) ..............44

        2.    *James F. Holderman III, Erin Courtney Hill, and Baby H* (¶¶ 278-328)........54

        3.    *Dr. Jason Kosek, Sarah Kosek, and Baby K* (¶¶ 329-357)...........................61

        4.    *Brandon Leitschuh, Emily Vuckovich-Leitschuh, and Baby L (¶¶ 358-393)*............67

        5.    *Danielle Anderson and Baby G* (¶¶ 394-436) ...............................74

        6.    *Kelly Metke and Future Baby M* (¶¶ 437-450) ...............................79

CAUSES OF ACTION (¶¶ 451-556) ................................................................................81

    A.    Substantive Due Process ........................................................................83

*Count I: Substantive Due Process/Conspiracy to Deprive Plaintiffs of Substantive Due Process: All Plaintiffs (except Plaintiff Metke) versus Defendants B.J. Walker, Nora Harms-Pavelski, Dr. Jill Glick, and ICAAP* .................................................................................83

*Count II: Substantive Due Process/Conspiracy to Deprive Plaintiffs of Substantive Due Process: Plaintiffs James, Courtney, and Baby H against Defendant Dr. Schulte* ..........................................................86

*Count III: Substantive Due Process/Conspiracy to Deprive Plaintiffs of Substantive Due Process: Plaintiffs Pastor Brian, Angela, and Baby B versus Defendants Dr. Skalski, Nurse Kozuch, Silver Cross, and Caseworker Kitakis* ...................................................................86

*Count IV: Substantive Due Process/Conspiracy to Deprive Plaintiffs of Substantive Due Process: Plaintiffs Dr. Kosek, Sarah, and Baby K versus Defendants Dr. John Doe (Silver Cross), Silver Cross, and Caseworker Williams* ..................................................................88

*Count V: Substantive Due Process/Conspiracy to Deprive Plaintiffs of Substantive Due Process: Plaintiffs Brandon, Emily, and Baby L versus Defendants Advocate Christ and Caseworker Allen* ..........................89

*Count VI: Substantive Due Process/Conspiracy to Deprive Plaintiffs of Substantive Due Process: Plaintiffs Danielle and Baby G versus Defendants UC Medical, Dr. Glick, Dr. Lysouvakon, and Caseworker Sherina* ...................................................................90

C. Fourth Amendment ..........................................................................91

*Count VII: Fourth Amendment Illegal Seizure Claim: Plaintiffs Courtney and Baby H against Defendant Dr. Suzanne Schulte* .....................91

*Count VIII: Fourth Amendment Illegal Search and Seizure Claim: Plaintiffs Pastor Brian, Angela and Baby B against Defendant Nurse Kozuch, Defendant Dr. Skalski, and Defendant Caseworker Kitakis* ..........................92

*Count IX: Fourth Amendment Illegal Search and Seizure Claim: Plaintiffs Dr. Kosek and Sarah against Defendant Caseworker Williams* ....................93

*Count X: Fourth Amendment Illegal Search and Seizure Claim: Plaintiffs Brandon, Emily, and Baby L against Defendant Caseworker Allen* ..............93

*Count XI: Fourth Amendment Illegal Search and Seizure Claim: Plaintiff Danielle against Defendant Caseworker Sherina* ...........................94

D. First Amendment ...........................................................................94

*Count XII: Denial of First Amendment Right to Free Exercise Claim: Plaintiffs James and Courtney against Defendant Dr. Schulte* .......................94

E.      Rule 23(b)(2) Class Action (Injunctive Relief Only) ..................................95

*Count XIII: Injunctive Relief Claim: All Plaintiffs and a Class of Similarly Situated Persons Against Defendant DCFS Acting Director Marc D. Smith* ...................................................................................................95

CONCLUSION..................................................................................................................102

## COMPLAINT

Plaintiffs JAMES F. HOLDERMAN III ("James") and ERIN COURTNEY HILL ("Courtney"), husband and wife, individually and on behalf of their minor child, Baby H; PASTOR BRIAN BOUGHER ("Pastor Brian") and ANGELA BOUGHER ("Angela") husband and wife, individually and on behalf of their minor child, Baby B; DR. JASON KOSEK ("Dr. Kosek") and SARAH KOSEK ("Sarah"), husband and wife, individually and on behalf of their minor child, Baby K; BRANDON LEITSCHUH ("Brandon") and EMILY VUCKOVICH-LEITSCHUH ("Emily"), husband and wife, individually and on behalf of their minor daughter, Baby L; DANIELLE ANDERSON ("Danielle"), individually and on behalf of her minor daughter, Baby G; and KELLY METKE ("Kelly"), individually and on behalf of her future baby boy, Baby M (for injunctive relief only); by their counsel, Richard Dvorak, of DVORAK LAW OFFICES, LLC, hereby file their Complaint against B.J. WALKER, Former Acting Director of the Illinois Department of Children and Family Services ("DCFS"), sued in her individual capacity; NORA HARMS-PAVELSKI, Former Deputy Director of Child Protection for DCFS, sued in her individual capacity; DR. JILL GLICK, Member of the DCFS's Children and Family Services Advisory Council, sued in her individual capacity; THE ILLINOIS CHAPTER OF THE AMERICAN ACADEMY OF PEDIATRICS ("ICAAP"), an Illinois non-profit corporation; SILVER CROSS HOSPITAL AND MEDICAL CENTER ("Silver Cross"), an Illinois non-profit corporation; ADVOCATE CHRIST HOSPITAL AND MEDICAL CENTER ("Advocate Christ"), an Illinois non-profit corporation; UNIVERSITY OF CHICAGO MEDICAL CENTER ("UC Medical"), an Illinois non-profit corporation; DR. SUZANNE G. SCHULTE, sued in her individual capacity; DR. MIROSLAW SKALSKI, sued in his individual capacity; DR. JOHN DOE (Silver Cross), sued in his individual capacity; DR. POJ LYSOUVAKON, sued in his individual capacity; MONIKA KOZUCH, a Silver Cross nurse, sued in her individual capacity; GINA KITAKIS, a DCFS Caseworker, sued in her

5

individual capacity; SHEKEILA WILLIAMS, a DCFS Caseworker, sued in her individual capacity; CASEWORKER LYNETTE ALLEN, a DCFS Caseworker, sued in her individual capacity; CASEWORKER SHERINA, a DCFS Caseworker, sued in her individual capacity; and MARC D. SMITH, Acting Director of DCFS, sued in his official capacity.  In support, Plaintiffs state as follows:

## INTRODUCTION

1.    The Plaintiffs in this case are well-informed and loving parents who consciously chose, for medical and/or religious reasons, to refuse certain unnecessary medical procedures for their newborn babies – namely the Vitamin K shot, erythromycin eye ointment, a Hepatitis B shot, and, in the case of James and Courtney, the newborn screening tests.

2.    This case puts a spotlight on the traumatic consequences to families, which includes irreparable harm to the sanctity of a family birth, when certain pediatricians in Illinois, most prominently Defendant Dr. Jill Glick, acting in concert with a professional pediatric medical association, specifically Defendant ICAAP, having power and influence over a department of State government, namely DCFS, work jointly or in concert with, and/or form an agreement with State officials employed by DCFS to permit doctors and hospital staff, acting under color of state law, to coerce, threaten, and intimidate parents with DCFS investigations and the potential loss of custody over their children, without any legal basis, following the parents' refusal to consent to unnecessary medical procedures being administered to their perfectly healthy newborns.

3.    In the Defendants' *opinion*, the parents should have allowed the prophylactic medical procedures to be administered to their perfectly healthy newborns, but the parents had reached different informed medical decisions.

4.     Significantly, none of the prophylactic medical procedures in question are mandated by any state or federal law, nor were they required by any demonstrable and/or urgent medical condition of the newborns.

5.     Prior to the birth of their babies, the parents in this Complaint told their pediatricians, and/or obstetricians, and/or medical staff at the hospital that they planned on refusing two or more of the aforementioned unnecessary medical procedures; and, these physicians or medical staff had no issue with the parents' informed medical choices.

6.     In fact, in four of the five cases, doctors and hospital staff actually approved written birth plans ahead of the births, in some instances, expressly notifying the parents that there would be no difficulties for refusing these unnecessary and prophylactic medical procedures.

7.     All of this planning and informed choice was for naught, however, when, soon after the births of their babies, pediatricians at the delivery hospitals, and sometimes hospital staff as well – suddenly and without warning disregarded these parents' birth plans, express wishes, and rights, and instead began to coerce the parents into allowing the pediatricians to administer unwanted and unnecessary medical procedures on their perfectly healthy babies in violation of those parents' constitutional rights, in some instances even using the threat of having the parents' newborn and/or other children removed from the parents' custody.

8.     All of the parents in this case stood their ground, insisting that their informed medical decisions for their newborns be honored.

9.     When the parents stood up for their informed choices and rights guaranteed by the United States Constitution, these same individuals called for DCFS intervention – which DCFS did per its previous agreement with some of the medical professionals and the organization involved – as a means

of further coercing the parents into accepting the unwanted and unnecessary medical procedures and/or force the procedures on the newborns against the parents' consent.

10.    In one case, Pastor Brian and Angela had their perfectly healthy newborn baby daughter taken away from them, just minutes after the birth, for approximately 13 hours at Defendant Silver Cross based solely on these refusals and were subsequently coerced, threatened, and ridiculed for their beliefs. Additionally, after their baby daughter was released back to them and they were allowed to leave the hospital, a DCFS caseworker caused the local police to arrive at Pastor Brian and Angela's home, without notice and involving three squad cars, to "lay eyes" on all five of their children, causing significant trauma to Angela and her children.

11.    In another case, James and Courtney declined a newborn screening testing procedure for their perfectly healthy newborn daughter based on a religious exemption written into Illinois law, which they read aloud and handed to a pediatrician practicing at AMITA Health Adventist Medical Center Hinsdale ("AMITA Health"), only to have this pediatrician ignore the law, sarcastically question the couple's sincerely held religious beliefs and practices that formed the basis for the state law exemption, and use the threat of a DCFS investigation as a coercive measure to obtain medical consent. When these efforts failed, the same pediatrician called and informed DCFS of other refusals James and Courtney had made for Baby H, even though the pediatrician had no genuine issue with those refusals, thus prompting a DCFS investigation and a traumatizing in-hospital situation, including an unconstitutional seizure. A DCFS supervisor later concluded this was *not* a "good faith" report of medical neglect.

12.    In another case, nurses at Silver Cross told Dr. Kosek that refusing the Vitamin K shot and erythromycin eye ointment for their baby would result in a call to DCFS even though the Hospital had preprinted refusal forms which he was required to sign twice. Additionally, a doctor who identified himself as the "Head of Pediatrics" at Silver Cross told Dr. Kosek and Sarah that if they did not accept

the unwanted and unnecessary medical procedures for their perfectly healthy baby girl, the hospital could take Baby K away and they would have to go to court to get their child back.

13.    In another case, a DCFS caseworker repeatedly used threats, including taking away both of Brandon and Emily's children, to bully, coerce, and threaten the couple into accepting unwanted and unnecessary medical procedures for their perfectly healthy baby daughter even going so far as insisting to Hospital staff that the Hepatitis B shot should be done before allowing Emily and Baby L to discharge. The DCFS caseworker further insisted on doing an immediate inspection of Emily and Brandon's home, which resulted in the couple being forced to remain apart and Emily and Baby L being held at the hospital after having been otherwise cleared for discharge.

14.    In another case, a pediatrician working at UC Medical, surrounded and supported by UC Medical employees, threatened Danielle that he was going to take Danielle's perfectly healthy baby girl into "protective custody" and forcibly administer an unwanted and unnecessary medical procedure. This forcible removal of Danielle's newborn baby from her mother's arms nearly took place, but was thwarted at the last minute only after a doula, who had been summoned by Danielle to the hospital, called 911, prompting two Chicago police officers to intervene on Danielle's behalf to prevent the family separation.

15.    In all of the investigations described in this Complaint, the DCFS caseworkers and supervisors determined the reports of medical neglect to be "unfounded."

16.    In each case, despite a DCFS supervisor's later findings that parents, in general and the Plaintiffs specifically, had the right to refuse unnecessary prophylactic medical procedures on behalf of their newborn babies, DCFS investigations were initiated and pursued.

17.    The primary reason the Plaintiffs suffered these abuses – and these abuses continue to this day – is DCFS Procedures 300, Appendix B, Medical Neglect, Section H (hereinafter referred to as

"Procedures 300, Section H"). Procedures 300, Section H – an express written DCFS policy in place at the time of four of the five incidents in this case – declares that a parent's refusal of the Vitamin K shot or the application of erythromycin eye ointment for a newborn is *per se* "medical neglect".

18. Procedures 300, Section H was adopted by high-ranking DCFS officials in concerted action with and under the influence of Defendant ICAAP and Defendant ICAAP physicians such as Defendant Dr. Glick, a private physician employed by Defendant UC Medical who is also a prominent member of Defendant ICAAP's Committee On Child Abuse and Neglect, ("COCAN"), and, also, a member of DCFS's Children and Family Services Advisory Council.

19. On August 2, 2018, DCFS's then-Acting Director B.J. Walker was forced to concede in a letter to DCFS staff and "stakeholders" that this policy impermissibly defined what should be considered "medically necessary" for the purposes of determining whether parents committed medical neglect. Defendant Walker wrote:

> In effect since 2015, this procedure inappropriately identifies what can and should be considered 'medically necessary.' Making that kind of determination falls outside the confines of our statutory and professional mission and judgement.

20. Despite this rescission, certain pediatricians in Illinois continue to use threats of DCFS intervention, and continue to cite this rescinded policy to justify their actions, to coerce parents into accepting unwanted, unnecessary, and prophylactic medical procedures for their perfectly healthy newborn babies based on Defendant ICAAP's express position with Defendant UC Medical going so far as to keep in place an express policy of taking children into "protective custody" to force such prophylactic medical procedures on healthy newborn babies against their parents' will, even post DCFS's rescission. This was the same UC Medical express policy that was used to justify the attempted

seizure of Danielle's baby girl, even though Procedures 300, Section H had been rescinded at the time of her baby's birth.

21.    DCFS's current Acting Director, Mark Smith, is aware, or should be aware, that pediatricians and hospitals in Illinois continue to use this rescinded policy to justify threats and coercive tactics against Illinois parents, including the "protective custody" practices referenced in this Complaint, but he has failed to take any action to stop this from occurring, and, in fact, DCFS continues to open and pursue investigations of parents who refused the unwanted and unnecessary medical procedures, as DCFS did with Danielle, even though her incident occurred long after DCFS rescinded Procedures 300, Section H.

22.    All of the Plaintiffs except Plaintiff Kelly Metke, who sues only for injunctive relief, seek punitive damages and monetary damages for the emotional trauma and mental anguish they suffered.

23.    All Plaintiffs also file suit for injunctive relief and seek to represent a class of Plaintiffs to make certain that these sorts of coercive, oppressive, and unconstitutional practices and policies are permanently enjoined.  No parent should be made to suffer the trauma, upset, and violations that these parents suffered during one of the most significant, meaningful, and otherwise joyous moments in their lives – the birth of their child – merely because certain medical providers and the professional organization to which they belong, in concert with  DCFS officials and employees, disapprove of the informed-medical and perfectly-legal choices the parents made on behalf of their newborn babies involving unnecessary and purely prophylactic medical procedures administered to healthy newborn babies.

## JURISDICTION AND VENUE

24.    This Court has jurisdiction of the action pursuant to the Civil Rights Act, 42 U.S.C. §§ 1983 and 1988; 28 U.S.C. §§ 1331 and 1343(a), and the Constitution of the United States;

25.     Venue is proper under 28 U.S.C. § 1391(b).  Upon information and belief, all Defendants with the exception of Nora Harms-Pavelski reside in this judicial district, and the events giving rise to the claims asserted herein occurred within the District.

## THE PARTIES

### *Plaintiffs*

26.     Plaintiffs James F. Holderman III and Erin Courtney Hill are husband and wife, and have two children, including a daughter, Baby H, born on May 21, 2018 at AMITA Health in Hinsdale, DuPage County, Illinois.

27.     Plaintiffs Pastor Brian Bougher and Angela Bougher are husband and wife, and have five children, including a daughter, Baby B, born on February 7, 2018 at Silver Cross in Joliet, Will County, Illinois.

28.     Plaintiffs Dr. Jason Kosek, a chiropractic doctor, and Sarah Kosek are husband and wife, and have one child, a daughter, Baby K, born on June 14, 2018 at Silver Cross in Joliet, Will County, Illinois.

29.     Plaintiffs Brandon Leitschuh and Emily Vuckovich-Leitschuh are husband and wife, and have two young children including a daughter, Baby L, born on July 31, 2018 at Advocate Christ in Oak Lawn, Will County, Illinois.

30.     Plaintiff Danielle Anderson has two children, including a daughter, Baby G, born on February 5, 2019 at UC Medical in Chicago, Cook County, Illinois.

31.     Plaintiff Kelly Metke lives in Cook County, Illinois, and is pregnant with Baby M, a boy, with an expected due date of January 10, 2020.  She is suing for injunctive relief only.

*Defendants*

### *High-Ranking DCFS Officials and Caseworkers*

32.    Defendant B.J. Walker is the former Acting Director of DCFS.  She is being sued in her individual capacity.

33.    Defendant B.J. Walker was acting under color of state law at all times relevant to this Complaint.

34.    Defendant Nora Harms-Pavelski is the former Deputy Director of Child Protection for DCFS.  She is being sued in her individual capacity.

35.    Defendant Harms-Pavelski was acting under color of state law at all times relevant to this Complaint.

36.    Defendant Dr. Jill Glick is a member of DCFS's Children and Family Services Advisory Council, and Defendant Dr. Glick is also the founder and director of the Multidisciplinary Pediatric Education and Evaluation Consortium, ("MPEEC"), a DCFS-funded "task force" dedicated to the detection, diagnosis, and legal follow-up of child abuse.

37.    Defendant Dr. Glick also a member of Defendant ICAAP, where she is a prominent member of the Committee On Child Abuse and Neglect ("COCAN").

38.    Defendant Dr. Glick is also a pediatrician licensed to practice medicine in the State of Illinois, and Medical Director for Child Advocacy and Protective Services for Defendant UC Medical.

39.    Dr. Glick was acting under color of state law at all times relevant to this Complaint.

40.    Defendant Gina Kitakis is a DCFS Caseworker who interacted with Pastor Brian, Angela, and Baby B, on or about February 7, 2018.

41.    Defendant Kitakis was acting under color of state law at all times relevant to this Complaint.

42.     Defendant Shekeila Williams is a DCFS Caseworker who interacted with Dr. Kosek, Sarah, and Baby K, on or about June 14, 2018.

43.     Defendant Williams was acting under color of state law at all times relevant to this Complaint.

44.     Defendant Caseworker Lynette Allen is a DCFS Caseworker who interacted with Brandon, Emily, and Baby L, on or about July 31, 2018.

45.     Defendant Allen was acting under color of state law at all times relevant to this Complaint.

46.     Defendant Caseworker Sherina is a DCFS Caseworker who interacted with Danielle and Baby G on or about February 5, 2019.

47.     Defendant Sherina was acting under color of state law at all times relevant to this Complaint.

### ***Organizations and Hospitals***

48.     Defendant ICAAP is an organization of approximately 2,300 pediatricians in Illinois, located in Chicago, Cook County, Illinois, and is a chapter of the American Academy of Pediatrics ("AAP"), a not-for-profit corporation formed under the laws of the State of Illinois, located in Chicago, Cook County, Illinois.

49.     Defendant ICAAP was acting under color of law at all times relevant to this Complaint, and is being sued under a *Monell* theory of liability for its actions taken as an organization.  Specifically, ICAAP is being sued based on one or more of its formal and/or informal policies and procedures, the moving force of which were damages to the Plaintiffs.[1]

---

[1] When referencing damages to the "Plaintiffs" in this case, Plaintiff Kelly Metke is not included in this reference, since she is suing for injunctive relief only.

50.    Defendant Silver Cross Hospital is an Illinois non-profit corporation, and Defendant Nurse Kozuch's employer, as well as the employer of Defendant Dr. John Doe (Silver Cross).

51.    Defendant Silver Cross is being sued on a *Monell* theory of liability for one or more of its formal and/or informal policies or procedures, the moving force of which was the injuries to Pastor Brian and Angela and Dr. Kosek and Sarah, and their newborn babies.

52.    Defendant Silver Cross also is being sued on a *respondeat superior* theory of liability as to the conduct of its employees and or agents whose actions are described in this Complaint.

53.    Defendant Advocate Christ Hospital is an Illinois non-profit corporation, and the employer of Defendant John Doe (Advocate Christ).

54.    Defendant Advocate Christ is being sued on a *Monell* theory of liability for one or more of formal and/or informal policies or procedures, the moving force of which was the injuries to Brandon and Emily, and their newborn baby.

55.    Defendant UC Medical is an Illinois non-profit corporation, and the employer of Defendants Dr. Lysouvakon, Dr. Glick, and unnamed employees referred to in this Complaint.

56.    Defendant UC Medical is being sued on a *Monell* theory of liability for one or more of its formal and/or informal policies or procedures, the moving force of which was the injuries to Danielle, and her newborn baby.

57.    Defendant UC Medical is also being sued on a *respondeat superior* theory of liability as to the conduct of its employees and or agents whose actions are described in this Complaint.

### *Medical Professionals*

58.    Defendant Dr. Suzanne G. Schulte is a pediatrician licensed to practice medicine in the State of Illinois who is affiliated with Lurie Children's Hospital of Chicago and was working at AMITA

15

Health Adventist Medical Center Hinsdale when she interacted with James and Courtney on May 21, 2018 and again on May 22, 2018, shortly after the birth of their daughter, Baby H.

59.     Defendant Schulte was acting under color of state law at all times relevant to this Complaint.

60.     Defendant Dr. Miroslaw Skalski is a pediatrician licensed to practice medicine in the State of Illinois who is affiliated with Lurie Children's Hospital of Chicago and was working at Defendant Silver Cross Hospital when he interacted with the Pastor Brian and Angela after the birth of their daughter, Baby B, on February 7, 2018.

61.     Defendant Dr. Skalski was acting under color of state law at all times relevant to this Complaint.

62.     Defendant Dr. John Doe (Silver Cross) is a pediatrician licensed to practice medicine in the State of Illinois who was working at Defendant Silver Cross Hospital when he interacted with Dr. Kosek and Sarah after the birth of their daughter, Baby K, on or about June 14, 2018.

63.     Defendant John Doe (Silver Cross) was acting under color of state law at all times relevant to this Complaint.

64.     Defendant Dr. Poj Lysouvakon is a pediatrician licensed to practice medicine in the State of Illinois and employed by Defendant UC Medical, who interacted with Danielle after the birth of her daughter, Baby G, on or about February 5, 2019.  Defendant Dr. Lysouvakon is also a member of Defendant ICAAP, where he is the chairman of the Committee on Injury Prevention.

65.     Dr. Lysouvakon was acting under color of state law at all times relevant to this Complaint.

66.     Dr. Lysouvakon was acting within the scope of his employment at Defendant UC Medical at all times relevant to this Complaint.

16

67. Defendant Monika Kozuch is a nurse employed by Defendant Silver Cross, who interacted with Pastor Brian, Angela, and Baby B, on February 7, 2018.

68. Defendant Nurse Kozuch was acting under color of state law, in concert with DCFS and within the scope of her employment at Defendant Silver Cross at all times relevant to this Complaint.

### *Official Capacity Claim for Injunctive Relief*

69. Defendant Marc D. Smith is the Director of DCFS.

70. He is being sued in his official capacity for injunctive relief only.

### BACKGROUND

#### A. Legal Rights at Issue

71. The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." The Supreme Court has long recognized that the Amendment's Due Process Clause, like its Fifth Amendment counterpart, guarantees more than fair process.

72. The Clause also includes a substantive component that provides heightened protection against government interference with certain fundamental rights and liberty interests. *Troxel v. Granville*, 530 U.S. 57, 65 (2000).

73. The liberty interest at issue in this case – the interest of parents in the care, custody, and control of their children – is one of if not *the* "oldest of the fundamental liberty interests recognized by th[e] [Supreme] Court." *Troxel,* 530 U.S. 65; *see also Stanley v. Illinois,* 405 U.S. 645, 651 (1972) ("It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children 'come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements'" (citation omitted)); *Wisconsin v. Yoder,* 406 U.S. 205, 232 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the

upbringing of their children is now established beyond debate as an enduring American tradition"); *Quilloin v. Walcott,* 434 U.S. 246, 255 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected"); *Parham v. J. R.,* 442 U.S. 584, 602 (1979) ("Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. Our cases have consistently followed that course."); *Santosky v. Kramer,* 455 U.S. 745, 753 (1982) (discussing "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child"); *Washington v. Glucksberg,* 521 U.S. 702, 720 (1997) ("In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the 'liberty' specially protected by the Due Process Clause includes the righ[t] ... to direct the education and upbringing of one's children.")

74. Parents generally have a fundamental liberty interest in refusing medical procedures for their minor children. "The right of family association includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state." *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000) (citing *Parham*, 442 U.S. at 602); see also *Cruzan v. Director, Mo. Dep't of Health*, 497 U.S. 261, 282 (1990); *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997); *Meyer v. Nebraska*, 262 U.S. 390 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925). Such parental decisions may be overruled only where there is a reasonable belief that "life or limb is in immediate jeopardy." *Brokaw v. Mercer County*, 235 F.3d 1000, 1010 (7th Cir. 2000).

75. Caseworkers, doctors, and hospitals acting with DCFS authority or medical organizations entwined with DCFS's management and acting in concert with DCFS, may not exert pressure, or cause pressure to be exerted, under color of law, on parents to allow medical personnel to force their minor children to undergo unnecessary medical procedures. As the Seventh Circuit has explained, exerting

18

pressure "to obtain a result to which the party applying the pressure had no right" is an example of duress and violates the substantive due process rights of the parents. *Hernandez , supra*, 657 F.3d at 482.

76.     Seizures of babies by medical personnel that occur without probable cause, a court order, or "exigent circumstances" similarly violate the Fourth Amendment. *Id*. at 474-75. Parents' fundamental liberty interest in the in the care, custody, and management of their children means that "[o]fficials may remove a child from the custody of its parent without prior judicial authorization *only* if the information they possess at the time of the seizure is such as provides reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury." *Wallis*, supra, 202 F.3d at 1138; (citing *Good v. Dauphin Cnty. Soc. Servs. for Children & Youth*, 891 F.2d 1087, 1093 (3d Cir. 1989) (citing *Mincey v. Arizona*, 437 U.S. 385, 393 (1978)); *see also Hurlman v. Rice*, 927 F.2d 74, 80 (2d Cir. 1991) (collecting cases).

77.     In the clearly-established precedent of *Hernandez v. Foster*, 657 F.3d 463 (7th Cir. 2011), the Seventh Circuit stated:

> A family's right 'to remain together without the coercive interference of the awesome power of the state' is 'the most essential and basic aspect of familial privacy.' *Heck, Michael C. v. Gresbach*, 526 F.3d 1008, 524 (7th Cir. 2008) (quoting *Duchesne v. Sugarman* , 566 F.2d 817, 825 (2d Cir. 1977)). The fundamental right to familial relations is an aspect of substantive due process. *E.g., Silven v. Ind. Dep't of Child Serv.*, 635 F.3d 921, 928 (7th Cir. 2011). *Id*. at 478.

78.     Thus, pursuant to well-established Constitutional authority that includes but is not limited to the above authorities, State-created *per se* policies that interfere with a family's liberty interest in familial privacy and remaining an intact family, that deny parents' fundamental rights to decline unnecessary and purely prophylactic medical procedures for their minor children, and that result in

unlawful searches and seizures violate the Fourth and Fourteenth Amendments to the United States Constitution.

### B. The Refused Medical Procedures and Their Risks

#### 1. *IM Vitamin K Shot*

79. The intramuscular Vitamin K shot ("Vitamin K shot") is a prophylactic injection of a synthetic form of Vitamin K (given to newborns often nearly simultaneously to the Hepatitis B shot) as a means of preventing what the medical community today terms Vitamin K Deficiency Bleeding ("VKDB"), formerly known as Hemorrhagic Disease of the Newborn.

80. Newborns who develop VKDB are categorized based on the time of VKDB development: Early (during the first 24 hours of birth), Classical (24 hours to 7 days after birth), and Late-onset (7 days to 12 weeks after birth) (*https://pediatrics.aappublications.org/content/112/1/191*).

81. A study referenced in the Winter 2019 ICAAP Newsletter (*http://illinoisaap.org/wp-content/uploads/37-1_Winter_Newsletter_ICAAP1218_FINAL_REV-1-25-19.pdf*) reported rates of VKDB over a two-year period in Malaysia, an area where 96% of infants are breastfed and 83% are not given prophylaxis. The rates of Early, Classical, and Late-onset VKDB were 1/7000, 1/4000, and 1/8000, respectively (*https://www.zora.uzh.ch/id/eprint/134095/1/MihatschWA_2016.pdf*).

82. Infants with risk factors for developing VKDB include those with certain genetic or hereditary conditions or diseases, liver diseases, maternal intake of blood-thinning drugs, poor or delayed feeding, or immediate cord clamping/cutting.

83. The statistics and study cited in the Winter 2019 ICAAP Newsletter necessarily include newborns and babies where risk factors could be involved. Healthy babies without any risk factors, such as the babies in this case, are at significantly less risk of being one of the babies to spontaneously develop VKDB as compared to the statistics referenced above, which in itself constitutes very little risk.

84. The health risks for an infant who suffers from VKDB include intracranial hemorrhage (ICH) or gastrointestinal (GI) bleeding if the VKDB is left undiagnosed and untreated.

85. *None* of the Plaintiffs' newborn babies had any of these risk factors at birth, and they all remain healthy, happy children to this day.

86. The assumption that all newborns have Vitamin K deficiencies is based on an arguably erroneous premise because many aspects of newborn development, including hemostasis, remain completely unknown to doctors and medical science. The standard for the deficiency is therefore guesswork, inapplicable, and/or unable to be established for any particular newborn.

87. With reference to the above statement, hemostasis is defined as: "The stoppage of bleeding or hemorrhage. Also, the stoppage of blood flow through a blood vessel or organ of the body." (*https://www.medicinenet.com/script/main/art.asp?articlekey=15839*)

88. However, what has been established is the fact that there are safety concerns and risks associated with having the Vitamin K shot injected into a baby. These include:

> (a)  The Vitamin K shot contains an artificial form of Vitamin K called phytonadione at a very high dose, which may have negative effects on a newborn baby unlike food-based Vitamin K called phylloquinone or doses administered orally, repeatedly, and spread out over a longer length of time;

> (b)  Certain formulations of Vitamin K shots contain levels of aluminum, a known neurotoxin; and/or polyoxyethylated fatty acid derivative, an emulsifier made with Ethylene Oxide (see "Characterizing the Severe Reactions of Parenteral Vitamin K1" *https://journals.sagepub.com/doi/full/10.1177/1076029616674825*), which weakens the blood brain barrier; and/or benzyl alcohol, a preservative that is known to cause fatal gasping syndrome in a percentage of newborns *(https://www.accessdata.fda.gov/drugsatfda_docs/label/2003/012223Orig 1s039Lbl.pdf; https://medlibrary.org/lib/rx/meds/vitamin-k1-1/).*

> (c)  The Vitamin K shot carries with it the highest warning a drug can have called a "Boxed Warning" or "Black Box Warning" for risk of death; and, studies of carcinogenicity, mutagenesis or impairment of fertility have not been conducted with Vitamin K Injection (https://www.aafp.org/afp/2010/0201/p298.html *and*

*https://en.wikipedia.org/wiki/Boxed_warning* (citing 21CFR201.57 Subpart B (a)(4))).

(d) A shortage of Vitamin K shots in 2014 led the American Academy of Pediatrics to adopt a resolution to advocate for the Food and Drug Administration to have "back-up" procedures in place to eliminate shortages because "[s]ome hospitals have resorted to administration of adult preparations of Vitamin K which contain benzyl alcohol and is contraindicated for newborns" *(https://www.aap.org/en-us/advocacy-and-policy/federaladvocacy/Documents/COFGA%20Agenda%20Book%20May%202015.pdf).*

89. The package insert (https://www.accessdata.fda.gov/drugsatfda_

*docs/label/2003/012223Orig1s039Lbl.pdf)* of a popular Vitamin K shot states under the heading

"ADVERSE REACTIONS":

Deaths have occurred after intravenous and intramuscular administration. (See Box Warning.) Transient 'flushing sensations' and 'peculiar' sensations of taste have been observed, as well as rare instances of dizziness, rapid and weak pulse, profuse sweating, brief hypotension, dyspnea, and cyanosis. Pain, swelling, and tenderness at the injection site may occur. The possibility of allergic sensitivity, including an anaphylactoid reaction, should be kept in mind. Infrequently, usually after repeated injection, erythematous, indurated, pruritic plaques have occurred; rarely, these have progressed to scleroderma-like lesions that have persisted for long periods. In other cases, these lesions have resembled erythema perstans. Hyperbilirubinemia has been observed in the newborn following administration of phytonadione. This has occurred rarely and primarily with doses above those recommended.

90. Alternatives to the Vitamin K shot exist for newborns with risk factors or for whose mothers choose to supplement: Oral Vitamin K drops are used in Europe to prevent VKDB with great efficacy, i.e. the incidence was 0-0.9 in 100,000 (https://www.ncbi.nlm.nih.gov/pubmed/8922069).

91. Some mothers, uncertain of their own Vitamin K intake, concerned about the levels in their breastmilk, and who also refuse the Vitamin K shot, choose to supplement their breast milk with the oral form of Vitamin K via liquid drops during one of the baby's first feedings and periodically thereafter.

92. Additionally, some parents who object to the Vitamin K shot cite the lack of scientific evidence to support the assumption that all newborns have a Vitamin K deficiency at birth or during the

first months of life or, for that matter, at any time thereafter, other than that which is prevented through dietary intake of Vitamin K (similar to other vitamins and nutrients) through breast milk, formula bottle feedings, and/or oral Vitamin K supplementation.

### 2. *Erythromycin Eye Ointment*

93. Erythromycin eye ointment may be applied to a newborn's eyes when there is a risk that the newborn has been exposed to certain bacteria and/or viruses during childbirth.

94. Erythromycin eye ointment is applied to a newborn's eyes to prevent an eye infection in a newborn called ophthalmia neonatorum (meaning essentially "acute inflammation of the eyes of a newborn from infection"). An ophthalmia neonatorum infection can cause the conjunctiva to become inflamed and damaged during the first month of a baby's life. The conjunctiva is a clear, thin membrane that covers part of the front surface of the eye and the inner surface of a baby's eyelids. Left totally untreated, ophthalmia neonatorum can cause blindness in a small percentage of newborns who develop an active eye infection.

95. A newborn may develop eyesight-threatening ophthalmia neonatorum from exposures during childbirth if the mother has an active gonorrhea or chlamydia infection at the time of birth.

96. Newborn babies born to uninfected mothers are at *zero* risk of exposure during child birth to these bacteria and/or viruses which cause eyesight threatening ophthalmia neonatorum.

97. Additionally, newborns born via caesarean section are at *zero* risk of exposure during childbirth to the bacteria and/or viruses which may cause ophthalmia neonatorum.

98. There are health risks to a baby that are associated with the administration of erythromycin eye ointment to the baby's eyes.

99. These health risks include a baby suffering pain, swelling, eye irritation, and temporary loss of vision which may inhibit initial breast feedings and mother-infant bonding.

23

100. Additionally, unnecessary use of antibiotics may lead to diminished effectiveness of the antibiotics in future applications when needed.

101. Antibiotic resistance is a growing problem that is well-acknowledged within the medical community.

### 3. *Hepatitis B Shot*

102. The Hepatitis B shot is promoted as a preventative measure that may confer a degree of immunity to the Hepatitis B virus (HBV) and, therefore, possibly prevent a Hepatitis B infection, which might result in cancer decades later.

103. According to the Centers for Disease Control ("CDC") website, "Hepatitis B is a liver infection caused by the Hepatitis B virus (HBV). Hepatitis B is transmitted when blood, semen, or another body fluid from a person infected with the Hepatitis B virus enters the body of someone who is not infected."

104. Because the HBV is transmitted by exposure to infectious blood or body fluids, individuals at highest risk of contracting Hepatitis B include individuals participating in high-risk sexual behavior, intravenous drug users, healthcare workers working in high-risk environments, and babies born to HBV infected mothers.

105. According to the CDC, in 2008, the mortality rate for Hepatitis B was 0.5 deaths per 100,000 population.

106. The mothers in this case were tested for the HBV shortly before their baby's birth, and they were all found to be negative for the virus.

107. Additionally, the Plaintiffs' newborn babies did not have any of the risk factors for HBV exposures.

108. No Illinois law, rule, or regulation requires the forced administration of a Hepatitis B shot to newborn babies against the express will of a parent or guardian, nor was there one in place at the time of the incidents in question.

109. Even though mothers are routinely screened and there is *zero* risk of mother-to-baby transmission during childbirth if the mother does not have Hepatitis B, the CDC recommended in 1991 that all newborns receive the Hepatitis B shot.

110. There are health risks to a baby associated with the Hepatitis B shot. According to the package insert of a currently administered Hepatitis B shot, those include:

> In healthy infants and children (up to 10 years of age), the most frequently reported systemic adverse reactions (>1% injections), in decreasing order of frequency, were irritability, fever, diarrhea, fatigue/weakness, diminished appetite, and rhinitis (https://www.fda.gov/media/74274/download).

111. Furthermore, according to the package insert:

> The following additional adverse reactions have been reported with use of the marketed vaccine... Nervous System Disorders Guillain-Barré syndrome; multiple sclerosis; exacerbation of multiple sclerosis; myelitis including transverse myelitis; seizure; febrile seizure; peripheral neuropathy including Bell's Palsy; radiculopathy; herpes zoster; migraine; muscle weakness; hypesthesia; encephalitis Skin and Subcutaneous Disorders Stevens-Johnson syndrome; alopecia; petechiae; eczema Musculoskeletal and Connective Tissue Disorders Arthritis Pain in extremity Blood and Lymphatic System Disorders Increased erythrocyte sedimentation rate; thrombocytopenia Psychiatric Disorders Irritability; agitation; somnolence; Eye Disorders Optic neuritis; tinnitus; conjunctivitis; visual disturbances; uveitis; Cardiac Disorders Syncope; tachycardia.

112. DCFS has never had a written policy that would indicate the refusal of a parent or guardian to have a Hepatitis B shot administered to their newborn baby be investigated as "medical neglect."

113. However, upon information and belief, there has been and continues to be a regular practice among certain Illinois pediatricians, hospital staff, and, even, DCFS caseworkers, of threatening parents or guardians who refuse to allow the administration of the Hepatitis B shots to newborn babies at birth

with DCFS intervention and/or the seizure of children, or to call to report these parents or guardians and open a "medical neglect" investigation based, in whole or in part, on the refusal of the Hepatitis B shot at birth.  This has been and continues to be often done in conjunction with the threats following refusals of a Vitamin K shot and erythromycin application, which was considered to be *per se* medical neglect upon a parent's refusal of these prophylactic medical procedures, pursuant to Procedures 300, Section H.  Even though this formal policy has been rescinded, the practices described above continues nevertheless.

   **4.**     ***Newborn Screening Test***

   114. Newborn screening tests, "NBS", are an ever-growing number of tests for genetic, metabolic, and congenital anomalies that the Illinois Department of Public Health "require[s] that every newborn be subjected to," most often without the informed consent of the newborn's parent.  410 ILCS 240/1.

   115. Newborn screening tests are usually performed within the first 24 to 48 hours of a baby's life.

   116. The core portion of the newborn screening test is the newborn blood screening.

   117. The newborn blood screening portion of the test involves the taking, testing, and storage of a baby's blood and/or a baby's personal genetic information.

   118. A newborn's blood is acquired though a minimally invasive, but painful, procedure whereby the baby's heel is pierced to extract five to six drops of blood which are squeezed out and placed on a Dried Blood Spot card ("DBS card").

   119. In Illinois, a newborn screening program began in 1965 with testing for a metabolic disorder known as PKU (phenylketonuria).  The NBS now encompasses screenings prior to a newborn

baby's discharge from a hospital or birthing center for more than 40 disorders, including newborn hearing (2002) and critical congenital heart disease (2013).

120. An analysis of the newborn screening program suggests that "on average, there are more than 50 false-positive results for every true-positive result identified through newborn screening in the United States." *(https://www.ncbi.nlm.nih.gov/pubmed/10891024).*

121. A June 2016 article in the American Society of Law, Medicine & Ethics by Dr. Norman Frost states:

> Over-enthusiastic newborn screening has often caused substantial harm and has been imposed on the public without adequate information on benefits and risks and without parental consent. This problem will become worse when genomic screening is implemented.

122. The Newborn Metabolic Screening Act (410 ILCS 240), requiring the administration of the newborn screening tests to all babies in Illinois upon birth, contains a clear religious exemption for refusing this NBS tests.

## C.    Illinois' Definition of "Medical Neglect" and "Temporary Protective Custody"

123. DCFS has implemented DCFS Rule 300: Allegation 79, which defines "Medical Neglect" as follows:

> Lack of medical or dental treatment for a health problem or condition that, if untreated or not treated as prescribed, could become severe enough to constitute serious or long-term harm to the child; lack of follow through on a reasonable prescribed medical or dental treatment plan for a condition that could become serious enough to constitute serious or long-term harm to the child if the treatment or treatment plan goes unimplemented…. It must be verified that the child has/had an untreated health problem, or that a prescribed treatment plan was implemented. Such verification must come from a physician, registered nurse, dentist, or by a direct admission from the alleged perpetrator. It must further be verified by a physician, registered nurse or dentist that the problem or condition, if untreated, could result in serious or long-term harm to the child.

124. Under DCFS's definition of "medical neglect," among other elements, it must be shown that the specific child in question has a "health problem or condition . . .if untreated, could result in serious long-term harm to the child."

125. DCFS Procedures 300, Section H contradicts how "medical neglect" is defined by Rule when it codified into a formal, written policy a blanket diagnosis of what constitutes "medical neglect" in the cases of all newborn babies in Illinois, regardless of the circumstances of a particular birth, but, more importantly, the policy was implemented in violation of Illinois' parents Constitutional rights to make informed medical decisions on behalf of their minor children.

126. Illinois law allows for a child to be taken into "temporary protective custody," but only in extreme cases, based on the particular circumstances surrounding an individual case.

127. The Legislature defines "Temporary Protective Custody" as follows:

> An officer of a local law enforcement agency, designated employee of [DCFS], or a physician treating a child may take or retain protective custody of the child without the consent of the person responsible for the child's welfare, if (1) he has reason to believe that the child cannot be cared for at home or in the custody of the person responsible for the child's welfare without endangering the child's health or safety; and (2) there is not time to apply for a court order under the Juvenile Court Act of 1987 [705 ILCS 405/1-1 et. seq. for temporary custody of the child. . . 325 ILCS 5/5.]

128. DCFS Rule 300.120 clarifies this definition to require that the child's caregiver "presents an imminent danger to the child's life or health."

129. Thus, any physician attempting to take or actually taking "temporary protective custody" of a child must show that he or she has "reason to believe that the child cannot be cared for at home or in the custody of the person responsible for the child's welfare without endangering the child's health or safety," *i.e.*, that the caregiver presents an "imminent danger to the child's life or health," *and* lack of time to apply for a court order. It also must be remembered that this statute must also be consistent with the Fourth Amendment's standard for justifying the seizures of children, *i.e.*, there must be a court order

supported by probable cause, or "exigent circumstances, meaning that state officers have reason to believe that life or limb is in immediate jeopardy." *Hernandez*, supra, 657 F.3d at 474.

**D.** **The Formation of DCFS Procedures 300, Section H**

**1.** ***The Initial 2015 Policy and Subsequent Concern by Pediatricians***

130. While there may be rare occasions when the Vitamin K shot, the erythromycin eye ointment, and/or the Hepatitis B shot are medically necessary for newborn babies based on the particular circumstances of a birth or symptoms of a particular baby, these procedures are otherwise unnecessary and purely prophylactic in nature.

131. Nevertheless, in 2015, DCFS established an express policy for investigating parents or guardians who chose to refuse the Vitamin K shot and/or the erythromycin eye ointment for their newborn baby, directing DCFS staff that these medical procedures are to be considered *per se* "medically necessary" and to investigate reports of parental refusal as "medical neglect."

132. This policy could be found in Procedures 300, Section H. Procedures 300, Section H, stated:

> For purposes of child protection services, the administration of silver nitrate or ophthalmic solution and Vitamin K shots or pills to newborns is considered medically necessary. Calls received at SCR concerning a parent or guardian denying consent for the administration of these treatments shall be taken as reports of medical neglect.

133. DCFS Procedures 300, Section H was intended as part of a larger procedural guide for DCFS employees in how to manage and investigate accusations of child abuse and neglect.

134. Defendant Dr. Glick, a pediatrician, a prominent member of Defendant ICAAP, specifically ICAAP's COCAN, and a member of DCFS's Children and Family Services Advisory Council, was, in 2014 and 2015, charged by her position with DCFS as being a "reviewer" of DCFS's "investigational protocol procedures 300," wherein Procedures 300, Section H is contained.

135. DCFS's Children and Family Services Advisory Council is intended to have 21 members, who are appointed by the Illinois Governor. Among the Children and Family Services Advisory Council's statutory responsibilities are:

> preparing and providing recommendations that identify areas of needed improvement regarding the investigation of allegations of abuse and neglect to children in Department of Children and Family Services' licensed child care facilities and institutions and transitional living programs, as well as needed changes to existing laws, rules, and procedures of the Department of Children and Family Services, and overseeing implementation of its recommendations.

136. Defendant Dr. Glick knew there was no medical or legal basis to consider a parent or guardian's refusal of a Vitamin K shot or the application of erythromycin eye ointment to be medical neglect in every case of a parent's refusal. Nevertheless, Defendant Dr. Glick developed, in concert with Defendant ICAAP and other high-ranking DCFS officials, such a DCFS policy, believing that Illinois pediatricians and hospitals should use Procedures 300, Section H to coerce parents into accepting unwanted and prophylactic medical procedures, with the threat of having a DCFS-authorized intervention and/or DCFS open a full "Medical Neglect" investigation, if the parents' refusals continued.

137. Although the Procedures 300, Section H policy, established in 2015, was published for internal DCFS use only, ultimately Defendant Dr. Glick, certain Illinois pediatricians, including influential and top-ranking pediatrician members of Defendant ICAAP, Defendant ICAAP officials, and some Illinois hospitals, agreed to take this internal policy and give it widespread publication to many Illinois pediatricians and hospitals so that these pediatricians and hospitals could use this policy – which carried with it the force of state power – to coerce parents and even seize their children upon refusal of the Vitamin K shot and/or erythromycin eye ointment.

138. However, in 2017, some members of the Perinatal Advisory Committee of the Illinois Department of Public Health ("PAC"), and other Illinois pediatricians were concerned about using

Procedures 300, Section H, and desired further explanations and/or discussions with DCFS. These PAC members and other Illinois pediatricians were troubled because prior to the development of this internal 2015 DCFS policy, parents or guardians who refused erythromycin eye ointment when there was no risk of eye-sight-threatening infection, or the Vitamin K shots for their healthy newborn babies, simply signed an informed-consent refusal form and were allowed to choose to deny the administration of such prophylactic and medically unnecessary procedures.

139. It is worth noting that in some of the cases described in the Complaint, after bullying and coercing failed to compel the Plaintiffs into accepting these unwanted and unnecessary medical procedures, the medical hospital staff gave the parents pre-printed informed-consent refusal forms regarding the Vitamin K shot, erythromycin eye ointment, and the Hepatitis B shots, which they agreed to sign. The fact that the hospitals would even have these pre-printed forms indicates that there was no good-faith basis to believe the parents were committing "medical neglect," since no reasonable doctor or hospital would allow such informed-consent refusal forms if they truly believed the refusal of such medical procedures constituted child abuse.

140. Furthermore, these PAC members and other Illinois pediatricians also were concerned whether Procedures 300, Section H would require all Illinois pediatricians, doctors, and other medical staff, as "mandated reporters" of child abuse under Illinois law, to report the Vitamin K shot refusal or erythromycin eye ointment refusal as "medical neglect," regardless of the particular circumstances of the case or the medical personnel's own medical opinion about the necessity or risks of such procedures.

141. By May 2017, the chairman of the PAC, Dr. Beau Batton, requested a meeting with DCFS officials on this specific issue to address inconsistencies in how hospitals across Illinois were responding when parents refused these prophylactic procedures.

142.  In June 2017, DCFS's then-Medical Director, Dr. Paula Jaudes, who is now deceased, and Defendant Harms-Pavelski, then-Deputy Director of Child Protection for DCFS, spoke at the PAC meeting and stated to the PAC members that, after consulting with DCFS's legal department and the DCFS administration, DCFS had decided that a Vitamin K shot refusal was *not* to be considered *per se* medical neglect, and was not a mandated call to DCFS, and that, further, if doctors or medical staff were to make a call to DCFS based solely on a parent refusal of those medical procedures, then there would be no DCFS investigation conducted.

143.  Certain high-ranking Defendant ICAAP pediatricians, including Defendant Dr. Glick, vehemently disagreed with the decision that DCFS would not investigate parents following their refusal of the Vitamin K shot and erythromycin eye ointment as announced by Defendant Harms-Pavelski and Dr. Jaudes at the PAC meeting.

144.  Defendant Dr. Glick worked in concert with high-ranking Defendant ICAAP officials working on behalf of the organization and certain ICAAP pediatricians to jointly engage with DCFS officials to reverse that decision and enforce the Procedures 300, Section H policy so that a parent's refusal of a Vitamin K shot or the application of erythromycin eye ointment would be taken as a report of *per se* "medical neglect" in every case and investigated by DCFS as such.

145.  These pediatricians and Defendant ICAAP, as an organization, further pressed for an agreement with DCFS officials whereby these parents would be "indicated" *child abusers*, even though these pediatricians and Defendant ICAAP knew there was no legal basis to make such claims.

146.  Defendant Dr. Glick and certain other Illinois pediatricians recognized that parents who were refusing Vitamin K were, in fact, making these choices with careful consideration.  In a June 20, 2017 email to Dr. Jaudes, Defendant Dr. Glick noted, "the parents are educated but have their own perspective as to why they don't want the Vit. K."

147. Moreover, Defendant Dr. Glick recognized that parents may also have religious reasons for refusing Vitamin K, while also presuming that all newborn babies are born Vitamin K deficient. "Only our higher being knows why babies are Vitamin K deficient," she noted.

148. However, despite recognizing that parents may have religious reasons for refusing Vitamin K and that "only our higher being knows why babies are Vitamin K deficient," Defendant Dr. Glick nevertheless proclaimed, "Refusal of Vitamin K is not a religious matter," and continued to make certain DCFS reverse its refusal to investigate parents' Vitamin K shot refusals as *per se* medical neglect.

149. In fact, many of these same physicians, including Defendant Dr. Glick, working in concert with and supported by Defendant ICAAP officials working on behalf of the organization took steps to implement a policy with DCFS officials that when parents refuse Vitamin K shots their newborn babies would be taken into "protective custody" and have the shots administered to the newborns against the will of their parents or guardians.

150. Specifically, Defendant Dr. Glick took steps to implement this policy position in an email sent on August 10, 2017 to Defendant Harms-Pavelski and other high-ranking DCFS officials. This email also included other Illinois pediatricians, including high-ranking members of Defendant ICAAP's COCAN, and Defendant ICAAP officials as support.

151. In this email, Defendant Dr. Glick noted that she and the other high-ranking members of COCAN were "all in agreement" that COCAN's "collective goal" would be for DCFS to allow Illinois pediatricians to take newborns into "protective custody", away from their parents or guardians, and then forcibly administer a Vitamin K shot to the newborn babies against the express wishes of the parents.

152. Defendant Dr. Glick recognized the obvious illegality of such an extreme position and/or was deliberately indifferent toward the Constitutional rights of the parents and children who would be effected by this policy. In fact, in this same August 10, 2017 email, Defendant Dr. Glick noted this was

a "major crossing of a very different threshold." Yet, Defendant Dr. Glick, in concerted effort with high-ranking pediatricians and officials of Defendant ICAAP, deliberately and/or in reckless disregard of the Constitutionality of such a policy, nevertheless sought to have the policy implemented at DCFS anyway.

153. Defendant Dr. Glick and Defendant ICAAP pediatricians and officials also took the position and sought to have a DCFS policy put in place that these parents and guardians, by refusing Vitamin K shots, would be *per se* "indicated" as child abusers after the fact. Defendant Dr. Glick stated that this extreme position was needed, not because the Vitamin K shot was medically necessary nor because the refusal to administer the shot was medical neglect or child abuse, but instead, because parents and guardians were *beginning to distrust the medical community's expertise*, saying that this was "not just about Vitamin K," and that "*a very clear message*" needs to be sent to these parents and guardians, "who do not see *the medical community as the expert*."

154. In this August 10, 2017 email, Defendant Dr. Glick also noted the critical role played by DCFS's Procedures 300, Section H policy in her hospital, Defendant UC Medical, drafting, creating, and enforcing its own Vitamin K shot and erythromycin policy which similarly recognized parents' refusal of the Vitamin K shot as "medical neglect." Defendant Dr. Glick wrote:

> Currently my hospital has a committee meeting to write a formal protocol-
> in great part due to DCFS recognizing this as child medical neglect, this
> helped frame the paradigm to be a situation of neglect and not to go towards
> a waiver as some hospitals are doing.

155. On September 25, 2017, in a letter written on Defendant ICAAP letterhead by the co-chairpersons of COCAN, and addressed to Defendant Walker, former Acting Director of DCFS, the COCAN co-chairs wrote that it was the "consensus" of the COCAN members that Vitamin K shot refusals be considered "medical neglect" and "should continue to be investigated as such." The September 25, 2018 letter, on which Dr. Jaudes was copied, requested a meeting with DCFS officials.

34

156. At about this same time, Defendant Dr. Glick wrote an undated letter ostensibly to the COCAN co-chairs and the "ICAAP Administration", titled, "DCFS response and management of hotline reports for Vitamin K refusal by parents." In this undated letter, Defendant Dr. Glick noted that she attended a recent COCAN meeting, and that, "As a group, we agree that refusal of necessary treatment at birth of Vitamin K deficiency is negligent. We support our child welfare decision to define Vitamin K refusal as a reportable act."

157. Defendant Dr. Glick noted in her undated letter that DCFS had made its recent decision to *not* investigate Vitamin K shot refusals based, in part, on the advice of neonatologists on PAC. But, Defendant Dr. Glick said in this letter that she felt her group of child-abuse pediatricians were in a superior position to the neonatologists to determine what is considered "medical neglect." Defendant Dr. Glick also referred to the Illinois child-abuse pediatricians, rather than the neonatologists, as "the recognized experts in child abuse and neglect," and requested a meeting with DCFS administrators to discuss "what the response of the medical community as well as the child welfare system should be to hotline reports of Vitamin K refusal."

158. Additionally, Defendant Dr. Glick specifically supported coercing parents or guardians who refuse Vitamin K with threat or reality of DCFS investigations. She wrote that the refusal of Vitamin K is a "poor choice" that can be countered with education, but also "through the impact of child welfare interventions," which she concluded "can be a very powerful incentive for parents not to put their child at risk."

159. The September 25, 2017 ICAAP letter and the undated letter by Defendant Dr. Glick were sent to Dr. Jaudes in an email on September 29, 2017. As part of that transmission, a representative for Defendant ICAAP simultaneously and strategically sent out the letters to dozens of Illinois pediatricians

35

at various Illinois hospitals informing them of Defendant ICAAP's policy position. The ICAAP representative's email stated:

> Attached please find the letter to DCFSsent [sic] on behalf of COCAN regarding their decision to define Vitamin K refusal as a reportable act, as well as Dr. Glick's letter regarding DCFS [sic] response and management of hotline reports for Vitamin K refusal by parents.

160. Dr. Jaudes shared these letters with Defendant Harms-Pavelski.

161. The September 25, 2017 letter on Defendant ICAAP letterhead and the context of its transmission with a "cc:" to dozens of Illinois pediatricians was essential to the implementation and, ultimately, the enforcement of DCFS's Procedures 300, Section H policy.

162. Defendant Harms-Pavelski and Dr. Jaudes knew from their previous examination of this issue, including the consultation of DCFS's legal team and Illinois neonatologists, that there was no basis to conclude that parents who refuse Vitamin K shots for their newborn babies were committing "medical neglect" solely as a result of that refusal. Yet, Defendants Harms-Pavelski and Dr. Jaudes decided to act and work in concert with Defendant Dr. Glick, Defendant ICAAP, and certain Illinois pediatricians and notified the leadership of the PAC, in an October 24, 2017 email Dr. Jaudes wrote, "We are asking all hospital [sic] to report the refusal as medical neglect."

163. Upon information and belief, this official instruction was then circulated to Illinois hospitals, including to Lurie Children's Hospital, Defendant UC Medical, Defendant Silver Cross, and Defendant Advocate Christ and the Defendant doctors named in this Complaint which are affiliated with, have privileges at, and/or work at one or more of these hospitals.

164. Upon information and belief, an agreement was reached by and among Defendant ICAAP, DCFS officials, and certain pediatricians, including Defendant Dr. Glick, to use the authority of DCFS to create the policy so that other pediatricians such as the Defendant doctors, as well as certain hospitals,

such as the Defendant hospitals, could use this same DCFS authority to further advance and carry out this unconstitutional policy at the hospitals.

165. The doctor and hospital Defendants agreed to respond to parent refusals of these prophylactic medical procedures at issue herein as *per se* "medical neglect" to justify and initiate DCFS investigations. Additionally, through this arrangement, the doctors and hospitals could coerce parents into accepting Vitamin K shots and the erythromycin eye ointment against the parents' will and, in doing so, be cloaked with DCFS's state authority and immunity.

166. Even though the written policy did not expressly state so, high-ranking DCFS officials, including but not limited Defendant Dr. Jill Glick, also knew that this policy could be used to take babies into "protective custody," *i.e.*, the forced removal of a baby from the baby's parents at the hospital so that certain medical procedures, most specifically the Vitamin K shot, could be administered to the babies against the parents' express will and, in some cases, against the religious beliefs and practices of the baby's parents. At the time that these high-ranking DCFS officials, including but not limited to Defendant Dr. Glick took this action, they knew this practice was unconstitutional and that it further was not supported by Illinois' definition of what is necessary to legally take a child into "protective custody," but these officials implemented the policy anyway.

167. Certain pediatricians, hospitals, including the Defendants in this case, along with Defendant ICAAP and DCFS officials, who include Defendant Harms-Pavelski and Dr. Jaudes, formed this agreement to deny parents these fundamental choices, and took overt acts ensuring the implementation and enforcement of Procedures 300, Section H, knowing it was unconstitutional. They further took overt acts to ensure that this illegal and unconstitutional policy served their intended purpose, even going so far as to create policy for forced removal of babies so that prophylactic medical procedures could be administered to babies against the will of the baby's parent or guardian.

37

168. Neither the internal policy first developed in 2015 nor the October 24, 2017 directive from DCFS to the pediatricians and hospitals complied with the legally-mandated safeguards of the Illinois Administrative Procedures Act, which includes but is not limited to following the Joint Committee on Administrative Rules process, public notice, and public hearings.

169. At the time that Defendant Harms-Pavelski and Dr. Jaudes agreed to send out the October 24, 2017 email, Defendant Harms-Pavelski and Dr. Jaudes apparently did not even consult then Defendant DCFS Acting Director, Defendant Walker, before advancing this directive.

170. Nevertheless, Defendant Walker became aware of the directive in November of 2017, and officially adopted the directive as the official policy of DCFS, although one not subject to the normal administrative-rule-making process, as described above.

171. As with the previous policy, the high-ranking DCFS officials, including but not limited to Defendants Walker, Harms-Pavelski and Dr. Glick, chose not to make this policy public and made efforts not to take this policy through the legally-mandated rule-making process. They did so because they knew the practice was unconstitutional and did not want to draw attention to the policy in a public setting.

172. Emboldened by the DCFS October 24, 2017 directive that Defendant Dr. Glick and Defendant ICAAP ensured DCFS adopted, an even greater numbers of pediatricians and hospitals in Illinois began to aggressively coerce and threaten parents who refused Vitamin K shots for their newborns with DCFS investigations in an attempt to get the parents to forgo their Constitutional right to refuse the unnecessary prophylactic medical procedures for their children at issue in this Complaint, knowing this policy was unconstitutional.

173. Upon information and belief, hundreds of Illinois families had their Constitutional rights violated by this policy, *i.e.* they were coerced or threatened to accept forced unnecessary medical

procedures for their babies against their express wishes and/or have their children seized from them based on their informed medical choices.

174. High-ranking DCFS officials, including but not limited to Defendant Walker and Defendant Harms-Pavelski and Dr. Jaudes, meanwhile, knew the Illinois pediatricians and hospital employees were using the prospect of calling DCFS on parents to threaten and coerce parents into giving up their constitutional rights to refuse unnecessary, prophylactic medical procedures for their children including Vitamin K shots and erythromycin eye ointment, and yet they allowed these threats and coercion to continue.

175. In fact, DCFS officials, including but not limited to Defendant Harms-Pavelski and Defendant Walker, reached an agreement with the Illinois pediatricians to follow through by having DCFS caseworkers investigate these parents for "medical neglect."

176. Defendant Harms-Pavelski and Defendant Walker further allowed DCFS caseworkers to similarly engage in unconstitutional threats and coercion once the Illinois pediatricians or other hospital employees called DCFS after parents' refusals of erythromycin eye ointment, Vitamin K shots, and, even by extension due to proximity in administration, Hepatitis B shots, as evidenced by one of the incidents, Brandon and Emily, in this Complaint.

177. DCFS officials and certain Illinois pediatricians, including the Defendant doctors knew that parents and guardians who were refusing Vitamin K shots were making informed medical decisions on behalf of their respective babies.

178. Further, these individuals also knew some of these parents and guardians were making such choices based on religious principles and belief, and thus many of these parents were insisting on the refusals even in the face of DCFS investigations.

179. Confidently cloaked with the authority of state action, Defendant Dr. Glick and other high-ranking members and officials of Defendant ICAAP, and DCFS officials, including but not limited to Defendant Harms-Pavelski and Dr. Jaudes, advanced and/or implemented the policy proposal which they had previously proposed to DCFS in August 2017, whereby hospitals, with the assistance of security guards, would take newborn babies into so-called "protective custody" under color of law and with the authority of the State, to force the application erythromycin eye ointment and/or the injection Vitamin K shots into newborn babies against the babies' parents' express wishes.

180. At the time that these Illinois pediatricians, Defendant ICAAP, and the DCFS officials named as Defendants in this Complaint (along with others not named as Defendants) devised this plan, they knew there was no legal basis for doing so, and that by doing so they would be violating the parents' Constitutional rights to refuse unnecessary prophylactic medical procedures for their children and, also, the parents' right to maintain custody of their children, yet they formulated the plan anyway.

181. In fact, so emboldened were certain Illinois hospitals that a number of these hospitals began to create their own policies for coercing and/or forcing the administration of Vitamin K shots and erythromycin on babies against the express wishes of their parents.

182. These individual hospital policies were developed for internal use and generally were not made available to the public or put on the hospital websites. The result of this lack of transparency was that parents could not make informed choices as to which hospitals had these policies, so as to avoid having to endure an invasive, traumatic, and lengthy DCFS investigation for refusing Vitamin K shots or erythromycin, or having their children taken into "protective custody" and having the medical procedures forcibly administered.

183. For example, in October of 2017, Defendant UC Medical developed an express, written policy that indicated the newborn baby of parents who refuse Vitamin K shots and/or erythromycin eye

ointment would be taken into "protective custody" by hospital staff, and have the shot or ointment administered to the baby against the express wishes and/or religious beliefs and practices of the parents.

184. UC Medical formed this policy with the help and assent of its Medical Director for Child Advocacy and Protective Services, Defendant Dr. Glick, who had also in 2014 and 2015, as previously stated, acted as a "reviewer" of DCFS's "investigational protocol procedures 300."

185. The UC Medical's Vitamin K policy was not put on UC Medical's website, and was not readily available to the public. James obtained a copy of this policy through a FOIA request made subsequent to initiating his investigation of DCFS's Vitamin K policy.

186. Another example is the express, written policy of Defendant Advocate Christ in Oak Lawn, Illinois. This policy, formalized in May 2018, indicates that physicians should try to convince parents to allow Vitamin K shots to be administered to newborn babies. However, if this does not work, the policy states that physicians should inform parents or guardians that if they refuse, hospital staff will contact DCFS to report the refusal essentially ensuring a full DCFS investigation. This policy was given to one of the parents subjected to Advocate Christ's refusal policy but is not generally available to the public or on the hospital's website. Upon information and belief, this policy is still in effect.

187. Other Advocate system hospitals have similar written policies which, upon information and belief, continue to be used as a tool of coercion as of the filing of this Complaint.

188. Moreover, Defendant Silver Cross appears also to have such a policy, based on what happened to Pastor Brian and Angela and Dr. Kosek and Sarah. It is apparent from what happened to these two couples that Defendant Silver Cross has either a formal or informal policy that would allow for babies to be taken into "protective custody," similar to that of UC Medical, informally referred to as the "no eyes and thighs" policy referenced during the incident involving Dr. Kosek and Sarah. These incidents are explained more fully below.

41

### 2. *The Rescission of Procedures 300, Section H*

189.  Shocked and appalled by the manner in which his family was treated, as described more fully below, in May 2018 James began networking with other parents in Illinois who were subjected to similar treatment or shared his concerns. James became a vocal advocate for the rights of parents to refuse unnecessary prophylactic medical procedures for their children.

190.  Through his networking, James became aware of the widespread practice of certain Illinois pediatricians and DCFS officials coercing and threatening, under color of law, parents who refuse unnecessary prophylactic medical procedures such as the Vitamin K shot, erythromycin eye ointment, and the Hepatitis B shot.

191.  James also became aware of DCFS's Procedures 300, Section H policy that considered refusal of the Vitamin K shot and erythromycin eye ointment as *per se* "medical neglect," ostensibly warranting DCFS intervention and/or investigation.

192.  James, along with other concerned and affected parents, lobbied Illinois legislators to aid the concerned parents in rescinding this policy.

193.  Additionally, James and other parents also confronted the PAC members at a June 14, 2018 PAC meeting, who deceptively argued that DCFS was solely responsible for the calls and investigations, covering up the key role that certain pediatricians, certain hospitals, and Defendant ICAAP had in implementing and carrying out this policy.

194.  James then went on to confront high-ranking DCFS officials, including Defendant Harms-Pavelski, informing them of the illegality of Procedures 300, Section H.

195.  On July 23, 2018, Bruce Dubre, an official with DCFS's Office of Children and Family Policy, sent an email in response an inquiry from to Elaine M. Spencer, Rules Analyst for the Joint Committee on Administrative Rules, "JCAR", in the Illinois General Assembly. Mr. Dubre wrote:

DCFS does not take reports of medical neglect for a parent refusing to have their child vaccinated; however, until recently we have accepted reports of parents who refuse to have their newborn treated with silver nitrate eye drops and vitamin K shots. Both of these treatments must be administered within the first 24 hours of life or they no longer have efficacy. The reason DCFS took these situations as the basis for medical neglect is due to the Infant Eye Disease Act [410 ILCS 215/3] requiring the application of the silver nitrate solution and because vitamin K shots are required via Title 77 Section 250.1830. Both of the rule and law apply to nursing staff and are not in ANCRA. As there is no mention of these procedures in Rule 300, we have issued an Action Transmittal immediately revoking the Department's policy of using a parent's failure to approve of either treatment as a basis for an allegation of medical neglect.

196. As Mr. Dubre impliedly conceded in his email, the Infant Eye Disease Act and Section 250.1830 are both administrative and/or regulatory in nature that in no way mandate that these medical procedures be given to babies against the express desires of the parents, nor do such laws or rules have anything to do with defining child abuse or medical neglect.

197. After receiving a copy of the Dubre email, James repeatedly and persistently requested a copy of the cited "Action Transmittal" from DCFS staff and officials. A copy of the cited "Action Transmittal" was never provided to James.

198. During this time period – after the Dubre email had stated that DCFS had revoked Procedures 300, Section H and that there was no basis in law to implement it in the first instance, but before Defendant Walker, former Acting Director of DCFS, formally rescinded the policy – one of the couples in this case, Brandon and Emily, was forced to endure a Hospital referral to DCFS and a DCFS caseworker using this supposedly rescinded policy to coerce and threaten Brandon and Emily into acceding to demands that their newborn baby be given the unnecessary medical procedures at issue in this case against their express will. The couple was also forced to endure a formal DCFS abuse/neglect investigation, were subjected to an illegal search of their home, and were forcibly torn apart during the precious time period after the birth of a child.

43

199.   Despite the Dubre email, it was apparent that the Procedures 300, Section H policy continued to be enforced, so James notified at least one DCFS official that he in communication with an attorney and was very seriously contemplating filing a lawsuit to seek injunctive relief for the rescission of this policy.

200.   On August 2, 2018, faced with the real and imminent prospect of being subjected to a court-ordered injunction, Defendant Walker, then acting DCFS Director, rescinded DCFS Procedures 300, Section H.

201.   In fact, Defendant Walker, consistent with the Dubre email, conceded in a letter to "DCFS staff and stakeholders" that Procedures 300, Section H had always been unlawful.  Defendant Walker's August 2, 2018 letter to "DCFS staff and stakeholders" stated that, effective immediately, DCFS would no longer consider the refusal by parents or guardians to allow doctors to administer Vitamin K shots or erythromycin eye ointment to newborn babies to be *per se* medical neglect. Defendant Walker wrote:

> In effect since 2015, this procedure inappropriately identifies what can and should be considered 'medically necessary.'  Making that kind of determination falls outside the confines of our statutory and professional mission and judgement.

202.   Defendant Walker's letter did not address the issue of physicians taking protective custody over a parent's refusal of the Vitamin K shot.

E.     **Incidents At Issue (Chronological)**

1.     ***Pastor Brian Bougher, Angela Bougher, and Baby B***

203.   On February 7, 2018, at 6:42 a.m., Baby B was born to Pastor Brian and Angela at Defendant Silver Cross in Joliet, Illinois.

204.   Baby B is the couple's fifth child.

205.   Prior to Baby B's birth, Pastor Brian and Angela had never encountered a problem with choosing to refuse unnecessary medical procedures for their children.

44

206. Pastor Brian and Angela believe God's design of man is not flawed and there is purpose to that design that exists beyond scientific or medical understanding. This is foremost among the reasons they do not want their children to receive a Vitamin K shot at birth.

207. Furthermore, based on their research on the subject, Pastor Brian and Angela reasonably believe the Vitamin K shot is medically unnecessary for a healthy newborn, and therefore they rightly believed their religious beliefs and practices did not put their baby at any medical risk.

208. Additionally, Pastor Brian and Angela are in a committed, faithful, and God-honoring marriage and neither Pastor Brian nor Angela has, or is at risk of contracting, the sexually-transmitted-disease infections that might warrant the administration of the erythromycin eye ointment to their newborn baby, in this case Baby B.

209. Pastor Brian and Angela had a birth-plan, approved by their attending midwife and personnel at Defendant Silver Cross ahead of the birth of Baby B.

210. Ahead of the birth, Pastor Brian and Angela were assured by their midwife, Kathy Craig, her associate, Lisa Abu-Samra, and unnamed medical personnel at Defendant Silver Cross, that so long as they signed a waiver of liability form, they could refuse the Vitamin K shot and erythromycin for their newborn and DCFS would not be called.

211. Additionally, weeks before the delivery, Brittany Hargens, a registered nurse, who created a Facebook group to advocate for parents rights on the Vitamin K refusal, called Defendant Silver Cross and spoke with Defendant Silver Cross's Charge Nurse, Susan, who told Brittany that Pastor Brian and Angela would simply have to sign some forms declining Vitamin K and Defendant Silver Cross would respect their wishes.

212. Angela also made two phone calls in which she received confirmation of her right to refuse medical procedures such as a Vitamin K injection and the erythromycin eye ointment for her newborn, both times conversing with a person in the Labor and Delivery Department at Defendant Silver Cross.

213. On the day of the birth, Pastor Brian and Angela gave a copy of their birth plan to a nurse at Defendant Silver Cross.

214. Additionally, the birth plan was already on file and in Angela's medical records as Midwife Craig had signed off on it and Midwife Lisa went over it with her.

215. Among other requests outlined in their birth plan, Pastor Brian and Angela expected that they would be allowed to have immediate skin-to-skin contact with Baby B, that Angela would be allowed to breastfeed, and that, for religious and scientific reasons, the umbilical cord blood we allowed to be fully transferred to their baby prior to the umbilical cord being cut.

216. Baby B was born within three hours of Angela and Pastor Brian arriving at Defendant Silver Cross.

217. Baby B was born naturally, with no epidural, and had no health issues at the time of birth.

218. Disregarding the couple's wishes and birth plan, Silver Cross medical personnel immediately cut Baby B's umbilical cord following the birth and before Pastor Brian and Angela had time to protest.

219. Baby B was then weighed and the APGAR test was also administered.

220. There was no indication that Baby B had any medical problems. Both her weight (almost 7 1/2 pounds) and her APGAR score were within the normal range.

221. Defendant Nurse Monika Kozuch then took Baby B and announced that she would be administering erythromycin. In response, Angela spoke up and said, "No, we are declining that, and we already agreed to sign the form," referencing their willingness to sign an informed consent form.

46

222. At this point, no hospital staff at Defendant Silver Cross had ever asked the couple to sign any refusal form, even though the couple had been told ahead of time that this would be required if they refused the prophylactic medical procedures, which in the case of Baby B were entirely unnecessary.

223. Defendant Nurse Kozuch relented, and did not administer the erythromycin.

224. Defendant Nurse Kozuch then announced that she would be administering the Vitamin K shot to which Angela responded, "We are declining that as well, and we already agreed to sign the form."

225. Defendant Nurse Kozuch relented, and did not administer the Vitamin K shot.

226. Without any further explanation, Defendant Nurse Kozuch walked past the couple with Baby B, turned around as she was leaving the room and announced: "I am taking your baby to the nursery, and I'm reporting you to DCFS due to your refusal."

227. Defendant Nurse Kozuch walked out of the room and took Baby B with her before Pastor Brian and Angela could even hold Baby B following the birth, which likely caused negative health effects for Baby B and causing severe emotional trauma to Pastor Brian and Angela.

228. Upon information and belief, Defendant Nurse Kozuch took Baby B away from Angela and Pastor Brian because of their refusals of the unnecessary and purely prophylactic medical procedures of the Vitamin K shot and/or erythromycin eye ointment for Baby B.

229. Midwife Lisa was very upset at what she saw was happening, and left the room. Pastor Brian and Angela later learned that Midwife Lisa was so upset that she protested Defendant Nurse Kozuch's actions to the nursing staff, telling them that the parents were told ahead of time that DCFS would not be called if they were willing to sign refusal forms.

230. About an hour after the birth, Pastor Brian and Angela still had not been allowed to see or hold their baby, or to have skin-to-skin time, or have Angela breastfeed Baby B, going against their

expressed desires. At this point, Silver Cross pediatrician Defendant Dr. Miroslaw Skalski visited their room and told Pastor Brian and Angela that Baby B tested low for blood sugar.

231. Upon information and belief, Baby B's blood sugar was low because Defendant Silver Cross medical personnel had not allowed Angela to breastfeed her baby, against the express wishes of the couple and their birth plan.

232. Defendant Dr. Skalski told the parents that he wanted to give the baby formula. Angela and Pastor Brian told Defendant Dr. Skalski that, unless there was a medical danger, they wanted to breastfeed the baby. Defendant Dr. Skalski told the couple that "breastfeeding won't help, but we can try it."

233. During this conversation, Pastor Brian and Angela repeatedly asked Defendant Dr. Skalski when they could see their baby. He initially did not answer them. Toward the end of the conversation, however, Defendant Dr. Skalski told them that Angela could come to the nursery to try to breastfeed the child once Baby B "was cleared."

234. In the meantime, staff at Defendant Silver Cross gave Baby B glucose intravenously without Pastor Brian and Angela's consent, according to medical records.

235. Finally, Pastor Brian and Angela were allowed to see Baby B again. During the preceding time period, Pastor Brian had repeatedly asked several nurses and doctors at Defendant Silver Cross when he and his wife could see Baby B. He received responses such as "Soon," "We'll check," or "We'll let you know."

236. Based on everything that was occurring and what Pastor Brian and Angela were told, the couple reasonably believed they were not being allowed to see the baby as a means of coercion and because of their refusal of the unnecessary prophylactic medical procedures Vitamin K shot and erythromycin eye ointment.

48

237.  The couple was allowed to go to the nursery, where Baby B was being held, to hold Baby B and so that Angela could breastfeed there.  A nurse in the nursery told the couple that when Baby B was first brought to the nursery, her blood sugar level was 41, and that hospital protocol was to give glucose at 40 (which had in fact been administered to the baby), and that the nurse believed it would take quite a while for the baby's numbers to jump above 50.  The nurse told the couple that once the baby's glucose levels were above 50, the baby could come back to the couple's room.

238.  Following breastfeeding, Baby B's glucose levels were tested at 66 after breastfeeding on just one side.

239.  Even though the nurse had just told the couple that Baby B would be allowed to go to their room once the glucose levels were above 50, the nurse did not allow Angela to bring Baby B back to her room.  When questioned by Angela about this, the nurse replied that Baby B could join the couple in their room "[h]opefully, within a couple of hours."

240.  For the next couple of hours after Pastor Brian and Angela waited back in their hospital room alone. Traumatized, worried, and confused, both Pastor Brian and Angela repeatedly asked the nurses and doctors of Defendant Silver Cross why they could not see their baby.  They received no explanation, and instead were told simply "not yet."

241.  During this time, Pastor Brian and Angela had a second conversation with Defendant Dr. Skalski in which they discussed the Vitamin K shot and erythromycin eye ointment.

242.  The conversation about erythromycin was short.  Pastor Brian and Angela told Defendant Dr. Skalski repeated that they were refusing erythromycin based on scientific and religious reasons, and further the couple told him they had a religious exemption letter with them if he wanted to see it.

243. Dr. Skalski informed Pastor Brian and Angela that it was not necessary for them to present a religious exemption letter and that he was not concerned about their refusal of the erythromycin eye ointment.

244. Pastor Brian and Angela's conversation with Defendant Dr. Skalski regarding Vitamin K refusal was much more involved.

245. Pastor Brian and Angela once again told Defendant Dr. Skalski they were refusing Vitamin K based on scientific and religious reasons, and that they had a religious exemption letter with them if he wanted to see it. Defendant Skalski again told the couple the letter was not necessary, but he then went on to ridicule the couple's religious beliefs and called their scientific research "stupid" and "wrong."

246. Angela told Defendant Dr. Skalski that she believes that Vitamin K may at times be medically necessary based on birth trauma, and asked Defendant Dr. Skalski if there was any birth trauma. Defendant Dr. Skalski told the couple, "No."

247. When Defendant Dr. Skalski confirmed that there was no birth trauma or any other specific and evident need for the Vitamin K shot, Pastor Brian and Angela again refused the Vitamin K shot, once again notifying Defendant Dr. Skalski of their sincerely-held religious and scientifically-based beliefs.

248. At no time during this conversation did Defendant Dr. Skalski give the couple any explanation as to why they were being prevented from seeing and having custody of their baby since the birth.

249. Later in the afternoon, two nurses at Defendant Silver Cross came in the room and asked if Angela would sign an informed consent waiver, which Angela had agreed to sign immediately after Baby B's birth. After expressing some reluctance due to distrust resulting from the obfuscations

50

provided by medical staff, the seizure of Baby B, and the threats to involve DCFS, Angela decided to sign the waiver/refusal form, specifically after being told that by signing the waiver/refusal form the couple would get Baby B back and that the call to DCFS would be reversed.

250.   About an hour later, a nurse came back, and told Angela they were "mistaken." The nurse said that once DCFS is called, there was nothing else that could be done to stop the removal or the investigation.

251.   At this point, Angela and Pastor Brian still had not been allowed to have custody of their baby and Baby B was still not back in their room.

252.   Dr. Skalski came into the room, and criticized Angela and Pastor Brian's choice to not accept the medical procedures, and mocked their religious beliefs.

253.   At about 8 p.m., about 13 hours after Baby B was taken from them, the nurses of Defendant Silver Cross returned Baby B back to Pastor Brian and Angela's care and custody without comment.

254.   At this point, Angela and Baby B were not yet cleared to leave the hospital, so they spent the night at Defendant Silver Cross.

255.   The next day, February 8, 2019 around noon, Angela was told that a DCFS caseworker would be coming to the hospital.  However, Angela had no way to make sure Pastor Brian would be there, as he was at home taking care of their other children.  Angela asked for a window of time to make sure that Pastor Brian could be there, but the hospital staff would not give her one.

256.   At around 2 p.m., Defendant DCFS Caseworker Gina Kitakis came into Angela's room and notified Angela that nobody was allowed to be present during the conversation. Therefore, one of Angela's friends, who had arrived to support her, had to leave the room.

257.   Pastor Brian was not present at the time for the start of this conversation, but he did arrive about halfway through it.

51

258.  During this conversation, Defendant Caseworker Kitakis told Angela that she had spoken to the doctors at Defendant Silver Cross, who all confirmed that there were no health risks to the baby. Defendant Caseworker Kitakis told Angela that the DCFS report would be determined to be unfounded. But that she (Defendant Caseworker Kitakis) was required to ask some questions.

259.  Defendant Caseworker Kitakis started asking questions about Pastor Brian and Angela's other children.

260.  The couple told Defendant Caseworker Kitakis that they were uncomfortable with this and that speaking with them was unnecessary if the case would be determined to be unfounded.

261.  In response to Pastor Brian and Angela's reluctance to discuss their other children, Defendant Caseworker Kitakis told Angela, "I am one of 17 people in this State of Illinois that can come into your child's school and talk to them at any time without your permission."

262.  Defendant Caseworker Kitakis then said that it was mandatory that she visit all of the couple's children in their home to officially close the case and declare the investigation "unfounded."

263.  However, Defendant Caseworker Kitakis had already told Angela that the investigation would be unfounded anyway, so Pastor Brian and Angela argued that there was no reason or basis for this.

264.  Angela said that she was uncomfortable with this questioning, and that they wanted to speak to a lawyer about it.  Defendant Caseworker Kitakis took this as a refusal of the home visit.

265.  Pastor Brian and Angela stated that they were not refusing the home visit, but just asking for additional time to speak with a lawyer.

266.  Defendant Caseworker Kitakis discouraged them from speaking with a lawyer.

267.  Defendant Caseworker Kitakis then got her supervisor on the phone, and Defendant Caseworker Kitakis told the supervisor that the couple was refusing the home visit.  Angela told

52

Defendant Caseworker Kitakis in a voice loud enough for the DCFS supervisor to hear over the phone that this was not what they said.

268.  The Pastor Brian and Angela then spoke with a lawyer, and the lawyer advised them not to speak to Defendant Caseworker Kitakis or DCFS personnel any further.  The lawyer then spoke with the DCFS supervisor, telling the supervisor to get a warrant if anyone wanted to come into the couple's home and to stop harassing them or speaking with them.

269.  Ignoring the lawyer's directive, which the couple indicated they agreed with, Defendant Caseworker Kitakis stayed at the hospital and continued to harass Pastor Brian and Angela and told them they did not need a lawyer.

270.  Defendant Caseworker Kitakis then said a home visit was probable for Tuesday, and she took a photograph of the baby without the couple's permission and left the hospital room.

271.  That entire week, Pastor Brian and Angela anxiously waited for DCFS to arrive; but, there was no DCFS visit.

272.  The following week, while Angela was at home with all five of their children, but, without Pastor Brian, there was a knock at the door which the couple's 13-year-old son, "N.B.", answered.

273.  A Joliet police officer was there and asked N.B. to get his parents.  Angela then noticed there were three Joliet police squad cars outside, and that two Joliet police officers were already inside their house.

274.  The police officer indicated they got a call from DCFS, and that he needed to see the couple's children.  Due to the circumstances, most notably the presence of three police squad cars, Angela reasonably believed the police may have been there to take away her children.  Angela stated that she wanted to speak with a lawyer, but the police indicated this was unnecessary.  Angela stated that she did not want the police officers in the house, and the police indicated they simply "had to lay

eyes" on the children. Angela tried frantically to assemble all the children for the police. However, Angela had to ask her son, C.B., multiple times to come down because, as she later found out, C.B. thought the police were there to take away his baby sister, and he also asked Angela whether the three police cars were there to take all the children away. C.B. was visibly shaken from the experience.

275. The police laid eyes on all of Pastor Brian and Angela's children and then left the house. However, the police stayed at the scene for a while. All of this his occurred in full view of the neighbors.

276. Angela received a call the next day, stating the case was being closed and was considered unfounded, and that she would get a letter stating so.

277. A few weeks later, Pastor Brian and Angela did receive a letter, which stated the DCFS investigation determined the allegation to be unfounded.

## 2. *James F Holderman III, Erin Courtney Hill, and Baby H*

278. On May 21, 2018, Baby H was born to James and Courtney at AMITA Health Adventist Medical Center ("AMITA Health") in Hinsdale, Illinois.

279. James and Courtney had a written birth plan, approved by their obstetrician, their midwife, and AMITA Health personnel ahead of Baby H's birth, which was and is contained in Courtney's medical records.

280. The birth plan for Baby H called for, inter alia, the couple's informed choice to refuse "all newborn procedures" for Baby H, including but not limited to their refusal of the Vitamin K shot, erythromycin eye ointment, the Hepatitis B shot, and "Heal Prick Testing," also known as NBS testing.

281. Baby H was healthy upon birth and Baby H had no medical problems that arose during her stay at the hospital or at any time thereafter.

282. Courtney had some tearing and subsequent bleeding as a result of the birth which Courtney, with James in support, did readily consent to treat.

283. This medical issue relating to Courtney had no effect on the health of Baby H, nor was it symptomatic of any medical problem with Baby H.

284. About 12 hours after Baby H's birth, Defendant Dr. Schulte arrived unexpectedly and uninvited to Courtney and Baby H's hospital room where the family was staying to perform the infant check-up.

285. Defendant Dr. Schulte was aware that James and Courtney were refusing the Vitamin K shot, the administration of erythromycin eye ointment, a Hepatitis B shot, and the NBS per the couple's birth plan. Defendant Dr. Schulte told James and Courtney that she had no genuine issue with three of the four refusals in their case.

286. Defendant Dr. Schulte knew that James and Courtney were supplementing Courtney's breast milk with oral Vitamin K drops according to an effective, peer-reviewed protocol utilized and extensively studied in Denmark. In fact, Defendant Dr. Schulte noted in Baby H's medical records during the evening of May 21, 2018, following her examination of Baby H that James and Courtney planned to provide Vitamin K to Baby H per the Denmark "protocol."

287. Defendant Dr. Schulte also knew Courtney did not have any STD infection that might require prophylactic erythromycin eye ointment in order to prevent the eyesight-threatening eye infection called ophthalmia neonatorum.

288. Defendant Dr. Schulte also knew Courtney had been recently tested for Hepatitis B and did not have Hepatitis B, and thus there was no chance that the Hepatitis B virus could possibly be transmitted to Baby H during childbirth. Dr. Schulte additionally stated that she does not call DCFS on parents who refuse vaccines.

289.  The only point of contention that Defendant Dr. Schulte raised on the evening of May 21, 2018 during the conversation with James and Courtney about their refusals was James and Courtney's refusal of the NBS for Baby H.

290.  Defendant Dr. Schulte stated repeatedly and adamantly there were no exemptions to the NBS, and that James and Courtney were not legally allowed to refuse such testing for Baby H.

291.  James and Courtney having refused the NBS for their son, P.H., just over three years prior, were perplexed by Defendant Dr. Schulte's repeated, adamant assertions.

292.  James replied he did not think this was correct but that he needed to look into the issue.

293.  Defendant Dr. Schulte told the couple that the only refusal that would result in her seeking DCFS intervention was the refusal of the newborn screening test. She used this to attempt to coerce the couple into consenting to the NBS, *i.e.*, if James and Courtney agreed to the newborn screening blood testing then DCFS would not be called, she told them.

294.  Following the encounter with Defendant Dr. Schulte, James went home and readily found and obtained a copy of the Illinois' Newborn Metabolic Screening Act (410 ILCS 240), "the Act" as previously designated, which contained a clear religious exemption for refusing the newborn screening tests.  James printed the text of the Act on May 21, 2018 and brought it back to the hospital.

295.  Sometime after midnight on May 22, 2018, well after Baby H had been deemed healthy with no medical issues, conditions, or problems by not only Defendant Dr. Schulte but all other hospital staff providing care to Baby H, an AMITA Health nurse mentioned to James and Courtney that she noted and refused to follow Defendant Dr. Schulte's order to call DCFS which had been placed in Baby H's medical chart.

296.  Alarmed and troubled, early in the morning of May 22, 2018, James and Courtney requested to speak with Defendant Dr. Schulte.  James showed Defendant Dr. Schulte the Act, read the

religious exemption portion of the Act to Defendant Dr. Schulte, gave her a copy of the Act, and requested that copies be made and that a copy of the Act be placed in Baby H's medical records.

297.  The couple repeatedly explained to Defendant Dr. Schulte that their sincerely held religious beliefs were their primary reason for not wanting to have their baby subjected to the newborn screening test, or, for that matter, any of the other unnecessary prophylactic medical procedures.

298.  Defendant Dr. Schulte scoffed and immediately questioned the couple's sincerely held religious beliefs by mockingly questioning to what religion they belong.

299.  James stated that they were Christian and paraphrased one of the religious tenets related to James and Courtney's sincerely-held religious beliefs regarding medical procedures.

300.  Nevertheless, Defendant Dr. Schulte threatened that she would be contacting the hospital's social-work department and implied a call would be made to DCFS anyway.  James replied this was improper and James clearly stated that he believed that Defendant Dr. Schulte was threatening him and Courtney.

301.  Defendant Schulte left with the Act in hand and did not return to Courtney and Baby H's hospital room.

302.  Defendant Dr. Schulte requested that AMITA Health social worker Melanie Heap call DCFS because of the couple's refusal of the newborn screening test, but social worker Heap refused to call DCFS as ordered by Defendant Dr. Schulte, according to Courtney's medical records.

303.  Social worker Heap objected to calling DCFS, specifically noting the couple's religious objections and the religious exemption clearly written in Illinois law.

304.  In fact, that morning, during the "social worker consult" ordered by Defendant Dr. Schulte, James and Courtney handed to social worker Heap a written statement stating James and Courtney's objection to the NBS as being in conflict with James and Courtney's religious tenets and practices by

which they were properly claiming a religious exemption from the NBS for Baby H. This written statement was put in Baby H's medical records.

305. Thus, James and Courtney properly invoked the exemption clause of the Act by claiming a religious exemption by way of a signed written statement of their objection based on their religious tenets and practices.

306. Having already had two hospital workers refuse her order to call DCFS to seek State intervention, Defendant Dr. Schulte made the call to DCFS herself.

307. Defendant Dr. Schulte was fully aware of the existence of James and Courtney's religiously-based objection and corresponding written statement exempting Baby H from the NBS before she called DCFS.

308. Therefore, rather than only notifying DCFS of the narrow reason for her concern (the refusal of the newborn screening test), Defendant Dr. Schulte instead led the DCFS intake worker, Seth W., to believe that James and Courtney were refusing "90 percent" of the "medical care" (which obviously included all of James and Courtney's other informed refusals). This suggestion was not only untrue, but, seemed to indicate that the couple was intentionally refusing necessary and urgent medical treatment for Baby H, which also was untrue.

309. Defendant Dr. Schulte also, apparently, failed to tell the DCFS intake worker that the only refusal that she had a genuine problem with was the refusal of the NBS, for which James and Courtney had properly claimed a valid religious exemption per Illinois law.

310. Thereafter, pursuant to the DCFS policy described more fully above, the DCFS intake worker, acting in concert with Defendant Dr. Schulte, added the refusals of the Vitamin K shot and erythromycin eye ointment as the basis for alleged "medical neglect." Additionally, the DCFS intake

58

worker categorized the Defendant Dr. Schulte's call and allegations as "Action Needed," the second-highest priority call for DCFS investigations, ensuring a rapid response to the situation at the Hospital.

311. The DCFS investigation began with a supervisor's phone call to Dr. Anubha Mittal, a pediatrician who, like Defendant Dr. Schulte, is also affiliated Lurie Children's Hospital and was working at AMITA Health, regarding the health of Baby H. Dr. Mittal expressed concern with the newborn screening test refusal. Further, Dr. Mittal stated that Courtney and Baby H had not been "released" from the hospital.

312. Defendant Dr. Schulte, in concert with Dr. Mittal and/or AMITA Health personnel, further took actions to coerce James and Courtney to consent to unwanted and unnecessary medical procedures for Baby H, by taking action that ensured hospital security personnel arrived and were stationed near the exit of the "Mother Baby Unit" of the hospital prior to the arrival of the DCFS caseworker.

313. DCFS Caseworker Christi Layton arrived and entered Courtney and Baby H's room as Baby H slept, for no proper medical purpose and despite James' and Courtney's repeated attempts to prevent Caseworker Layton from entering Courtney and Baby H's room since there was clearly no medical purpose and no proper legal purpose for Caseworker Layton to enter the room.

314. Because of these circumstances and the fact that James and Courtney were told that Caseworker Layton could not leave until Caseworker Layton had at least laid eyes on Baby H, at this time and in the time preceding, Courtney reasonably believed she and Baby H were not free to leave the hospital, even though it was Courtney's desire to leave the hospital with Baby H.

315. Defendant Dr. Schulte caused this seizure of Courtney and Baby H to occur as both additional coercion and punishment for James and Courtney's refusal of all of the unnecessary medical procedures that were refused for Baby H.

316.  Every AMITA Health staff member or medical personnel James and Courtney spoke with on May 22, 2018 other than Defendant Dr. Schulte and Dr. Mittal told the couple that they did nothing wrong and could not have done anything different to avoid this painful and emotionally traumatic episode.

317.  After seeing Baby H, DCFS Caseworker Layton followed up with Dr. Mittal. At this point, just over an hour and a half after expressing concern to a DCFS supervisor about the newborn screening refusal, Dr. Mittal stated she "has no concerns at this time for the child's health. The child is happy and healthy," according to Caseworker Layton's interview report.

318.  Caseworker Layton also spoke with Defendant Dr. Schulte, who similarly confirmed that there were "no health problems" with Baby H.

319.  Caseworker Layton confirmed through multiple interviews with medical staff that James and Courtney's refusals were of "routine tests" that were "not medical necessities."

320.  Also, while she was at AMITA Health, Caseworker Layton contacted DCFS Supervisor John Gac as part of a "Supervisory Consultation."  DCFS Supervisor Gac wrote in a report:

> Parents have the right to decline routine medical exams as there is no evidence to suggest that the newborn has any medical condition nor is there any genetic history provided that would suggest the alleged victim would need to be screened.  Child will be cleared for discharge from the hospital with no more than routine follow up/well child visits.

321.  Despite this report, a DCFS case against James and Courtney had been opened as a result of Defendant Dr. Schulte's actions on May 22, 2018, and, in order to have it closed, James was required to bring James and Courtney's son, P.H., to the DCFS Agency Office so Caseworker Layton could interview P.H., which James did under duress on May 25, 2018. There were no issues with the couple's other child, P.H., who is very well cared for, healthy, and happy.

322. Caseworker Layton's concluding report stated of Baby H: "The alleged victim appeared to be healthy and gave no sign of medical complications or issues that would suggest there was need to override the parents' rights to decline routine medical treatment/screens."

323. Caseworker Layton reiterated that "*not one*" doctor or nurse claimed the tests were medical necessities, and that "no medical provider deemed this to be medical neglect."

324. Supervisor Gac agreed, concluding his report by stating, "*Does not appear to be a good faith report*."

325. Nevertheless, the DCFS investigation remained open an additional five weeks, which was extremely stressful and upsetting for James and Courtney. The investigation was officially closed as "unfounded" in July 2018.

326. Upon information and belief, even though the report was unfounded, the reports and medical records by Illinois law will remain in DCFS custody for five years from the date the investigation was closed, and can be accessed by certain authorities who have legal access to such information.

327. Additionally, upon information and belief, if James and Courtney have more children, which the couple intends to do, this information could be used again in determining whether James and Courtney have a pattern of committing "medical neglect" which creates a significant ongoing anxiety for James and Courtney.

328. The aforementioned actions of the Defendants caused James and Courtney a loss of liberty, mental anguish, as well as, severe and permanent emotional distress.

### 3. *Dr. Jason Kosek, Sarah Kosek, and Baby K*

329. On June 14, 2018, Baby K was born to Dr. Jason Kosek and Sarah Kosek at Defendant Silver Cross Hospital and Medical Center ("Silver Cross"), in Joliet, Illinois.

330. Prior to the birth of their daughter, Baby K, Dr. Kosek and Sarah worked out a birth plan with a nurse at Defendant Silver Cross, which listed their desire to refuse certain medical procedures, namely the administration of the Vitamin K shot, the administration of a Hepatitis B shot, and the application of erythromycin eye ointment. The birth plan also included the directive that they did not want their baby out of their custody following the birth.

331. Additionally, prior to Baby K's birth, Dr. Kosek and Sarah were provided a single-page, pre-printed informed consent/refusal waiver form to refuse both the Vitamin K shot and the erythromycin eye ointment, which they signed indicating their intent to refuse these unnecessary, prophylactic medical procedures. As part of signing the refusal form, Dr. Kosek and Sarah were informed that hospital staff would be calling DCFS to seek DCFS intervention as a result of the couple's refusals.

332. As indicated in their birth plan, the couple did refuse the above medical procedures.

333. After the birth of Baby K, a different hospital nurse stated that, based on the couple's refusals of the above-mentioned unnecessary prophylactic medical procedures, the hospital would call DCFS, even though the proper waiver forms had already been signed.

334. Additionally, a different nurse commented to that nurse, that Baby K was to receive "no eyes and thighs", indicating by this phraseology that this was not an infrequent request and that it was the policy or protocol of Defendant Silver Cross to call DCFS whenever a parent or guardian refuses erythromycin eye ointment or Vitamin K and/or Hepatitis B shots, which as described are administered to the eyes and thighs respectively.

335. Defendant DCFS Caseworker Shekelia Williams came into the couple's room approximately one hour after Baby K's birth while Sarah was still receiving post-delivery care in the birthing suite.

336. It should be noted that, just minutes prior to Defendant Caseworker Williams arrival, a nurse rushed in and once again requested Dr. Kosek and Sarah sign the one-page informed refusal form for the Vitamin K shot and erythromycin eye ointment refusal. Dr. Kosek and Sarah signed the form for a second time. Dr. Kosek was troubled by this situation and attempted to photograph the signed form for his records but his effort was aggressively denied by the nurse.

337. After her arrival, Defendant Caseworker Williams proceeded to tell Dr. Kosek and Sarah that she had never handled a call like this and that the couple have been reported to DCFS for medical neglect of Baby K, and that they were in danger of Baby K being taken away from them.

338. Dr. Kosek and Sarah indicated this was an informed consent medical choice, not medical neglect. Defendant Caseworker Williams seemed to agree with the parents that it was an informed decision, not medical neglect, and then left to speak with a hospital administrator.

339. Shortly thereafter, Dr. Kosek and Sarah spoke with Defendant Dr. John Doe (Silver Cross) Doctor, who identified himself as the "Head of Pediatrics" at the Hospital.

340. Defendant Dr. John Doe (Silver Cross) told Dr. Kosek and Sarah that Baby K could be taken away from them if they refused the three unwanted medical procedures referenced above.

341. Defendant Dr. John Doe (Silver Cross) also told Dr. Kosek and Sarah that he had never experienced anyone who refused these medications, and Dr. Kosek responded by asking why then does the hospital have a "no eyes or thighs" protocol. Defendant Dr. John Doe (Silver Cross) had no answer to this question.

342. Upon information and belief, Defendant Dr. John Doe (Silver Cross) knew it was the common practice and policy of Silver Cross to target parents who refused the medical procedures at issue in this case with DCFS intervention, but that he lied to Dr. Kosek and Sarah to make them feel like

they were outliers or bad parents who were making an unusual and uniformed choice in an attempt to coerce them into accepting unwanted medical procedures for Baby K.

343. Dr. Kosek, Sarah, and Defendant Dr. John Doe (Silver Cross) had about a 30-minute conversation concerning the pros and cons of these procedures, including the Black Box warning on the Vitamin K package insert, which indicates the administration of a Vitamin K shot could result in serious physical harm or possible death of Baby K. Specifically, Dr. Kosek and Sarah told the doctor they were refusing these medical procedures because of possible side effects of the procedures, and the fact that they were unnecessary.

344. During this conversation, Defendant Dr. John Doe (Silver Cross) threatened that the hospital could take Baby K away from Dr. Kosek and Sarah if they refused these medical procedures, and that they would then have to go to court to get the baby back. Or, alternatively, he told Dr. Kosek and Sarah, the hospital could re-release the baby into their custody after administering these medical procedures. Under either scenario, though, Defendant Dr. John Doe (Silver Cross) emphasized that he would forcibly administer the unwanted prophylactic medical procedures to Baby K.

345. Defendant Dr. John Doe (Silver Cross) told Dr. Kosek and Sarah that if they would agree to allow him to administer the unwanted prophylactic medical procedures, he would leave, and there would no longer be any issues.

346. Dr. Kosek then told Defendant Dr. John Doe (Silver Cross) that the couple would allow the administration of the medical procedures at issue, if Defendant Dr. John Doe (Silver Cross) would sign a document guaranteeing that there are no health risks associated with these medical procedures and accept all liability any harm that resulted. Dr. Kosek, who had twice signed the hospital's waiver form, only made such a request because Dr. Kosek fully believed Defendant Dr. John Doe would never sign such a document as there are unquestionable health risks associated with the administration of

Vitamin K shot and erythromycin eye ointment. Defendant Dr. John Doe (Silver Cross) refused to sign such a document.

347. During the course of this conversation, Defendant Caseworker Williams would occasionally interject, in an effort to calm Sarah down when she began to cry. Defendant Caseworker Williams told Dr. Kosek and Sarah she did not see any harm with the medical procedures and that they should just go along with the demands being made by Dr. John Doe (Silver Cross).

348. Dr. Kosek and Sarah told Defendant Dr. John Doe (Silver Cross) and Defendant Caseworker Williams that Dr. Kosek had pre-consulted with their own pediatrician, Dr. Paul Tortoriello from DuPage Medical Group, and that Dr. Tortoriello was fine with the couple's refusals. Dr. Kosek also suggested that Dr. Tortoriello could prescribe an oral Vitamin K, which Dr. Kosek and Sarah would have allowed as a back-up plan. Dr. Kosek and Sarah offered to call Dr. Tortoriello, but a hospital nurse present for this conversation indicated that Dr. Totoriello was going to be coming by later that day anyway so a call was unnecessary.

349. Both Defendant Dr. John Doe (Silver Cross) and Defendant Caseworker Williams ignored Dr. Kosek's comments about their family pediatrician, Dr. Tortoriello.

350. As Defendant Dr. John Doe (Silver Cross) was leaving the room, he told Dr. Kosek and Sarah that he would contact the hospital administrator, and that they would "continue the process," indicating that he would continue the process of attempting to take physical custody of Baby K to forcibly administer the unwanted medical procedures.

351. About a half hour later, in the presence of Defendant Caseworker Williams, a hospital administrator came into the room, and she also said they could take Baby K and administer the medication against Dr. Kosek and Sarah's consent, and then Baby K would either be returned to them or they would have to go to court to take custody of the baby. Dr. Kosek indicated he would take all

responsibility for not administrating the medication, but this had no effect on the hospital administrator and she left the room while again indicating the process of taking away Baby K would continue.

352. Sarah again began to cry as a result of these horrific threats to take away their newborn baby girl.

353. Approximately one half hour later, after all prior coercion tactics had failed, a different hospital administrator came in, and she told Dr. Kosek and Sarah they did not want to take away the baby, rather that they wanted to make sure Dr. Kosek and Sarah knew the risks, and that the hospital staff and the doctor were just following hospital protocol. Defendant Caseworker Williams was present for this conversation as well, and this prompted Defendant Caseworker Williams to ask the hospital administrator, "So we aren't taking custody of the baby?" This then prompted the administrator to tell Williams, "No, not at this time."

354. However, the hospital administrator and the DCFS worker told Dr. Kosek and Sarah there could be legal ramifications to a DCFS report because of both Dr. Kosek and Sarah's own status as mandatory reporters: Dr. Kosek is a chiropractor and Sarah is a teacher.

355. Defendant Caseworker Williams told Dr. Kosek and Sarah that the DCFS investigation would continue, and that they would be required to do a home visit. Defendant Caseworker Williams also told Dr. Kosek and Sarah that they would be required to give DCFS references, including family members and employers, who were all, in fact, called about this incident and notified that Dr. Kosek and Sarah were being investigated for the possible neglect of Baby K.

356. In September 2018, Defendant Caseworker Williams did the required home visit, entering Dr. Kosek and Sarah's home without their voluntary consent of Dr. Kosek or Sarah, and without any legal basis for doing so.

357. In September of 2018, Dr. Kosek and Sarah received a letter from DCFS indicating the report of medical neglect was unfounded.

### 4. *Brandon Leitschuh, Emily Vuckovich-Leitschuh, and Baby L*

358. On July 31, 2018, Baby L was born to Brandon and Emily at Advocate Christ Hospital ("Advocate Christ") in Oak Lawn, Illinois.

359. Brandon and Emily had a birth plan, approved by Defendant Advocate Christ ahead of the birth of their daughter, Baby L. Emily's obstetrician knew she planned to follow the same procedures she did with her first child.

360. The birth plan included Brandon and Emily's intention to refuse the administration of erythromycin eye ointment, the Vitamin K shot, and a Hepatitis B shot for their baby. They verbally told all nurses and doctors when they arrived of their birth plan.

361. Regarding the erythromycin, Brandon and Emily were concerned in general about certain contraindications listed on the package insert, but specifically because both Emily and the couple's other daughter have allergies and auto-immune disorders, and the erythromycin eye ointment's package insert indicates that the administration of erythromycin may cause allergic reactions.

362. Brandon and Emily were troubled by these warnings, given the fact that the family has a history of auto-immune disorders generally, and more specifically, Emily has been diagnosed with an allergic reaction to erythromycin.

363. Additionally, Brandon and Emily agreed with medical doctors' advice that antibiotics are given too early and too often to children. The couple expressed these concerns to Hospital staff. They also did not view erythromycin eye ointment as necessary because Emily had a cesarean and there is no risk for an STD infection in the Baby L's eyes. Additionally, Emily had been screened for STDs prior to giving birth and all tests were negative.

364. Regarding the Vitamin K shot, Brandon and Emily knew before the birth of their baby that the Vitamin K package insert lists allergic reactions and death as possible side effects of having the shot administered. They told hospital staffs they were willing to give oral Vitamin K drops but were told that was not an option.

365. With regard to the Hepatitis B shot, Brandon and Emily refused the administration of this medical procedure for their baby because there was no medical need for it since Emily had already been recently tested for Hepatitis B and her tests were negative.

366. After arriving at Advocate Christ for the birth of their baby, a hospital nurse told Brandon and Emily that they would need to sign a refusal for the Hepatitis B shot and the Vitamin K refusal, but later they requested a signature for refusal of the eye ointment, since the staff forgot to do this initially.

367. The nurse told Emily that if she refused a Vitamin K shot for their baby, it is the policy of Defendant Advocate Christ to call DCFS, but she indicated that because they have a valid medical reason for the refusal, then it should not be an issue.

368. Baby L was born healthy with no significant health concerns and nothing remotely relevant to the refusals at issue in this Complaint.

369. Despite the hospital nurse telling Brandon and Emily that they had valid medical reasons for refusing the medical procedures at issue, which according to the medical records was also confirmed by at least one Hospital doctor as reasonable refusals, DCFS was called to investigate based on the Defendant Advocate Christ's express policy of reporting the refusal of Vitamin K or erythromycin eye ointment to DCFS as medical neglect against all parents or guardians who refuse the administration of the Vitamin K shot or erythromycin eye ointment for their newborn babies. Even though medical staff noted in Emily's medical records that her medical condition made it appropriate for her to refuse these

medications, Defendant Advocate Christ's express policy made no exceptions, and thus the DCFS investigation began.

370. When Defendant Advocate Christ formulated this express policy, it knew that there was no constitutional basis to do so, that the policy conflicted with Illinois law, and that the blanket nature of the policy would result in DCFS investigations being conducted against parents like Brandon and Emily, for whom the particular choice to decline these medical procedures would have been deemed appropriate by its medical staff.

371. About 24 hours after the birth, while still at the hospital, a Cook County DCFS Caseworker told Brandon and Emily when she visited them at the hospital that the investigation will be conducted by Will County, that the Will County caseworker would do a home visit, and that that this would likely be the end of it.

372. That evening, the day after Baby L's birth, during a phone conversation with Brandon and Emily (on speaker), the Will County DCFS caseworker, Defendant Lynette Allen (hereinafter "Caseworker Allen"), threatened Brandon and Emily that she was going to take custody of both of the couple's children (their other daughter was 17 months old at the time). She threatened that the children would not be allowed to go into the custody of family members because it was a medical neglect case and that most likely the children would not be kept together.

373. Additionally Defendant Caseworker Allen told Brandon and Emily that the couple now needed to give the Hepatitis B shot to Baby L because it was too late for the administration of the Vitamin K shot and application of erythromycin eye ointment. She also stated repeatedly during the conversation that she was hoping and praying that Baby L would not die because of their medical neglect.

374. After this is when the nurse came in to request their signature on the erythromycin refusal form because Hospital staff forgot to do it the day before.

375. Defendant Caseworker Allen's investigation occurred despite the fact that the policy upon which it was presumably based, Procedures 300, Section H, had supposedly already been revoked subsequent to an "Action Transmittal", according to DCFS spokesperson, Bruce Dubre.

376. Thus, either Defendant Caseworker Allen had been notified by DCFS that this policy was rescinded and she persisted in her actions anyway, or Defendant Walker never took the steps of notifying her caseworkers that they should no longer be investigating couples based solely on them refusing Vitamin K shots or erythromycin eye ointment, knowing DCFS had no legal basis for implementing the policy in the first place, as she later conceded on August 2, 2018, or, Bruce Dubre speciously stated to a JCAR rules analyst that Procedures 300, Section H had been revoked.

377. Emily repeated her medical concerns and conditions to Defendant Caseworker Allen, but Defendant Caseworker Allen told Emily that she had to prove that Baby L has these same medical conditions that run in Baby L's family. Since Baby L was a day old, Caseworker Allen's demands were absurd and impossible to meet.

378. Defendant Caseworker Allen was yelling at Brandon and Emily over the phone, as a hospital social worker stepped into the room to listen in.

379. Additionally, Defendant Caseworker Allen likely lied to Brandon and Emily when she told them that she had the hospital medical records, since the social worker confirmed to Brandon and Emily that she had not even sent this paperwork to DCFS yet.

380. During this phone conversation, Defendant Caseworker Allen repeatedly told Brandon and Emily that she hoped Baby L did not die due to their decisions.

381. Defendant Caseworker Allen also told Brandon and Emily that if they continued to refuse these medical procedures, the medical staff at DCFS would need to come to their house every week or month to check on them and their children, stating she had to talk with DCFS medical staff to see how often the baby would need to be checked.

382. Emily asked what Defendant Caseworker Allen wanted her to do to avoid having their children taken away, and Defendant Caseworker Allen told Emily it was too late for the first two medical procedures, the Vitamin K shot and erythromycin eye ointment, but that it was not too late to allow hospital staff to administer the Hepatitis B shot. When Defendant Caseworker Allen was telling Brandon and Emily this, the hospital social worker was shaking her head, indicating this was not necessary. Emily stated that she was not reported for refusing the Hepatitis B shot, but Caseworker Allen indicated that this did not matter. Medical records later obtained confirm that the Hospital social worker informed Defendant Caseworker Allen that no medical staff was reporting Brandon and Emily for medical neglect for refusing a Hepatitis B shot, but Defendant Caseworker Allen insisted that the Hepatitis B shot should be done before allowing the couple to discharge.

383. During the phone conversation, Brandon and Emily were telling Defendant Caseworker Allen that their pediatrician was aware of their plans for refusing these three medical procedures and had no problem with the couple's plans. But Defendant Caseworker Allen told them she did not care about their pediatrician's views on this; she only cared about the opinion of the Hospital doctor's views on this matter, even though the medical records later obtained indicated that Defendant Caseworker Allen knew that there was no concern expressed by medical staff that Emily and Brandon were committing medical neglect.

384. Nevertheless, once Defendant Caseworker Allen realized that Baby L's pediatrician visited Baby L at the hospital, she told Brandon and Emily that they needed to provide a letter from this

pediatrician indicating their refusals did not constitute medical neglect. Emily called Baby L's pediatrician, and the pediatrician later told Emily that Defendant Caseworker Allen was yelling at her (the pediatrician) as well.

385. Even though Defendant Caseworker Allen received the letter from the Baby L's pediatrician indicating that refusing the medical procedures at issue in this case did not constitute medical neglect, Defendant Caseworker Allen nevertheless told the hospital social worker that Baby L must be held at the hospital and could not be released to Brandon and Emily until after a home visit was conducted.

386. At this time, Emily reasonably did not feel free to leave the hospital, as she was not going to leave Baby L alone at the hospital. The Hospital social worker came in and told Emily and her mother that Caseworker Allen told her that Baby L was not to be released to Emily. Emily was crying and the social worker asked what she could do. Emily responded, "Tell me she can't take my kids." The social worker responded, "She can."

387. Brandon went home that night to take care of the couple's other young daughter and Emily stayed at the hospital with her mother and Baby L.

388. The next morning, the hospital obstetrician came in and told Emily that she was medically cleared to leave the hospital. However, Emily was told that the hospital would not allow Baby L to go home until DCFS did the home visit, on orders of Defendant Caseworker Allen. This has been confirmed by the medical records, which indicate Defendant Caseworker Allen would not allow Emily and Baby L to be discharged until DCFS completed a home visit.

389. Additionally, even though Brandon desperately wanted to come to the hospital, he was required to stay home with the couple's other daughter to complete the DCFS home visit. Defendant Caseworker Allen refused to complete the home visit until Emily re-signed the medical refusal forms

for the Vitamin K injection and administration of the erythromycin eye drops because Emily had circled the risk of allergic reactions on the form and wrote next to it that she had a family history of allergic reactions. Defendant Caseworker Allen told Emily that the form had to be re-signed because writing on the form supposedly indicated that she didn't understand the risks of the refusals. Emily was crying and upset by this, but after consultation with Hospital staff and family members, Emily agreed to re-sign the medical refusal form, without her handwritten additions. This insistence on having Emily re-sign the medical waiver form thus unnecessarily prolonged an already illegal seizure.

390. When Defendant Caseworker Allen entered Brandon and Emily's home, she did so without their valid consent, and without a legal basis to do so.

391. Once cleared by Defendant Caseworker Allen, Emily and Baby L were allowed to be released from the hospital that evening. Emily was driven home by her mother while Brandon remained home with their other child.

392. Were it not for the actions of Defendant Caseworker Allen and the policy of Defendant Advocate Christ, Emily and Baby L would have left the hospital hours earlier, and Brandon would not have been compelled to stay home, away from Baby L, awaiting on the forced home visit. This separation of the family caused anxiety and stress, and, as a result, the family also was not able to take newborn photos at the hospital, due to the forced separation.

393. Months later, Brandon and Emily received a letter from DCFS stating the accusations of medical neglect were determined to be unfounded.

5. _**Danielle Anderson and Baby G**_

394. On February 5, 2019, Baby G[2] was born to Danielle at the University of Chicago Medical Center ("UC Medical") in Chicago, Illinois.

395. Danielle chose to have her baby born at Defendant UC Medical because she was considered higher risk, due to a shortened cervix. This condition does not and did not cause birth trauma.

396. On February 5, 2019, Baby G was delivered via natural birth, without a C-Section and without an epidural.

397. Before the birth of Baby G, Danielle had her neonatal examinations performed by Dr. Roxanne Holt, an obstetrician at Defendant UC Medical. Danielle told Dr. Holt about her desire to refuse unnecessary medical procedures, which would include a Vitamin K shot and a Hepatitis B shot (the two did not discuss the refusal of the erythromycin eye ointment). Dr. Holt told Danielle this was acceptable, and that there would be no issues refusing these medical procedures.

398. Upon information and belief, Defendant UC Medical does not give any information to prospective parents and guardians about the consequences of refusing certain medical procedures, and Dr. Holt specifically told Danielle that such refusals were acceptable and that there would be no consequences for doing so.

399. Had Danielle been told the truth about UC Medical's policy ahead of time, Danielle would have chosen another hospital to give birth. Prior to the Baby G's birth, Danielle had no idea that her reasonable and informed medical choices for Baby G could result in DCFS involvement.

400. Danielle arrived at UC Medical on February 4, 2019, but the birth occurred at about 6:30 a.m. on February 5, 2019. During the birth, Baby G's father was also present at the hospital.

---

[2] Danielle's baby has the last name of her father, who is not a Plaintiff in this case. His last name begins with the letter G, and thus Danielle's baby is referred to as Baby G in the Complaint.

401. Baby G was born a healthy baby girl with no medical problems. Danielle and the baby's father were able to hold the baby.

402. However, immediately after birth, Danielle told the hospital staff that she did not want the hospital to administer a Vitamin K shot or Hepatitis B shot to Baby G, nor any other injections.

403. A pediatrician at the hospital came into the room and advised Danielle that if she did not allow the hospital to administer the Vitamin K shot the hospital would take away her baby. This conversation occurred within an hour of the birth. Danielle told the pediatrician to leave the room, which she did.

404. Later in the morning, different pediatrician came to the room bringing materials regarding Vitamin K and further discussed the materials with Danielle. This pediatrician did not mention DCFS or taking away the baby.

405. That afternoon, doctors and nurses at the hospital kept coming to Danielle and Baby G's room try to convince Danielle to allow the forced administration of the Vitamin K shot on Baby G, but Danielle continued to refuse the unwanted and unnecessary medical procedure.

406. That evening, Danielle contacted a doula through Facebook, and began communicating with her to get advice about her rights to refuse unnecessary medical procedures for her child.

407. The next morning, hospital doctors and other staff continually harassed Danielle about the Vitamin K shot, with one doctor telling her it was "state law" that she cannot refuse the Vitamin K shot. Danielle confirmed with this doctor that there was nothing wrong with the health of Baby G, but the doctor told her it was preventative in nature.

408. By this time, Danielle knew that this doctor was lying to her, that the Vitamin K shot was not state law, so Danielle wanted to go to a different hospital, closer to her home. However, there were still tests being done Baby G, so Danielle remained at Defendant UC Medical.

409. At about 7:30 a.m. on February 6, 2019, Defendant Dr. Poj Lysouvakon, Medical Director of the Infant Nursery, came into Danielle's room. Danielle advised Defendant Dr. Lysouvakon that she did not want to discuss the Vitamin K issue, and that he should leave the room if he was there to discuss this topic. Danielle notified Defendant Dr. Lysouvakon that she was going to record the conversation. At that point, Defendant Dr. Lysouvakon told her that they were going to take the baby into "protective custody" and that the procedure would last about 7 minutes, meaning the administration of the Vitamin K shot. Danielle then told him to leave, and he did.

410. Upon information and belief, Defendant Dr. Lysouvakon knew that Procedures 300, Section H had been rescinded, that there was no legal basis to take Baby G into "protective custody" – even before that rescission but even more so afterward – yet he threatened to do so anyway.

411. The doula arrived at 8 a.m. that morning. Immediately after the doula arrived, Defendant Dr. Lysouvakon came back into the room, this time with three other staff members, and he told Danielle that he had the legal right to physically take Baby G from Danielle to administer the Vitamin K shot.

412. Upon hearing this, the doula called 311 to ask about Danielle's options. The operator at 311 advised the doula to call 911.

413. During this ordeal, Danielle also had been communicating with her cousin, who was a medical student. Danielle's cousin told Danielle to tell the doctors that she had the right to refuse these procedures.

414. Defendant Dr. Lysouvakon and the three other hospital staff members entered the room, but, on advice of the doula, Danielle asked the doctor to get his legal team.

415. Dr. Lysouvakon then came back into the room with hospital security and a nurse, stating that he was going to physically take away the baby.

76

416. Danielle asked Defendant Dr. Lysouvakon why his legal team was not with him, and he told Danielle that he had them on the phone. Danielle asked that they be physically present, and Dr. Lysouvakon said he called them and then Defendant Dr. Lysouvakon proceeded to tell Danielle that he had the right to physically remove the baby from Danielle's custody.

417. Upon information and belief, Dr. Lysouvakon made no efforts to consult with a lawyer, but instead this was a ruse to cloak himself with legal authority where there was none.

418. At this point, Danielle stood up and told the doula to call 911 because the situation was going to get physical. Danielle also told the doctor and the hospital staff that they needed to leave immediately. Dr. Lysouvakon left, and two Chicago police officers arrived shortly thereafter.

419. Danielle told the police officers that Defendant Dr. Lysouvakon was threatening to take away Baby G from her, and that she had the right to refuse a Vitamin K shot for her daughter. Danielle showed them literature about her rights, including the August 2, 2018 rescission letter from Defendant Walker, indicating that DCFS had rescinded its earlier Vitamin K policy as referenced above in this Complaint, as well as, other information about the potential danger of the Vitamin K shot, which had been given to Danielle by the doula and her cousin.

420. The police officers then spoke with Defendant Dr. Lysouvakon, with the door open. Defendant Dr. Lysouvakon told the officers that the hospital had within one hour after birth to give the shot. The officer responded that it was long past one hour, so they should stop harassing Danielle.

421. The police officers told Defendant Dr. Lysouvakon to leave the room, and that Danielle needs to bond with Baby G and enjoy being with her baby. The police officers also told Dr. Lysouvakon that Danielle had the right to leave the hospital.

422. The officers then assured Danielle that Defendant Dr. Lysouvakon was going to leave her alone, and that Defendant Dr. Lysouvakon was not going to take away Baby G.

423. Two other police officers arrived in order to help escort Danielle out of the hospital, but she decided to stay until all the tests and procedures were completed.

424. Defendant Dr. Lysouvakon came back and told Danielle, "Let's not hold a grudge." He also told her that she could stay at the hospital. Danielle then told Defendant Dr. Lysouvakon to get the discharge papers ready and that she was ready to leave once the tests were done.

425. Danielle left the hospital at about 3:30 p.m. on February 6, 2019.

426. While at the hospital, DCFS never attempted to contact Danielle.

427. On February 15, 2019, Defendant Caseworker Sherina called Danielle to tell her DCFS was investigating a medical neglect report based on the referral from the Defendant UC Medical.

428. Caseworker Sherina conducted her investigation based on Danielle's refusal of a Vitamin K shot without ever acknowledging to Danielle that Procedures 300, Section H had been rescinded. Thus, Caseworker Sherina, either had been notified by DCFS that this policy was rescinded and she persisted in her actions anyway, or Defendant Walker never took the steps of notifying her caseworkers that they should no longer be investigating couples for refusing Vitamin K shots, knowing DCFS had no legal basis for implementing the policy in the first place, as she had conceded in August of 2018.

429. Defendant Caseworker Sherina followed up with a text that same day. Defendant Caseworker Sherina and Danielle missed each other's calls for a while, but eventually they spoke over the phone, and Defendant Caseworker Sherina stated that DCFS was required to do a home visit.

430. Defendant Caseworker Sherina came to Danielle's home for the home visit, and gave her documents regarding medical neglect information. Defendant Caseworker Sherina stated that she had to come back again to see Danielle's other child, which she did.

431. During both of these home visits, Defendant Caseworker Sherina came into Danielle's home without her consent, and without any legal authority to do so.

78

432. At one point during the investigation, Defendant Caseworker Sherina called and told Danielle that they were going to indicate her for medical neglect, unless she allowed Baby G to receive a Vitamin K shot at an upcoming doctor's visit.

433. Danielle asked Defendant Caseworker Sherina to confirm this requirement in writing. Defendant Caseworker Sherina then called Danielle back and told Danielle that she changed her mind, and that the report was going to be unfounded.

434. Nevertheless, Defendant Caseworker Sherina stated that she needed another doctor to verify that the refusal of Vitamin K was not medical neglect.

435. Defendant Caseworker Sherina then contacted Dr. Jasmine Scott, Baby G's pediatrician, who verified there were no medical issues with Baby G, and that it was Danielle's right to decline these medical procedures.

436. Months after Baby G's birth, DCFS finally closed their investigation, with a determination that the report of medical neglect was unfounded.

6.     ***Kelly Metke and Future Baby M***

437. Plaintiff Kelly Metke is a highly-educated woman with an MBA from the University of Chicago.

438. Kelly is pregnant with a baby boy, Baby M, with a due date of January 10, 2020.

439. Kelly is planning on having her birth at Prentice Hospital, operated by Northwestern University Hospital in Chicago, Illinois.

440. Kelly plans on refusing any Vitamin K shot for Baby M, the application of erythromycin eye ointment, and a Hepatitis B shot.

441. Kelly has one other biological child, a girl, born in October of 2017 at Prentice Hospital. During this birth, Hospital staff administered a Vitamin K shot, erythromycin, and a Hepatitis B shot, without her informed consent.

442. Following this birth, Kelly became an advocate for informed consent and parental choice.

443. Kelly also became a member of James' informal group of parents concerned about these issues, and has become well aware of the legal and medical issues at issue in this case.

444. Through her experiences, research, and advocacy, she has come to learn about DCFS practices before and after the rescission of Procedures 300, Section H.

445. Kelly is concerned that if she refuses the three medical procedures mentioned above, that she will be investigated by DCFS for medical neglect, that her baby could be removed from her and forcibly given these unwanted and unnecessary medical procedures, that her custody of Baby M or her other biological child could be in jeopardy and/or that she will be forced to endure threats to take such actions as a means to coerce her into accepting these three unwanted medical procedures.

446. To prevent this from happening, Kelly has made inquiries with her obstetrician and pediatrician about her plan on refusing these medications, absent a specific need for them based on the circumstances of her birth, and these doctors indicated to her that they would honor this request.

447. Kelly's obstetrician advised her against the refusals, but indicated that she would honor the request, and that no report of medical neglect would be made.

448. Kelly's pediatrician, meanwhile, is supportive of the refusal of these medical procedures, and has recommended that an oral Vitamin K supplement is used, which she does plans on doing at about the time of the birth.

449. However, based on what Kelly has learned through her experience, research and advocacy, these assurances are insufficient, since neither of these doctors will be the pediatrician who will interact

with Baby M on the day of his birth. Also, calling the Hospital personnel is an insufficient guarantee because Kelly has learned that couples, including some of the couple Plaintiffs in this case, were affirmatively told by Hospital personnel that there would be no issue if these medical procedures are refused, only to have the unconstitutional mistreatment occur any way. Moreover, there does not appear to be a practical way of ensuring that whatever pediatrician arrives at the hospital will not engage in these unconstitutional practices. Only an injunction will assure Plaintiff Metke that she will be allowed to refuse the three medical procedures at issue in this case without suffering the consequences described above.

450. Therefore, Kelly requests an injunction against Defendant Smith to ensure that she is not coerced, threatened, or investigated for medical neglect based solely on these refusals.

## **CAUSES OF ACTION**

### ***Substantive Due Process – General Allegations Common to all Counts***

451. A family has the right under the substantive due process clause of the Fourteenth Amendment to the United States Constitution to remain together without the coercive interference of the awesome power of the State, which is the most basic aspect of family privacy.

452. A parent has the right to decline unnecessary prophylactic medical procedures for his or her minor child.

453. The medical procedures that the Plaintiffs declined on behalf of their newborn babies were medically unnecessary and purely prophylactic.

454. Defendants knew that Plaintiffs had a Constitutional right to refuse such medical procedures and intentionally denied them this right and/or were deliberately indifferent and/or reckless in their denial of this right.

455. All of the Defendants acted under color of state law when taking the actions described in this complaint.

456. The DCFS Defendants that are being sued for damages – Walker, Harms-Pavelski, Dr. Glick, and the Defendant Caseworkers – were employed by the State and charged with supervising and/or conducting investigations of child abuse. Among other wrongful actions, they used the power given to them as State officials and/or employees and through their authorities and investigative powers to cause the Plaintiffs to be threatened and coerced into accepting unwanted and unnecessary medical procedures.

457. The Defendants who interacted with the Plaintiffs at the hospitals – Drs. Schulte, Skalski, John Doe (Silver Cross), and Lysouvakon, along with Nurse Kozuch – used their state authority and the threat of state action – a DCFS investigation and the possible breakup of the family – to coerce and threaten the Plaintiffs into accepting unwanted and unnecessary medical procedures, and in the case of Dr. Lysouvakon to threaten to seize Danielle's baby, and in the case of Dr. Skalski and Nurse Kozuch to actually seize Pastor Brian and Angela's baby, even though such actions were clearly illegal and unconstitutional.

458. Defendants Dr. Jill Glick and ICAAP, meanwhile, conspired with DCFS officials, including but not limited to Defendant Harms-Pavelski, Dr. Jaudes, and Defendant Walker to implement a DCFS policy that all of them knew was illegal, and then they made sure that Illinois pediatricians and hospitals carried out this policy of using coercive threats and actions designed to enforce compliance with their desires that no parent be allowed to refuse the prophylactic medical procedures at issue in this case.

**Count I:  Substantive Due Process/Conspiracy to Deprive Plaintiffs of Substantive Due Process:
All Plaintiffs (Except Plaintiff Kelly Metke) versus Defendants B.J. Walker, Nora Harms-Pavelski,
Dr. Jill Glick, and ICAAP**

459.  Each of the above paragraphs is incorporated as if fully restated herein.

460.  These Defendants had no direct contact with the Plaintiffs during their incidents, however, their actions proximately caused the denial of the substantive due process rights of the Plaintiffs.

461.  Defendant Walker, *inter alia*, knew that there was no legal basis for implementing Procedures 300, Section H, yet she worked in concert with the other named Defendants in this count to implement this policy, thereby authorizing Illinois pediatricians and hospitals to use the power of the State's child-abuse agency, DCFS, to coerce and threaten parents such as the Plaintiffs into accepting unnecessary medical procedures to their perfectly healthy newborn babies against the Plaintiffs' express wishes.

462.  Before rescinding this policy, Defendant Walker knew there was a widespread practice of Illinois hospitals and pediatricians using this policy to coerce parents into accepting unwanted and unnecessary medical procedures, yet she continued to allow DCFS to be used to further these illegally coercive acts.

463.  Even after rescinding this policy, Defendant Walker took no actions to make sure these coercive and illegal practices discontinued, even though she was aware that these practices continued even after the rescission of Procedures 300, Section H.

464.  Defendant Harms-Pavelski, *inter alia*, was the Director of Child Protection for DCFS and the person most knowledgeable regarding DCFS's child protection policies and procedures. Defendant Harms-Pavelski knew prior to forming an agreement with Defendant Dr. Jill Glick, Defendant ICAAP, and certain Illinois hospitals and pediatricians, that there was no legal basis for the implementation of Procedures 300, Section H, yet she deliberately chose implementation of the policy nonetheless.  In fact, it appears that she made the decision to codify the policy – and notified Illinois pediatricians and

hospitals of this – without Defendant Walker's consultation, although Defendant Walker later adopted and enforced this unconstitutional policy, as well, when later notified.

465. Before DCFS rescinded Procedures 300, Section H, Defendant Harms-Pavelski knew there was a widespread practice of Illinois hospitals and pediatricians using this policy to coerce parents into accepting unwanted and unnecessary medical procedures, yet she continued to allow DCFS to be used to further these illegally coercive acts.

466. Even after the rescission of the Procedures 300, Section H policy, Defendant Harms-Pavelski took no actions to make sure these coercive practices discontinued, even though she was aware that these practices continued even after Defendant Walker's letter rescinding the policy.

467. Defendant Dr. Jill Glick was perhaps the most aggressive of the individual Defendants in ensuring the advancement of Procedures 300, Section H. She, along with Defendant ICAAP, also was a key individual in implementing and carrying out this policy on a statewide basis, since she was on the DCFS advisory council that advises the DCFS Director on policies relating to medical neglect issues and, also, previously a "reviewer" of Procedures 300. Additionally, Defendant Dr. Glick was a key figure in not taking "no" for an answer when DCFS announced to Illinois pediatricians, PAC members, and hospital administrators that it was not going to continue to maintain Procedures 300, Section H, and made sure that DCFS changed that position on this issue to continue to enforce Procedures 300, Section H, knowing that implementing the procedure was illegal and unconstitutional. In fact, Defendant Glick clearly wrote in an email that Defendant UC Medical relied on the authority of DCFS's Procedures 300, Section H to develop and implement its own formal policy, which allows Defendant UC Medical staff to take "protective custody" of newborn babies merely because their parents chose to refuse prophylactic medical procedures after careful and thoughtful consideration. Her actions following the rescission of Procedures 300, Section H, also show her deliberate disregard of the Constitutional rights of Illinois

84

parents such as the Plaintiffs. As a member of the DCFS advisory council, Defendant Dr. Glick knew DCFS rescinded Procedures 300, Section H, and yet she continued to carry out her "protective custody" policy anyway, even after the DCFS policy rescission on August 2, 2018. In fact, before the rescission, there was no basis to cite this policy for her "protective custody" policy, since Procedures 300, Section H did not authorize the forced seizure of newborn babies and the forced administration of unnecessary and prophylactic procedure against the express will of parents. Yet, Defendant Dr. Glick not only implemented this unconstitutional policy at UC Medical – and advocated other hospitals do it as well – but she then continued to carry out this unconstitutional policy even after the rescission of Procedures 300, Section H.

468. Defendant ICAAP is an organization whose membership consists of thousands of Illinois pediatricians, and, as an organization, worked in concert with Defendant Dr. Jill Glick to not take "no" for an answer after DCFS initially indicated it would not be continuing to enforce Procedures 300, Section H, knowing that such a policy was illegal and unconstitutional. Defendant ICAAP through its status, prestige, and influence with both DCFS officials and its own member pediatricians, as well as its strong messaging and standard-setting capability was an essential element in the DCFS policy's re-implementation and widespread enforcement of the Procedures 300, Section H policy even though it was illegal and, clearly, unconstitutional. Specifically, Defendant ICAAP broadly circulated a letter on its official letterhead which, referring to a parent's Vitamin K shot refusal, stated, "Our consensus is that this is medical neglect and should continue to be investigated as such." In so doing, Defendant ICAAP adopted and circulated to both DCFS officials and ICAAP pediatricians with prominent positions in Illinois hospitals an official ICAAP policy which its members had promulgated declaring a parents Vitamin K shot refusal to be per se medical neglect; thereby, allowing this policy to be used by DCFS to justify DCFS's implementation and enforcement of Procedures 300, Section H. Further, Defendant

ICAAP as an organization and through its officials and members worked in concert with DCFS officials, including Defendants Walker, Harms-Pavelski and Dr. Glick, to make certain that this policy of using state authority, through DCFS, to coerce parents such as the Plaintiffs into accepting the administration of unnecessary and unwanted prophylactic medical procedures against the parent's express desires advanced Defendant ICAAP's desired purpose.

469. The proximate cause of the actions of the aforementioned Defendants were the injuries to the Plaintiffs, including but not limited to a loss of their liberty, emotional distress, and mental anguish.

## Count II: Substantive Due Process/Conspiracy to Deprive Plaintiffs of Substantive Due Process: Plaintiffs James, Courtney, and Baby H against Defendant Dr. Schulte

470. Each of the above paragraphs is incorporated as if fully restated herein.

471. Defendant Dr. Schulte acted under color of law when she illegally used the state power held by DCFS to coerce Plaintiffs James and Courtney into accepting unwanted and unnecessary medical procedures. This coercion took the form of threats to seek DCFS intervention, which Defendant Dr. Schulte knew had not only the power to investigate James and Courtney for the serious charge of medical neglect, but to take actions to take away the custody of not only Baby H, but also James and Courtney's other child, P.H.

472. The proximate cause of the actions of the aforementioned Defendants were the injuries to these Plaintiffs, including but not limited to a loss of their liberty, emotional distress, and mental anguish.

## Count III: Substantive Due Process/Conspiracy to Deprive Plaintiffs of Substantive Due Process: Plaintiffs Pastor Brian, Angela, and Baby B versus Defendants Dr. Skalski, Nurse Kozuch, Silver Cross, and Caseworker Kitakis

473. Defendant Nurse Kozuch acted under color of law when she illegally used the state power held by DCFS to coerce Plaintiffs Pastor Brian and Angela into accepting unwanted and unnecessary medical procedures for their baby. This coercion took the form of using the threat of a DCFS investigation to coerce Pastor Brian and Angela into accepting the unwanted and unnecessary medical

procedures, and Defendant Nurse Kozuch knew DCFS had the power to investigate Pastor Brian and Angela for the serious charge of medical neglect, and/or to take actions to take away the custody of not only Baby B, but also Pastor Brian and Angela's other four children.

474. Defendant Dr. Skalski acted under color of law when he illegally used the state power held by DCFS to coerce Plaintiffs Pastor Brian and Angela into accepting unwanted and unnecessary medical procedures for their baby. This coercion took the form of using the threat of a DCFS investigation to coerce Pastor Brian and Angela into accepting the unwanted and unnecessary medical procedures, and Defendant Dr. Skalski knew DCFS had the power to investigate Pastor Brian and Angela for the serious charge of medical neglect, and/or to take actions to take away the custody of not only Baby B, but also Pastor Brian and Angela's other four children.

475. Defendant Caseworker Kitakis acted under color of law when she illegally used her DCFS powers to investigate, coerce, and threaten Plaintiffs Pastor Brian and Angela for refusing to allow doctors and nurses to administer unwanted and unnecessary medical procedures on their baby, knowing there was no legal basis to do so, and she further acted under color of law in sending out law enforcement officers to do an illegal "home visit."

476. Defendant Silver Cross acted under color of state law in adopting a formal or informal policy or procedure that proximately caused the violation of the Plaintiffs' constitutional rights.

477. Defendant Silver Cross has an informal and/or formal policy or procedure or widespread practice that allowed for doctors and nurses to threaten and coerce parents who refused the medical procedures at issue in this case, and emboldened doctors and nurses working at its hospital by encouraging or even demanding that they use DCFS as a tool for conducting these illegal threats and coercive acts.

478. Moreover, upon information and belief, Defendant Silver Cross had a formal and/or informal practice or procedure or widespread practice of allowing Hospital staff or pediatricians working at the hospital to take newborns into "protective custody" upon parents refusing the medical procedures at issue in this case.

479. Defendant Silver Cross Hospital is also liable for any actions taken by its employees based on a *respondeat superior* theory of liability for any actions of its employees and/or agents who acted under color of state law to deny the constitutional rights of the Plaintiffs.

480. The proximate cause of the actions of the aforementioned Defendants were the injuries to these Plaintiffs, including but not limited to a loss of their liberty, emotional distress, and mental anguish.

**Count IV:  Substantive Due Process/Conspiracy to Deprive Plaintiffs of Substantive Due Process:
Plaintiffs Dr. Kosek, Sarah, and Baby K versus Defendants Dr. John Doe (Silver Cross), Silver
Cross, and Caseworker Williams**

481. Defendant Dr. John Doe (Silver Cross) acted under color of law when he illegally used the state power held by DCFS to coerce Plaintiffs Dr. Kosek and Sarah into accepting unwanted and unnecessary medical procedures for their baby.  This coercion took the form of using the threat of a DCFS investigation to coerce Dr. Kosek and Sarah into accepting the unwanted and unnecessary medical procedures, and Defendant Dr. John Doe (Silver Cross) knew DCFS had the power to investigate Dr. Kosek and Sarah for the serious charge of medical neglect, and/or to take actions to take away the custody of Baby K..

482. Defendant Caseworker Williams acted under color of law when she illegally used her DCFS powers to investigate Dr. Kosek and Sarah for refusing to allow doctors and nurses to administer unwanted and unnecessary medical procedures on their baby, knowing there was no legal basis to do so.

483. Defendant Silver Cross Hospital had a formal or informal policy or procedure that proximately caused the violation of the Plaintiffs' constitutional rights.  Defendant Silver Cross has an informal and/or formal policy or procedure or widespread practice that allowed for doctors and nurses

to threaten and coerce parents who refused the medical procedures at issue in this case, and emboldened doctors and nurses working at its hospital by encouraging or even demanding that they use DCFS as a tool for conducting these illegal threats and coercive acts.

484. Defendant Silver Cross Hospital is also liable for any actions taken by its employees based on a *respondeat superior* theory of liability.

485. The proximate cause of the actions of the aforementioned Defendants were the injuries to these Plaintiffs, including but not limited to a loss of their liberty, emotional distress, and mental anguish.

## Count V:  Substantive Due Process/Conspiracy to Deprive Plaintiffs of Substantive Due Process: Plaintiffs Brandon, Emily, and Baby L versus Defendants Advocate Christ and Caseworker Allen

486. Defendant Caseworker Allen acted under color of law when she illegally used her DCFS powers to investigate Plaintiffs Brandon and Emily and to threaten them and coerce them into accepting unwanted and unnecessary medical procedures on their baby, knowing there was no legal basis to do so, and, in fact, that the doctors and other medical staff did not consider medical neglect, due to the Emily's unique medical condition.

487. Defendant Caseworker Allen also acted under color of law when she illegally used her DCFS powers to seize the Plaintiffs and insist that they accept unwanted medical procedures for their Baby, and that they further allow her into their home to do an unconstitutional "home visit," even though she knew such actions were illegal and unconstitutional.

488. Defendant Advocate Christ acted under color of state law in implementing a written policy that proximately caused the violation of the Plaintiffs' constitutional rights.

489. Defendant Advocate Christ had an express policy at the time – and which upon information and belief continues to be in place – that requires its medical staff and doctors working at its Hospital to call DCFS to investigate parents who refuse Vitamin K shots and the application of erythromycin eye ointment for newborn babies in all cases of such refusal, even though the Hospital knew such a policy

was illegal and unconstitutional, and further that the blanket nature of the policy would cause constitutional injury to persons such as Emily and Brandon, whose reasons for refusal of these medical procedures were deemed reasonable by Hospital staff, as was the case here.

490. The proximate cause of the actions of the aforementioned Defendants were the injuries to these Plaintiffs, including but not limited to a loss of their liberty, emotional distress, and mental anguish.

## Count VI: Substantive Due Process/Conspiracy to Deprive Plaintiffs of Substantive Due Process: Plaintiffs Danielle and Baby G versus Defendants UC Medical, Dr. Glick, Dr. Lysouvakon, and Caseworker Sherina

491. Defendant Dr. Lysouvakon acted under color of law when he illegally used the state power held by DCFS to coerce Plaintiff Danielle into accepting unwanted and unnecessary medical procedures for her baby. This coercion took the form of using the threat of a DCFS investigation to coerce Danielle into accepting the unwanted and unnecessary medical procedures, and Defendant Dr. Lysouvakon knew DCFS had the power to investigate Danielle for the serious charge of medical neglect, and/or to take actions to take away the custody of not only Baby G, but also Danielle's other child. This coercion also took the form of actually threatening to physically take Baby G into "protective custody" and forcibly administer unwanted and unnecessary medical procedures, against Danielle's will and consent, and without any legal basis of doing so.

492. Defendant Caseworker Sherina acted under color of law when she illegally used her DCFS powers to investigate Plaintiff Danielle for refusing to allow doctors and nurses to administer unwanted and unnecessary medical procedures on her baby, knowing there was no legal basis to do so.

493. Defendant UC Medical and Defendant Dr. Glick, who was instrumental in implementing the policy at UC Medical, acted under color of state law in implementing an express written policy that proximately caused the violation of the Plaintiffs' constitutional rights. Defendant UC Medical has an express policy that allowed for doctors and nurses to threaten and coerce parents who refused Vitamin K shots for their newborn babies, and emboldened doctors and nurses working at its hospital by

90

encouraging or even demanding that they use DCFS as a tool for conducting these illegal threats and coercive acts, including but not limited to taking newborn babies into "protective custody" when their parents refuse a Vitamin K shot for their newborns.

494. Defendant UC Medical also liable for any actions taken by its employees based on a *respondeat superior* theory of liability for the actions of any employees who acted under color of state law to deny the constitutional rights of the Plaintiffs.

495. The proximate cause of the actions of the aforementioned Defendants were the injuries to these Plaintiffs, including but not limited to a loss of her liberty, emotional distress, and mental anguish.

**Count VII: Fourth Amendment Illegal Seizure Claim**
**Plaintiffs Courtney and Baby H against Defendant Dr. Suzanne Schulte**

496. Each of the above paragraphs setting forth the factual allegations is incorporated as if fully restated herein.

497. A person has the right under the Fourth Amendment to the United States Constitution to be free from unlawful searches and seizures.

498. Defendant Dr. Schulte caused DCFS Caseworker Layton to arrive at the Hospital and caused Courtney and Baby H to be seized, *i.e.*, Courtney reasonably did not feel free to leave the Hospital with Baby H until the on-site DCFS investigation at the hospital was complete. More specifically, Courtney was told by Hospital staff that Caseworker Layton could not leave until Caseworker Layton had seen Baby H. At that time and in the time preceding this conversation, Courtney had a desire to leave the Hospital with Baby H, but reasonably believed that they were not free to leave. This, along with all the other circumstances of the case as alleged in this Complaint, constitutes an illegal seizure.

499. The proximate cause of the actions of the aforementioned Defendants was the injuries to these Plaintiffs, including but not limited to a loss of their liberty and, for Courtney, emotional distress, and mental anguish.

91

**Count VIII: Fourth Amendment Illegal Search and Seizure Claim**
**Plaintiffs Pastor Brian, Angela and Baby B against Defendant Nurse Kozuch, Defendant Dr.**
**Skalski, Silver Cross, and Defendant Caseworker Kitakis**

500. Pastor Brian, Angela and Baby B bring a Fourth Amendment illegal seizure claim against Defendants Nurse Kozuch and Dr. Skalski for, while acting under color of law, taking away their baby from them (and the baby from her parents), for no legitimate legal reason.

501. Defendant Silver Cross acted under color of state law in adopting a formal or informal policy or procedure that proximately caused the violation of the Plaintiffs' constitutional rights. Upon information and belief, Defendant Silver Cross had a formal and/or informal practice or procedure or widespread practice of allowing Hospital staff or pediatricians working at the hospital to take newborns into "protective custody" upon parents refusing the medical procedures at issue in this case.

502. Moreover, Defendant Silver Cross is also liable for any actions taken by its employees based on a *respondeat superior* theory of liability for any actions of its employees and/or agents who acted under color of state law to deny the constitutional rights of the Plaintiffs.

503. Pastor Brian and Angela bring a Fourth Amendment illegal search and seizure claim against Defendant Caseworker Kitakis for, while acting under color of law, causing Joliet police officers to enter their home without a warrant, without their consent, and without a legal basis for doing so.

504. Pastor Brian and Angela specifically objected to Defendant Kitakis and made it clear they would not consent to such a home visit, and in response Defendant Caseworker Kitakis instead used the Joliet police department to do the home visit. This "home visit" was not the product of free and voluntary consent, and was caused by the actions of Defendant Caseworker Kitakis.

505. The proximate cause of the actions of the aforementioned Defendants was the injuries to the Plaintiffs, including but not limited to a loss of liberty and emotional distress.

**Count IX: Fourth Amendment Illegal Search and Seizure Claim**
**Plaintiffs Dr. Kosek and Sarah against Defendant Caseworker Williams**

506.  Plaintiffs Dr. Kosek and Sarah bring a Fourth Amendment illegal search and seizure claim against Defendant Caseworker Williams for, while acting under color of law, entering their home without a warrant, without their consent, and without a legal basis of doing so.

507. This "home visit" was expressed to the Plaintiffs as mandatory, and the Plaintiffs at no time gave their free and voluntary consent for Defendant Caseworker Williams to enter their home.

508.  The proximate cause of the actions of the aforementioned Defendant was the injuries to the Plaintiffs, including but not limited to a loss of liberty and emotional distress.

**Count X: Fourth Amendment Illegal Search and Seizure Claim**
**Plaintiffs Emily and Baby L against Defendant Caseworker Allen**

509.  Emily and Baby L bring a Fourth Amendment illegal seizure claim against Defendant Caseworker Allen for, while acting under color of law, causing them to not be allowed to leave the Hospital after they were medically cleared to leave and after they wanted to leave the Hospital, together, and further Caseworker Allen caused Brandon to be illegally seized because he was not allowed to leave his home and go to the Hospital to visit his wife and Baby L because he was required against his will to stay home for Defendant Caseworker Allen's non-consensual and illegal home visit.

510.  Brandon and Emily bring a Fourth Amendment illegal search and seizure claim against Defendant Caseworker Allen for, while acting under color of law, entering their home without a warrant, without their consent, and without a legal basis of doing so.

511. This "home visit" was expressed to the Plaintiffs as mandatory, and the Plaintiffs at no time gave their free and voluntary consent for Defendant Caseworker Williams to enter their home.

512.  The proximate cause of the actions of the aforementioned Defendant was the injuries to the Plaintiffs, including but not limited to a loss of liberty and emotional distress.

## Count XI: Fourth Amendment Illegal Search and Seizure Claim
## Plaintiff Danielle against Defendant Caseworker Sherina

513.  Danielle brings a Fourth Amendment illegal search and seizure claim against Defendant Caseworker Sherina for twice, while acting under color of law, entering her home without a warrant, without her consent, and without a legal basis of doing so.

514.  These "home visits" were expressed to the Plaintiff as mandatory, and the Plaintiff at no time gave her free and voluntary consent for Defendant Caseworker Sherina to enter her home.

515.  The proximate cause of the actions of the aforementioned Defendant was the injuries to the Plaintiff, including but not limited to a loss of liberty and emotional distress.

## Count XII: Denial of First Amendment Right to Free Exercise Claim
## Plaintiffs James and Courtney against Defendant Dr. Schulte

516.  Each of the above paragraphs setting forth the factual allegations is incorporated as if fully restated herein.

517.  A person has the right guaranteed by the First Amendment to freely exercise his or her religion without interference by a person acting under color of law.

518.  Illinois law allows parents and/or guardians who claim a religious exemption in writing to not be forced to have their newborn baby undergo the newborn screening tests.

519.  James and Courtney refused the NBS because such test conflicts with their religious tenets and practices.

520.  James presented Newborn Metabolic Screening Act to Defendant Dr. Schulte and read the exemption portion of the Act to her aloud.  The Act states:

> The provisions of this Act shall not apply when parent or guardian of the child objects thereto on the grounds that such test conflicts with his religious tenets and practices. A written statement of such objection shall be presented to a physician or other person whose duty it is to administer and report such tests under the provisions of the Act.

521. James and Courtney properly provided to Hospital staff their signed written statement of their objection to and refusal of the NBS because such tests conflict with their religious tenets and practices, which was contained and is contained in Baby H's medical records.

522. James and Courtney fully complied with this provision of the Act.

523. Defendant Dr. Schulte knew the Plaintiffs fully complied with Illinois law in this regard.

524. James and Courtney told Defendant Dr. Schulte that they objected to such testing based on their religious tenets and practices.

525. Nevertheless, Defendant Dr. Schulte scoffed at the James and Courtney's sincerely held religious beliefs, and coerced the James and Courtney into accepting the newborn screening tests for their baby against their desire and against their religious tenets and practices, and when James and Courtney refused to accede to Defendant Dr. Schulte's coercive demands, Defendant Dr. Schulte not only continued to coerce, but also sought to punish against James and Courtney by seeking DCFS intervention and to have DCFS commence a "Child Abuse and Neglect" investigation, knowing there was no medical or legal basis to do so, and knowing that the James and Courtney had properly obtained a religious exemption to the NBS.

526. The proximate cause of the actions of the Defendant were the injuries to the Plaintiffs, including but not limited to a loss of their liberty, emotional distress, and mental anguish.

<u>**Count XIII: Injunctive Relief Claim**</u>
<u>**All Plaintiffs and a Class of Similarly Situated Persons**</u>
<u>**Against Defendant DCFS Director Marc D. Smith**</u>

527. Count XIII is brought by the named Plaintiffs, individually and on behalf of all other similarly situated persons, pursuant to Rule 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, seeking injunctive and declaratory relief against Defendant Marc D. Smith, in his official capacity as Director of DCFS.

528. The named Plaintiffs provisionally propose this Count be certified on behalf of the following class:

> All persons in the State of Illinois who are currently expecting a child, who currently are attempting to conceive and have a child in the immediate future, or who currently have plans to conceive and have a child in the immediate future, and who intend to forego allowing medical administration of the Vitamin K shot, Hepatitis B shot, erythromycin eye ointment.

529. Upon information and belief, members of the proposed class number in the hundreds or thousands so that joinder of all class members is impracticable. This Count claims of the proposed class representatives and those of the proposed class members raise common questions of law and fact concerning, inter alia, whether the questions are common to the named Plaintiffs and to the members of the proposed class because Defendants have acted and will continue to act on grounds generally applicable to both the named Plaintiffs and proposed class members.

530. The claims of the named Plaintiffs are typical of the claims of the members of the proposed class.

531. The named Plaintiffs will fairly and adequately protect the interests of the members of the plaintiff class.

532. The Plaintiffs are represented by counsel who are highly experienced in federal class action litigation involving civil rights issues.

533. The Defendants have acted on grounds generally applicable to the plaintiff class, thereby making appropriate final injunctive and corresponding declaratory relief with respect to the class as a whole.

534. Each of the above paragraphs setting forth any factual allegations is incorporated as if fully restated herein. Meanwhile, during the periods pertinent to the allegations in this Complaint, DCFS had a widespread practice of accepting these "medical neglect" calls from Illinois pediatricians and of

investigating parents for "medical neglect" in whole or in part based on such a Hepatitis B shot refusal, even though there was no legal basis to do so.

535. Upon information and belief, this practice continues to be in existence as of the filing of this Complaint, in that some Illinois pediatricians and hospitals continue to threaten parents who refuse Hepatitis B shot with DCFS investigations, and DCFS continues to conduct such investigations, without any legal basis for doing so.

536. Defendant Walker's letter rescinding Procedures 300, Section H was silent as to the propriety of having Illinois pediatricians or hospital employees take "protective custody" of newborn babies based solely on a parent's refusal, in order to facilitate the forced administration of a Vitamin K shot or erythromycin eye ointment against the express will of the parent or their sincerely held religious beliefs.

537. Defendant Walker's letter did not address this practice even though high-ranking DCFS officials, including Defendant Harms-Pavelski and Dr. Jaudes knew that certain pediatricians, Illinois hospitals, and even DCFS caseworkers, were engaging in such a widespread practice and/or were using the threat of taking newborn babies into "protective custody" to coerce parents into the forced administration of the Vitamin K shot and/or erythromycin.

538. Defendant Harms-Pavelski and Dr. Jaudes knew Illinois hospitals were engaging in this practice and they either failed to notify Defendant Walker that this practice was occurring, or they did notify Defendant Walker that this practice was occurring, yet Defendant Walker failed to take measures to make sure this practice stopped.

539. For example, Defendant UC Medical has a written policy in effect since October 2017 that specifically mandates all physicians must take "protective custody" of newborn babies based on a parent's refusal of the Vitamin K shot or erythromycin eye ointment. These procedures mandate that,

97

after the social worker on-call has been notified, the attending physician should attempt to convince parents to "consent" to the administration of Vitamin K and erythromycin, and to warn parents or guardians of the "consequences" of refusal. If refusal persists, the policy states that the attending physician must call security at the Hospital to assist physicians in the forcible removal of the newborn babies from the custody of their parents or guardians in order to administer the Vitamin K shot and that DCFS shall be called to inform the agency of the refusal. This policy was issued in writing and, upon information and belief, signed by the President of the Hospital, the Chief Medical Officer of the Hospital, the Medical Staff President, and the Chief Nursing Officer.

540. In justifying this draconian action, this policy refers to DCFS Procedures 300, Section H (2015), where, in addition to the DCFS-staff instruction regarding the Vitamin K shot and erythromycin eye ointment, immediately following there is an instruction regarding a procedure for responding to a physician taking "protective custody". This section states:

> If a physician notifies SCR that temporary protective custody has been taken because the parent/caregiver's religious beliefs do not permit them to consent to necessary medical care, such information must be transmitted by the physician to the local State's Attorney's Office. No investigation will be taken unless there is additional information supporting other allegations of abuse or neglect.

541. Knowing that Illinois hospitals and certain pediatricians were unconstitutionally seizing newborn babies in order to force unnecessary and prophylactic medical procedures on them – or at the very least using this policy as a coercive measure to force such unwanted and unnecessary medical procedures on babies – Defendants Walker and/or Defendant Harms-Pavelski should have made it clear to the Illinois physicians and hospitals that a newborn baby should not be taken into "protective custody" based solely on the parent's refusal of the Vitamin K shot or the administration of erythromycin eye ointment.

98

542. Additionally, after Procedures 300, Section H was rescinded, no Illinois hospitals or Illinois physicians should have continued these practices, which were unconstitutional regardless of the enactment of the policy. Shockingly, such practices have not stopped, and have continued even after the rescission of Procedures 300, Section H. In fact, one of the cases in this Complaint occurred *after* the rescission, on or about February 5, 2019.

543. Furthermore, James can confirm numerous accounts of parents succumbing to the pressure put on by Illinois pediatricians and/or hospital staff threatening to call DCFS or take their children into "protective custody," and the parents allowing the forced medical procedures.

544. Furthermore, James can confirm numerous reports of parents being pressured by certain Illinois pediatricians and/or hospital staff to allow the unwanted and unnecessary administration of the Vitamin K shot, erythromycin eye ointment, and/or the Hepatitis B shot to their babies, and when these parents persisted in their refusal, DCFS investigations followed. This occurred both before and after the rescission of DCFS's Procedures 300, Section H policy.

545. James has also submitted FOIA requests for DCFS calls and investigations based, in whole or in part, on the refusals Vitamin K and Hepatitis B shot, and it appears from the numbers of these calls and investigations, that DCFS continues to receive calls for both refusals but investigates parents based solely on a parent's refusal of the Vitamin K shots. According to these FOIA records, from August 3, 2018 (the day after the rescission of Procedures 300, Section H) to October 31, 2018, there were 25 calls to DCFS for Vitamin K refusals, with 15 of those resulting in investigations for medical neglect. In a more recent month, April of 2019, there were 10 calls to DCFS for Vitamin K refusals, with 6 of these resulting in investigations for medical neglect.

546. Some of the Plaintiffs in this case either plan on having another child or cannot rule out having another child. Plaintiff Kelly Metke, meanwhile, is pregnant, with a due date in January 10,

2020. However, due to DCFS's lack of clear direction in this matter, and the Illinois hospitals' lack of transparency as to their policy regarding parents who refuse the medical procedures at issue in this case, these Plaintiffs do not currently feel safe having a baby at any Illinois hospital.  They credibly fear being threatened and investigated once again by DCFS for "medical neglect" and/or having their child taken into "protective custody" if they refuse the administration of the Vitamin K shot, erythromycin eye ointment, a Hepatitis B shot, or, for that matter, the newborn screening test.

547.  Although the Procedures 300, Section H, policy has been rescinded, a *de facto* policy of continuing to investigate parents for "Medical Neglect" continues, as does a practice of one or more Illinois hospitals to take children into "protective custody" based on such refusals.

548.  Thus, the Plaintiffs seek a permanent injunction, as set forth in this Count of this Complaint.

549.  A person has the right under the substantive due process clause of the Fourteenth Amendment to the United States Constitution to remain together without the coercive interference of the awesome power of the State, which is the most basic aspect of family privacy.

550.  A parent or guardian has the right to decline unnecessary prophylactic medical procedures for his or her minor child.

551.  The medical procedures that the adult Plaintiffs declined on behalf of their baby daughters were medically unnecessary and prophylactic.

552.  Defendant Smith and/or other high-ranking DCFS officials are aware that in Illinois there is a systematic, widespread practice of Illinois pediatricians and hospitals using DCFS to coerce parents into receiving unwanted and unnecessary medical procedures for the newborn babies, and in some instances the development of policies to have these babies taken into "protective custody" in order to

forcibly administer unwanted and unnecessary medical procedures, including the Vitamin K shot and erythromycin eye ointment.

553. Defendant Smith and/or other high-ranking DCFS officials, meanwhile, know or should know such actions are being taken against the parents of newborn babies in Illinois, and yet not only take no corrective measures to prevent this from happening, but also actively participate in these practices.

554. The adult Plaintiffs, all of child-bearing age, credibly fear a substantial likelihood that they will be subjected to these practices in the future if they have more children.

555. On information and belief, parents in Illinois have been – and continue to be – threatened with a DCFS investigation for "medical neglect" based in part or in whole on the refusal of a Hepatitis B shot at birth. This information is relevant to the Plaintiffs' policy claim in general, but also more specifically, it is related to the Plaintiffs' injunctive relief claim.

556. Thus, the Plaintiffs request that this Honorable Court grant a permanent injunction against DCFS, to be enforced through Defendant Smith, or the current DCFS Director, as to the following:

> (a) DCFS should be ordered to notify all Illinois hospitals and Defendant ICAAP that it is prohibited by law for any Illinois hospital (or its employees or agents), physician, or DCFS employee to take a newborn baby into "protective custody" to administer a Vitamin K shot, and/or erythromycin eye ointment and/or a Hepatitis B shot, unless there is a specific and immediate emergency medical need to do so based on the particular circumstances of the situation; and

> (b) DCFS should be ordered to notify all Illinois hospitals and Defendant ICAAP that it is prohibited by law for any Illinois hospital (or its employees or agents), physician, or DCFS employee or agent to coerce or threaten any parent or guardian who chooses to refuse the administration of a Vitamin K shot, and/or erythromycin eye ointment and/or a Hepatitis B shots with a DCFS investigation, unless the circumstances of a particular birth rise to the level of "medical neglect," as defined by Illinois law; and

> (c) DCFS should be ordered to notify all Illinois hospitals and Defendant ICAAP that it is prohibited by law for any Illinois hospital (or its employees

or agents), physician, or DCFS employee or agent to initiate a DCFS investigation of any parent or guardian who chooses to refuse the administration of a Vitamin K shot, and/or erythromycin eye ointment and/or a Hepatitis B shot with a DCFS investigation, unless the circumstances of a particular birth rise to the level of "medical neglect," as defined by Illinois law; and

(d) DCFS should be ordered to refuse to initiate any investigations as "medical neglect" based solely on a parent or guardian's choice to refuse the administration of a Vitamin K shot, and/or erythromycin eye ointment and/or a Hepatitis B shot; and

(e) Defendants Silver Cross, Advocate Christ, and UC Medical – and any other Hospital with similar policies – should be ordered to rescind its policies of allowing doctors, nurses or other medical staff to take a baby into "protective custody" to forcibly administer the a Vitamin K shot, and/or erythromycin eye ointment and/or a Hepatitis B shot on a newborn baby against the wishes of that baby's parents or guardians, unless the circumstances of a particular birth warrant taking a newborn into "temporary protective custody," as defined by Illinois law. Moreover, these hospitals should be permanently enjoined from implementing or enforcing any policy that allows doctors, nurses, or other medical staff to threaten or to actually initiate DCFS investigations against parents or guardians based solely on their refusals of the administration of a Vitamin K shot, and/or erythromycin eye ointment and/or a Hepatitis B shot, unless the circumstances of a particular birth rise to the level of "medical neglect," as defined by Illinois law.

## **CONCLUSION**

WHEREFORE, the Plaintiffs demand judgment against Defendants (except for Defendant Smith) for compensatory and punitive damages, plus the costs of this action and attorneys' fees, and such other and additional relief as this Court deems equitable and just, including declaratory and injunctive relief.

**PLAINTIFFS DEMAND TRIAL BY JURY.**

RESPECTFULLY SUBMITTED,

s/Richard Dvorak
An Attorney for the Plaintiffs

Richard Dvorak
DVORAK LAW OFFICES, LLC
6262 Kingery Highway, Suite 305
Willowbrook, IL 60527
(630) 568-3190 (phone)
(312) 873-3869 (fax)
richard.dvorak@civilrightsdefenders.com