**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HOLDERMAN, et al. | ) | |
| | ) | |
| *Plaintiffs,* | ) | 19 CV 6324 |
| v. | ) | |
| | ) | Hon. Sara L. Ellis |
| WALKER, et al. | ) | |
| | ) | |
| *Defendants.* | ) | |

**PLAINTIFFS' CONSOLIDATED RESPONSE**
**TO DEFENDANTS' MOTIONS TO DISMISS**

Richard Dvorak
Mariam Hai
DVORAK LAW OFFICES, LLC
6262 Kingery Highway, Suite 305
Willowbrook, Illinois 60527
630-568-3190
richard.dvorak@civilrightsdefenders.com
mariam.hai@civilrightsdefenders.com

Steven F. Molo
Megan Cunniff Church
Allison Mileo Gorsuch
MOLOLAMKEN LLP
300 N. LaSalle St.
Chicago, IL 60654
(312) 450-6700 (telephone)
(312) 450-6701 (facsimile)
smolo@mololamken.com
mchurch@mololamken.com
agorsuch@mololamken.com

*Attorneys for the Plaintiffs*

## TABLE OF CONTENTS

I.   Statement of Facts ................................................................................................ 2

   A.   Regulatory and Statutory Background ........................................................... 2

      1.   Child Abuse Reporting Requirements .................................................... 2

      2.   Definition of Medical Neglect ............................................................... 3

      3.   DCFS Investigation Procedures .............................................................. 4

      4.   Temporary Protective Custody ............................................................... 5

      5.   Newborn Procedures in Illinois .............................................................. 6

   B.   The Events Giving Rise to Plaintiffs' Claims ............................................... 6

   C.   Section H ...................................................................................................... 16

      1.   Adoption of Section H ........................................................................... 16

      2.   Reaffirmation of Section H ................................................................... 17

      3.   Rescission of Section H ......................................................................... 18

II.  Standard of Review ............................................................................................. 19

III. Argument ............................................................................................................. 19

   A.   Defendants Violated Plaintiffs' Constitutional Right to Family Integrity. .................. 20

      1.   The state may not interfere with the constitutionally protected right to family integrity absent probable cause or reasonable suspicion of past or imminent abuse. ....... 20

      2.   The defendants lacked even reasonable suspicion to justify their interference in the plaintiffs' right to family integrity. ................................................................... 21

      3.   Reports were not based on reasonable suspicion or probable cause ......................... 24

      4.   Threats were not based on reasonable suspicion either. ........................................... 28

      5.   Defendants' counterarguments are unavailing ........................................................ 30

      6.   DCFS defendants fail to show how the complaint is insufficient ............................. 32

   B.   The Defendants Violated Plaintiffs' Constitutional Right To Be Free From Unreasonable Searches and Seizures. ................................................................... 33

      1.   The Fourth Amendment prohibits unreasonable searches and seizures. ................. 33

      2.   The complaint properly alleges that the plaintiffs' Fourth Amendment rights were violated. ................................................................................................................ 34

   C.   Defendant Schulte Violated the Holderman-Hills' First Amendment Rights. ............. 40

      1.   The First Amendment provides for the free exercise of religion. ............................ 40

      2.   Schulte violated the Holderman-Hills' right to free exercise. .................................. 41

   D.   Defendants Conspired To Deprive Plaintiffs of Their Constitutional Rights. .............. 42

      1.   Private defendants' counterarguments fail .............................................................. 43

2.    DCFS counterarguments fail..................................................................... 45

E.    Private Defendants Acted Under Color of State Law................................... 46

1.    Individual defendants were jointly engaged with the state and were personally involved in the constitutional deprivation........................................................... 46

2.    Institutional defendants were jointly engaged with the state and had unconstitutional policies. ...................................................................................... 51

F.    Defendants Are Not Entitled to Qualified Or Other Immunity. ................................... 55

1.    Qualified immunity is not available because the constitutional rights were violated and were clearly established. ........................................................................ 55

a.    Plaintiffs' rights were violated................................................................. 56

b.    The right to family integrity was clearly established............................. 56

2.    The right to be free from unreasonable searches and seizures was clearly established........................................................................................................... 58

3.    Defendants' counterarguments are unavailing.......................................... 58

4.    Schulte cannot claim witness immunity. ................................................... 60

G.    DCFS Cannot Claim Sovereign Immunity Under the Eleventh Amendment. ............ 60

H.    Defendants' Conduct Is Not Political Advocacy. ....................................................... 61

1.    The *Noerr-Pennington* doctrine exists to protect speech............................ 61

2.    Defendants' actions went beyond speech and into conspiracy. ................. 62

IV.    Conclusion ..........................................................................**Error! Bookmark not defined.**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adickes v. S. H. Kress & Co.*,
   398 U.S. 144 (1970)..................................................................................47, 48

*Armato v. Grounds*,
   766 F.3d 713 (7th Cir. 2014) ...............................................................46

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..............................................................................19

*Blum v. Yaretsky*,
   457 U.S. 991 (1982)..........................................................................46, 49

*Bonner v. McCallum*,
   No. 01-C-487-C, 2001 WL 34373164 (W.D. Wis. Nov. 16, 2001) .......................................41

*Breitweiser v. Ind. Dep't of Child Serv.*,
   1:15-cv-01687-TWP-MJD, 2016 WL 6989773 (S.D. Ind. Nov. 10, 2016)................38, 58, 60

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*,
   531 U.S. 288 (2001)......................................................................51, 53, 54

*Brokaw v. Mercer Cty.*,
   235 F.3d 1000 (7th Cir. 2000) ............................................................ *passim*

*C.H. v. Grossman*,
   No. 14 C 8174, 2015 WL 4554774, (N.D. Ill. July 28, 2015) ................................51

*City of Escondido, Cal. v. Emmons*,
   139 S. Ct. 500 (2019).........................................................................56

*Colbert v. City of Chicago*,
   851 F.3d 649 (7th Cir. 2017) ...............................................................47

*Darryl H. v. Coler*,
   801 F.2d 893 (7th Cir. 1986) ...............................................................37

*Daugherty v. Page*,
   906 F.3d 606 (7th Cir. 2018) .............................................................42, 44

*Day v. Wooten*,
   947 F.3d 453 (7th Cir. 2020) ...............................................................56

*Dennis v. Sparks*,
    449 U.S. 24 (1980) ................................................................................46, 47, 48

*Dickman v. Rosado*
    No. 16 C 9448, 2019 WL 3728698, (N.D. Ill. Aug. 1, 2019) ................................51

*Doe v. Heck*,
    327 F.3d 492 (7th Cir. 2003) ........................................................ *passim*

*Erickson v. Pardus*,
    551 U.S. 89 (2007) (per curiam) ............................................................19

*Evans v. Torres*,
    No. 94 C 1078, 1996 WL 5319 (N.D. Ill. Jan. 4, 1996) ............................48, 50, 51

*Filarsky v. Delia*,
    566 U.S. 377 (2012) ........................................................................46

*Fleischfresser v. Dirs. of Sch. Dist. 200*,
    15 F.3d 680 (7th Cir. 1994) ................................................................41

*Fredrickson v. Proviso Twp.*,
    814 F. Supp. 2d 802 (N.D. Ill. 2010) ......................................................63

*G & S Holdings LLC v. Cont'l Cas. Co.*,
    697 F.3d 534 (7th Cir. 2012) ................................................................40

*Glickman v. Vill. of Morton Grove*,
    No. 18-cv-4931, 2019 WL 1754091 (N.D. Ill. Apr. 19, 2019) ................................22

*Glisson v. Indiana Dep't of Corr.*,
    849 F.3d 372 (7th Cir. 2017) ................................................................52

*Glover v. Carr*,
    949 F.3d 364 (7th Cir. 2020) ................................................................55

*Goetz v. Mt. Sinai Hosp.*,
    No. 91 C 5723, 1995 WL 107130 (N.D. Ill. Mar. 8, 1995) ............................50, 51

*Gramenos v. Jewel Companies, Inc.*,
    797 F.2d 432 (7th Cir. 1986) ................................................................48

*Hernandez v. Foster*,
    657 F.3d 463 (7th Cir. 2011) ........................................................ *passim*

*Iskander v. Vill. of Forest Park*,
    690 F.2d 126 (7th Cir. 1982) ................................................................52

*Jones v. Bock,*
  549 U.S. 199 (2007) .........................................................................................55

*Knight v. Foreman,*
  No. 1:15-CV-3-2 JVB, 2015 WL 9093977 (N.D. Ind. Dec. 16, 2015) ...................................50

*Kyllo v. United States,*
  533 U.S. 27 (2001) .....................................................................................37, 38

*Lugar v. Edmondson Oil Co.,*
  457 U.S. 922 (1982) ...................................................................................47, 53

*Manning v. Dye,*
  No. 02 C 372, 2004 WL 2496456 (N.D. Ill. Nov. 5, 2004) ...................................................44

*Mercatus Grp., LLC v. Lake Forest Hosp.,*
  641 F.3d 834 (7th Cir. 2011) .....................................................................62, 63, 64

*Mohil v. Glick,*
  842 F. Supp. 2d (N.D. Ill. 2012) ...........................................................................60

*Pearson v. Callahan,*
  555 U.S. 223 (2009) ...................................................................................55, 56

*Rangel v. Reynolds,*
  607 F. Supp. 2d 911 (N.D. Ind. 2009) ....................................................................50, 51

*Rodgers v. Lincoln Towing Serv., Inc.,*
  596 F.Supp. 13 (N.D. Ill. Mar. 29, 1984) .....................................................................50

*Ryan v. Mary Immaculate Queen Ctr.,*
  188 F.3d 857 (7th Cir. 1999) ...............................................................................35

*Santosky v. Kramer,*
  455 U.S. 745 (1982) ......................................................................................20

*Sarkan v. Kane-Kendale Mental Health Center*
  No. 86 C 8669, 1987 WL 11833 (N.D. Ill. 1987) ..............................................................43

*Sebesta v. Davis,*
  878 F.3d 226 (7th Cir. 2017) ............................................................................22, 25

*Shields v. Ill. Dep't of Corr.,*
  746 F.3d 782 (7th Cir. 2014) ..............................................................................52

*Siliven v. Ind. Dep't of Child Servs.,*
  635 F.3d 921 (7th Cir. 2011) ........................................................................21, 22, 26

*Slater v. Dep't of Children & Family Servs.*,
    953 N.E.2d 44 (Ill. App. Ct. 1st Div. 2011)................................................................16

*Smith v. Ball State Univ.*,
    295 F.3d 763 (7th Cir. 2002) ......................................................................................23

*Smith v. Org. of Foster Families For Equal. & Reform*,
    431 U.S. 816 (1977)....................................................................................................20

*Tarpley v. Keistler*,
    188 F.3d 788 (7th Cir. 1999) ........................................................................62, 63, 64

*Tatum v. Lucas*,
    No. 11-C-1131, 2019 WL 652854 (E.D. Wis. Feb. 15, 2019)...................................41

*Thompson v. Holm*,
    809 F.3d 376 (7th Cir. 2016) ................................................................................40, 41

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    137 S.Ct. 2012 (2017)................................................................................................40

*Troxel v. Granville*,
    530 U.S. 57 (2000).....................................................................................................20

*Vanwinkle v. Nichols*,
    No. 1:15-cv-01082-JMS-MJD, 2015 WL 9275671 (S.D. Ind. Dec. 18, 2015) ......................60

*Wallis v. Spencer*,
    202 F.3d 1126 (9th Cir. 2000) ...................................................................................30

*Walsh v. Mellas*,
    837 F.2d 789 (7th Cir. 1988) .....................................................................................55

*White v. Pauly*,
    137 S. Ct. 548 (2017)..................................................................................................56

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972)....................................................................................................23

*Xiong v. Wagner*,
    700 F.3d 282 (7th Cir. 2012) ...............................................................................22, 25

## Statutes

Fed. R. Civ. P. 12(b)(6)........................................................................................................2, 35

U.S. Const., amend. IV .........................................................................................................33

42 U.S.C. §1983................................................................................................... *passim*

5 Ill. Comp. Stat. Ann. 100/1-1 *et seq.* ...............................................................................16

77 Ill. Adm. Code §250.1830(g)(8) .......................................................................................6

89 Ill. Admin. Code §300 ...........................................................................................4, 5, 29

89 Ill. Admin. Code § 300.100(a) ..........................................................................................5

89 Ill. Admin. Code § 300.100(b) ..........................................................................................5

89 Ill. Admin. Code § 300.100(g) ..........................................................................................5

89 Ill. Admin. Code § 300.100(h) ..........................................................................................5

89 Ill. Admin. Code §300 Appendix B ..............................................................................4, 28

325 ILCS 5/2 ..........................................................................................................................2

325 ILCS 5/3 ..........................................................................................................................4

325 ILCS 5/4(a) .....................................................................................................................3

325 ILCS 5/4(m) ....................................................................................................................3

325 ILCS 5/4.02 .....................................................................................................................3

325 ILCS 5/5 ..........................................................................................................................6

325 ILCS 5/7 ..........................................................................................................................3

325 ILCS 5/7.3 .......................................................................................................................3

410 ILCS 215/3 ......................................................................................................................6

410 ILCS 240/3 ...............................................................................................................24, 28

Moments after giving birth and welcoming their babies into the world, the plaintiffs were threatened that their healthy newborns would be taken from them. They were threatened that their other children could be taken away. In one instance, a healthy baby was seized from her parents—moments after birth—while hospital personnel accused the parents of medical neglect. Illinois Department of Children and Family Services ("DCFS") investigations were launched against the plaintiffs in the delivery rooms, and those investigations continued from the hospitals into the plaintiffs' homes. Police officers arrived in hospital rooms and at front doors. The defendants used threats, intimidation, and the power of the state in a joint effort to force the plaintiffs into allowing certain prophylactic medical procedures on their babies. In doing so, the defendants violated the plaintiffs' constitutional rights to family integrity, to freedom of religious expression, and to be free from unreasonable searches and seizures.

This case arises out of the births of five children in Illinois between February 2018 and February 2019. The plaintiffs are parents who refused to allow hospital personnel to administer prophylactic medical procedures on their newborn babies, who are also plaintiffs. The prophylactic medical procedures were Vitamin K and Hepatitis B shots, application of erythromycin eye ointment, and in one instance, a newborn metabolic screen. Solely because the plaintiffs refused these medical procedures on their healthy newborns, the defendants threatened to report, and then ultimately reported, the plaintiffs to DCFS for medical neglect.

But the law requires, at a minimum, the existence of reasonable suspicion based on the particular circumstances of a case before DCFS can investigate parents for abuse and neglect. There was no reasonable suspicion here. The defendants' threats, their seizures of the newborn babies, and their reports to DCFS further violated the plaintiffs' constitutional rights, as there was no basis, much less probable cause, to justify the warrantless searches and seizures of the

1

plaintiffs, their homes, and their families. The reports to DCFS were based solely on a few lines of policy buried in a DCFS manual. Known as "Section H," the policy directed DCFS employees to consider as *per se* medical neglect any report of a parent or guardian refusing to allow Vitamin K shots or erythromycin eye ointment to be administered to their baby at birth, regardless of the health of the child.

Because parents should not be threatened with having their newborn babies taken or investigated for medical neglect by DCFS merely for refusing prophylactic medical procedures, the plaintiffs have brought suit against certain medical providers, a professional organization of medical providers, hospitals, and DCFS caseworkers and officials who implemented and enforced this draconian policy against them. The plaintiffs have alleged violations of their constitutional rights to family integrity, to freedom of religious expression, and to be free from unreasonable searches and seizures. Pursuant to Fed. R. Civ. P. 12(b)(6), the defendants have moved to dismiss the complaint for failure to state a claim, or in the alterative, on the grounds that they have qualified immunity. (Dkt. Nos. 59, 64, 67, 71, 77, 78, & 93). As discussed below, the plaintiffs have alleged sufficient facts in support of their claims, and none of the defendants can claim qualified immunity. Accordingly, this Court should deny the defendants' motions in their entirety.

## I. STATEMENT OF FACTS

### A. Regulatory and Statutory Background

#### 1. *Child Abuse Reporting Requirements*

Under the Illinois Abused and Neglected Child Reporting Act ("ANCRA"), DCFS is responsible for receiving reports of child neglect and "protect[ing] the health, safety, and best interests of the child." 325 ILCS 5/2; *see* DCFS Br. 2, Dkt. 93. DCFS is the "sole agency

responsible for receiving and investigating reports of child . . . neglect" made under ANCRA. 325 ILCS 5/7.3.

Certain persons are "mandatory reporters," meaning that they must report a potential case of child abuse or neglect "when they have reasonable cause to believe that a child known to them in their professional or official capacities may be a . . . neglected child." 325 ICLS 5/4(a). Medical personnel, including physicians and nurses, are mandatory reporters. *Id.* at (a)(1).[1] Failure to report a potential case of neglect is considered a misdemeanor, and filing a false report is a felony. *Id.* § 5/4(m). Physicians who willfully fail to report neglect may also be subject to discipline from the Illinois State Medical Disciplinary Board. *Id.* § 5/4.02.

ANCRA also provides specific instruction for infant medical neglect cases. *See* 325 ILCS 5/7.3(a). DCFS is obligated to appoint a pediatrician as its Perinatal Coordinator, who is required to "review all reports of suspected medical neglect involving newborns or infants" and "assist in necessary referrals to appropriate perinatal medical care and treatment." *Id.* If the "Perinatal Coordinator or other designated medical specialists . . . determine that a newborn or infant child is being neglected," a DCFS employee will take necessary steps to protect the baby's life or health, including "taking temporary protective custody" of the baby. *Id.*

### 2. *Definition of Medical Neglect*

The ANCRA statute defines a "neglected child" as "any child who is not receiving the proper or necessary . . . medically indicated treatment[,] including food or care not provided[,] solely on the basis of the present or anticipated mental or physical impairment[,] as determined by a physician acting alone or in consultation with other physicians[,] or otherwise is not

---

[1] While DCFS suggests that mandatory reporters must immediately call a "hotline," that requirement does not actually appear in § 5/4. *See* DCFS Br. at 2, Dkt. 93. Section 7 provides that reports shall be made by telephone or in person. 325 ILCS 5/7.

receiving the proper or necessary support or medical or other remedial care recognized under

State law as necessary for a child's well-being." 325 ILCS 5/3.

The Illinois Administrative Code § 300 Appendix B defines medical neglect as:

Lack of medical or dental treatment for a health problem or condition that, if untreated or not treated as prescribed, could become severe enough to constitute serious or long-term harm to the child; lack of follow-through on a reasonable prescribed medical or dental treatment plan for a condition that could become serious enough to constitute serious or long-term harm to the child if the treatment or treatment plan goes unimplemented.

Appendix B also includes additional "Factors To Be Considered" in making a

determination of medical neglect. For example, the factors include:

- The child's physical condition

- The seriousness of the current health problem;

- The probable outcome if the current health problem is not treated and the seriousness of that outcome;

- The generally accepted health benefits of the prescribed treatment;

- The generally recognized side effects/harms associated with the prescribed treatment;

- Whether the parent has been informed about the availability of preventive health care services and how services can be obtained.

89 Ill. Admin. Code § 300 Appendix B. This regulation also states that:

It must be verified that the child has/had an untreated health problem, or that a prescribed treatment plan was implemented. The verification must come from a physician, registered nurse, dentist, or by a direct admission from the alleged perpetrator. *It must further be verified by a physician, registered nurse or dentist that the problem or condition, if untreated, could result in serious or long-term harm to the child.*

*Id.* (emphasis added).

3.    *DCFS Investigation Procedures*

After a report is made to DCFS, a two-part investigation is required under the Illinois

Administrative Code. 89 Ill. Admin. Code § 300 *et seq.* First, DCFS makes "an initial

4

investigation to validate whether there is reasonable cause to believe that child abuse or neglect exists." *Id.* § 300.100(a). That initial investigation includes in-person contact with all alleged child victims, in-person or telephone contact with the reporter (if known), and data checks of DCFS and law enforcement records. *Id.* § 300.100(b). Only reports of inadequate shelter and environmental neglect require an in-person examination of the home. *Id.*

Second, the investigative staff of DCFS must examine the following criteria to see if a "good faith indication to believe that abuse or neglect exists":

    1)    The alleged victim(s) must be less than 18 years of age; and

    2)    The alleged victim(s) must either have been harmed or must be in substantial risk of harm; and

    3)    There must be an abusive or neglectful incident or set of circumstances as defined in Appendix B of this Part which caused the alleged harm or substantial risk of harm to the child.

    . . .

    5)    For neglect, the alleged perpetrator must be the child's parent, guardian, foster parent or any person responsible for the child's welfare at the time of the alleged neglect.

*Id.* § 300.100(g). Appendix B contains dozens of descriptions of incidents or circumstances declared neglectful or abusive, including circumstances constituting medical neglect described *supra*.

If any of the above criteria is not present, then the investigation will be terminated; if all criteria are present, then DCFS staff shall begin a formal investigation. *Id.* § 300.100(h).

    4.    *Temporary Protective Custody*

DCFS personnel or a treating physician may take temporary protective custody of a child without consent of the parent if "(1) he has reason to believe that the child cannot be cared for at home or in the custody of the person responsible for the child's welfare without endangering the

child's health or safety; and (2) there is not time to apply for a court order . . . for temporary custody of the child." 325 ILCS 5/5. A physician may administer treatment where "the failure to render such treatment will likely result in death or permanent harm to the minor" and there is not time to apply for a court order. *Id.*

5. *Newborn Procedures in Illinois*

Newborn babies are often given a series of medical procedures in the first few hours after birth. SAC ¶¶ 78, 93, 102.[2] These medical procedures include an injection of Vitamin K, an injection of a Hepatitis B vaccine, and application of erythromycin eye ointment. *Id.* Newborns are also often given a series of screening tests. ¶¶ 114-15. Illinois hospital licensing regulations require health care providers to administer a Vitamin K shot "usually within the first hour after delivery as a prophylaxis against hemorrhagic disorder in the first days of life." 77 Ill. Adm. Code § 250.1830(g)(8). The Infant Eye Disease Act (410 ILCS 215/3) indicates the equivalent of the erythromycin eye ointment shall be administered as soon as possible after birth, but no later than within one hour. No such requirement exists for the Hepatitis B injection. Adverse side effects can result from these medical procedures, including the risk of death in the case of the Vitamin K shot. ¶¶ 87, 98-99, 110. Hospital licensing regulations do not require parents to accept the procedures, and hospitals have pre-printed forms available for parents who want to refuse these procedures. ¶ 139.

B. **The Events Giving Rise to Plaintiffs' Claims**

As detailed in the Second Amended Complaint and summarized below, the plaintiff parents made informed choices to refuse prophylactic medical procedures for their newborn babies, at the defendant hospitals, and communicated those choices to the defendant doctors,

---

[2] All paragraph references are to the Second Amended Complaint ("SAC"), Dkt. 98.

nurses, and staff. Because they refused these medical procedures, the parents were threatened that their babies would be taken, their older children would be taken, and they would be investigated by DCFS for medical neglect. For the Court's reference, a summary chart of the respective plaintiffs, the corresponding defendants, and the paragraphs describing the events giving rise to the plaintiffs' claims in the Second Amended Complaint is included here:

| Plaintiffs | Defendants | Allegations |
|---|---|---|
| **Bougher**<br>Brian Bougher<br>Angela Bougher<br>Baby B | B.J. Walker, *former DCFS acting director*<br>Nora Harms-Pavelski, *former DCFS deputy director*<br>Dr. Jill Glick<br>ICAAP<br>Silver Cross Hospital<br>Dr. Miroslaw Skalski<br>Monika Kozuch<br>Gina Kitakis, *DCFS Caseworker*<br>Marc D. Smith, *DCFS Director* | ¶¶ 203-277<br>¶¶ 437-455<br>¶¶ 459-466<br>¶¶ 486-491<br>¶¶ 513-542 |
| **Holderman-Hill**<br>James Holderman III<br>Erin Courtney Hill<br>Baby H | B.J. Walker, *former DCFS acting director*<br>Nora Harms-Pavelski, *former DCFS deputy director*<br>Dr. Jill Glick<br>ICAAP<br>Dr. Suzanne G. Schulte<br>Marc D. Smith, *DCFS Director* | ¶¶ 278-328<br>¶¶ 437-455<br>¶¶ 456-458<br>¶¶ 482-485<br>¶¶ 502-512<br>¶¶ 513-542 |
| **Kosek**<br>Dr. Jason Kosek,<br>Sarah Kosek<br>Baby K | B.J. Walker, *former DCFS acting director*<br>Nora Harms-Pavelski, *former DCFS deputy director*<br>Dr. Jill Glick<br>ICAAP<br>Silver Cross Hospital<br>Shekelia Taylor-Williams, *DCFS Caseworker*<br>Marc D. Smith, *DCFS Director* | ¶¶ 329-357<br>¶¶ 437-455<br>¶¶ 467-471<br>¶¶ 491-494<br>¶¶ 513-542 |
| **Leitschuh**<br>Brandon Leitschuh<br>Emily Vuckovich-Leitschuh<br>Baby L | B.J. Walker, *former DCFS acting director*<br>Nora Harms-Pavelski, *former DCFS deputy director*<br>Dr. Jill Glick<br>ICAAP<br>Advocate Christ Hospital and Medical Center<br>Lynette Allen, *DCFS Caseworker*<br>Marc D. Smith, *DCFS Director* | ¶¶ 358-393<br>¶¶ 437-455<br>¶¶ 472-476<br>¶¶ 495-498<br>¶¶ 513-542 |

| Plaintiffs | Defendants | Allegations |
|---|---|---|
| **Anderson**<br>Danielle Anderson<br>Baby G | B.J. Walker, *former DCFS acting director*<br>Nora Harms-Pavelski, *former DCFS deputy director*<br>Dr. Jill Glick<br>ICAAP<br>University of Chicago Medical Center<br>Dr. Poj Lysouvakon<br>Serena Rodgers, *DCFS Caseworker*<br>Marc D. Smith, *DCFS Director* | ¶¶ 394-436<br>¶¶ 37-455<br>¶¶ 477-481<br>¶¶ 499-501<br>¶¶ 513-542 |

1. *The Boughers*

Baby B was born healthy to Brian and Angela Bougher on February 7, 2018 at defendant Silver Cross Hospital. ¶203. After Baby B was born, defendant Monika Kozuch, a nurse, held Baby B and announced that she would be administering the Vitamin K shot and the eye ointment. ¶¶221, 224. The Boughers refused both medical procedures, and the medical procedures were not administered. ¶¶221, 223.

Without warning, Kozuch took Baby B out of the delivery room, stating that she was taking Baby B to the nursery. Kozuch then said that she was reporting the Boughers to DCFS because they refused to allow her to administer the Vitamin K shot and the eye ointment. ¶227. The Boughers had not even had a chance to hold Baby B, and Angela Bougher was not allowed to start the skin-to-skin contact that is important for mother-child bonding or to attempt breastfeeding. ¶230.

An hour passed without the Boughers being able to see or hold Baby B. ¶230. Defendant Dr. Miroslaw Skalski entered the room and told the Boughers that Baby B had tested low for blood sugar and the nurses were going to give the baby formula. ¶¶231-32. The Boughers wanted Angela to breastfeed Baby B, but Skalski refused to let Angela try. ¶233. Staff at Silver Cross then gave Baby B glucose without the Boughers' consent. ¶234. Over the

course of the next hours, the Boughers asked repeatedly to see their baby again – and no one at Silver Cross gave them a straight answer or allowed them to see Baby B. ¶235.

Finally, the Boughers were allowed to see their baby in the nursery, and Angela breastfed the baby. ¶¶235, 237. A nurse told the Boughers that once the baby's blood sugar level measured above 50, the baby could return to the family's room. ¶237. Baby B's blood sugar level tested at 66 after breastfeeding, but the nurse still did not allow the Boughers to bring Baby B back to their room. ¶¶238- 39.

The Boughers waited in their room for hours without Baby B, worried and afraid. ¶240. They continually asked to see their baby and to know when their baby would be returned to them, but they received no permission and no explanation. ¶240. While they waited, Skalski told them that he was not concerned about the eye ointment, but he was concerned about the Vitamin K refusal. ¶¶243, 245. Skalski confirmed there was no birth trauma to Baby B. ¶247.

Silver Cross nurses also asked Angela Bougher to sign an informed consent waiver, which they told her would allow her to get Baby B back and would reverse the call to DCFS. ¶249. After Angela Bougher signed the informed consent waiver, however, she was still not allowed to see or hold Baby B, and she was told that the DCFS investigation could not be stopped. ¶¶250-51. Skalski stopped by their room again to discuss the medical procedures again. ¶252. At 8 p.m., almost 13 hours after Baby B was taken from them, Baby B was returned to the Boughers. ¶253.

The next day, defendant Gina Kitakis, a DCFS caseworker, came into the Boughers' room. ¶256. Brian Bougher was at home with their other children and arrived at the hospital halfway through Kitakis's visit. ¶¶255, 257. Kitakis told the couple that the doctors at Silver Cross had confirmed there were no health risks to the baby and that the DCFS report would be

9

deemed unfounded. ¶258. Kitakis continued asking questions, and informed the couple that she was required to do a home visit to check on the Boughers' other children. ¶¶260, 262. The Boughers consulted with a lawyer, who spoke with the DCFS supervisor and told the supervisor to get a warrant if anyone wanted to come into the couple's home and to stop harassing them or speaking with them. ¶268.

A week or so after Baby B's birth, a police officer knocked on the door of the Boughers' home. ¶¶272-73. The Boughers' 13-year-old son answered the door, and the police officer asked to speak with his parents. ¶273. Three police squad cars sat outside the Boughers' home, and two police officers entered the home. ¶273. A police officer said that he had received a call from DCFS and that he needed to see the Bougher children. ¶274. Angela was afraid that the police had come to take her children away, and she asked to speak to a lawyer. *Id.* The police officers said they just wanted to lay eyes on the children, and Angela frantically tried to assemble her five children. *Id.* The Boughers' 13-year-old son was afraid and did not want to come downstairs. *Id.* He was worried the police would take his baby sister and perhaps all of the children because the police had brought three cars. *Id.* The police looked at the children briefly and left the home but remained in the Boughers' yard. ¶275. The next day, the Boughers received a phone call from DCFS stating the case was being closed and considered unfounded. ¶276. A few weeks later, the Boughers received a letter stating the same. ¶277.

### 2. *The Holderman-Hills*

On May 21, 2018, Baby H was born healthy to James Holderman III and Erin Courtney Hill. ¶¶278, 281. About 12 hours after Baby H's birth, defendant Dr. Suzanne G. Schulte came to perform the infant checkup. ¶284.

Schulte knew that the couple had refused the Vitamin K shot, the eye ointment, the Hepatitis B shot, and the newborn screening test. ¶285. She also knew that the family was

giving Baby H oral Vitamin K and that Hill did not have Hepatitis B or any sexually transmitted diseases that could transmit an eye infection to Baby H. ¶¶286-88. Schulte had no issue with the couple's refusal of the Vitamin K shot, the Hepatitis B shot, or the eye ointment, but she told the Holderman-Hills that there were no exemptions for the newborn screening test. ¶¶285, 290.

Schulte stated that she would seek DCFS intervention if they refused the screening test. ¶293. A nurse told the couple that Schulte had placed a note to call DCFS in Baby H's medical chart but that she had not called. ¶295. Alarmed that Schulte had made that note, the couple spoke with Schulte and showed her the text of the religious exemption to the newborn screening test. ¶296. Schulte mocked the Holderman-Hills' religious beliefs and would not accept the religious exemption. ¶¶293, 295, 297-300. Following the requirements in the newborn-screening statute to make the religious exemption in writing, the couple gave a hospital social worker the written exemption letter, and this letter was made part of the medical file. ¶297. Schulte called DCFS anyway, reporting that the Holderman-Hills were refusing 90% of the medical care for Baby H. ¶¶306, 308. Based on Schulte's report of the Holderman-Hills' refusals, the caseworker investigated the Holderman-Hills for refusing the Vitamin K shot and the eye ointment. ¶310.

A DCFS caseworker came to the hospital. ¶313. The hospital staffed additional security personnel prior to the caseworker's arrival. ¶312. The couple was informed that the caseworker could not leave the hospital until the caseworker laid eyes on the baby. ¶314. Hill felt that she was not free to leave the hospital because of these restrictions. *Id.*

The couple repeatedly requested that the caseworker not enter their room, but she entered anyway. ¶313. After seeing Baby H, the caseworker discussed the baby's health with another pediatrician, who declared the baby to be happy and healthy. ¶317. Schulte also confirmed

11

Baby H did not have health problems. ¶318. Other medical staff confirmed that the tests the Holderman-Hills refused were routine and not necessary. ¶319. A DCFS supervisor also confirmed that no further action was necessary. ¶320.

In order to have the DCFS case closed, Holderman had to bring the couple's other son to the DCFS office for an interview. ¶321. The caseworker found no issues, and the report she issued concluded that there was no need to override the parents' declination of medical screening and that no medical provider deemed it medical neglect. ¶¶322, 323. Her supervisor concurred that the report was not made in good faith. ¶324. Specifically, the supervisor wrote that "parents have the right to decline routine medical exams as there is no evidence to suggest that the newborn has any medical condition nor is there any genetic history provided that would suggest the alleged victim would need to be screened." ¶320. The caseworker also wrote that "not one" of the doctors or nurses, including Schulte, deemed the refused tests medically necessary, and concluded, "Does not appear to be a good faith report." ¶¶323-24. The case was closed as unfounded, but the reports and records will remain in DCFS custody for five years. ¶¶325-27.

3. <em>The Koseks</em>

On June 14, 2018, Baby K was born healthy to Jason and Sarah Kosek at defendant Silver Cross Hospital. ¶¶12, 329. Prior to Baby K's birth, the Koseks were informed that refusing Vitamin K and eye ointment would result in hospital staff calling DCFS. ¶331. The Koseks signed a pre-printed waiver form indicating their refusal to both medical procedures. *Id.*

When Baby K was born, the Koseks refused the medical procedures. ¶332. A Silver Cross nurse told the Koseks that DCFS was going to be called as a result of this refusal. ¶333. Another nurse stated that Baby K would receive "no eyes and thighs" – no eye ointment and no administration of Vitamin K to the baby's thigh. ¶334.

12

Only one hour after Baby K was born, defendant Shekeila Taylor-Williams, a DCFS caseworker, came into the Koseks' delivery room. ¶335. Taylor-Williams stated that the couple had been reported for medical neglect and that they were in danger of having Baby K taken away from them. ¶337. The Koseks then spoke with a Silver Cross doctor who identified himself as the head of pediatrics at Silver Cross. ¶339. The doctor told them repeatedly that Baby K could be taken away from them if they refused the medical procedures and that they would have to go to court to get the baby back. ¶¶340, 344. The doctor also stated that he could forcibly administer the procedures to Baby K. ¶344. The doctor left the room while indicating that he would continue in the process of taking custody of Baby K to administer the procedures. ¶350.

About thirty minutes later, another hospital administrator told the Koseks that she could take the baby and administer the medical procedures forcibly. ¶351. This administrator warned that Baby K could still be taken away from them such that they would have to go to court to get the baby back. *Id.* Sarah Kosek began to cry at the thought of her losing custody of her baby girl. ¶352.

Finally, a third administrator entered the Koseks' room and said they would not take the baby away. ¶353. Taylor-Williams confirmed that she was not taking custody of the baby at that time either. *Id.* Taylor-Williams told the Koseks that she was required to do a home visit and to call the Koseks' references. ¶355.

In September 2018, Taylor-Williams conducted the home visit, entering the Kosek home without the Koseks' consent. ¶356. Later that month, the Koseks received a letter from DCFS stating that the report of medical neglect was unfounded. ¶357.

### 4. *The Leitschuhs*

On July 31, 2018, Baby L was born healthy to Brandon Leitschuh and Emily Vuckovich-Leitschuh at defendant Advocate Christ Hospital. ¶¶358, 368. The Leitschuhs refused the

13

Vitamin K shot, the eye ointment, and the Hepatitis B shot for Baby L.  ¶369.  Because Advocate Christ had an express policy of calling DCFS when parents refuse Vitamin K or eye ointment for their babies, an Advocate Christ staff member called DCFS to report the Leitschuhs. *Id*.

The day after Baby L's birth, defendant Lynette Allen, a DCFS caseworker, called the Leitschuhs and threatened to take custody of both of their children, stating that the children would not be allowed to stay with family members because it was a medical neglect case.  ¶372. The only basis of the threats and the accusation of medical neglect was the Leitschuhs' refusal of the Vitamin K shot and the eye ointment.  ¶373.  Allen also stated that DCFS staff would have to visit their home every week or month to check on them and their children.  ¶381.

Allen further stated that she did not care about the opinion of the Leitschuhs' pediatrician, only the opinion of the hospital doctor.  ¶383.  Nevertheless, Allen required a letter from the family's pediatrician indicating that their refusals did not constitute neglect.  ¶384.  The family provided the letter, but Allen told the hospital social worker that Baby L could not be released to the family until a home visit was conducted.  ¶385.  Emily Leitschuh did not feel free to leave the hospital because she would not leave without Baby L.  ¶386.  When she asked the hospital social worker if Allen could really take her kids, the social worker said, "she can." *Id.*

The next morning, Emily Leitschuh was medically cleared to leave the hospital.  ¶388. However, the hospital would not allow her to leave with Baby L until Allen conducted a home visit.  *Id.*  Brandon Leitschuh remained at home with the couple's first child while the home visit was conducted.  ¶¶389-90.  The Leitschuhs did not consent to the home visit, but Allen entered the home anyway.  ¶390.  Emily Leitschuh and Baby L would have left the hospital as soon as Emily was medically cleared but were unable to do so because of the conditions Allen placed on

her leaving. ¶392. The family remained separated as a result of Allen's actions. *Id.* Months later, the Leitschuhs received a letter stating that the accusations of medical neglect were unfounded. ¶393.

### 5. *Danielle Anderson*

On February 5, 2019, Baby G was born healthy to Danielle Anderson at defendant University of Chicago Medical Center (UCMC). ¶¶394, 401. Anderson refused the administration of the Vitamin K shot and the Hepatitis B shot. ¶402. Within an hour of Baby G's birth, a pediatrician told Anderson that the hospital would take away her baby if she did not allow the hospital to administer Vitamin K. ¶403. Medical staff at UCMC continued to press Anderson to accept the Vitamin K shot, and she continually refused. ¶¶404-07.

The next day, February 6, 2019, Anderson informed defendant Dr. Poj Lysouvakon that she did not want to discuss Vitamin K with him when he entered her room. ¶409. Lysoukavon told her that he was going to take the baby into protective custody and administer the Vitamin K shot. *Id.* Anderson called her doula, who came to the hospital. ¶411. Right after the doula arrived, Lysouvakon entered the room with three other staff members and told Anderson that he had the legal right to physically take Baby G from her to administer the Vitamin K shot. *Id.* Lysouvakon left and returned with hospital security and a nurse to take Baby G. ¶415. Anderson told the doula to call 911 and then told Lysouvakon and the other staff to leave the room. ¶418. Two Chicago police officers soon arrived, and Anderson told them that Lysouvakon was threatening to take her baby away. ¶¶418-19. The police officers told Lysouvakon to not take the baby, that she needs to be left alone to bond with her baby, and that she had a right to leave the hospital with her baby. Lysouvakon then left. ¶¶420-21.

Anderson left the hospital that afternoon. ¶425. Prior to leaving the hospital, she had no contact with DCFS. ¶426. On February 15, 2019, defendant Serena Rodgers, a DCFS

15

caseworker, called Anderson to tell her that DCFS was investigating a medical neglect report based on UCMC's referral. ¶427. Rodgers told Anderson that if she did not allow the baby to get the Vitamin K shot at a doctor's visit, Rodgers would indicate her for medical neglect. ¶432. Without Anderson's consent, Rodgers conducted two home visits, including one visit to see Anderson's other child. ¶¶430-31. Rodgers also contacted Baby G's pediatrician, who confirmed that there was no medical issue requiring the medical procedures. ¶435. Months later, DCFS concluded that the report was unfounded, and closed the investigation. ¶436.

## C. Section H

The basis of the defendants' above-described actions against the plaintiffs was a DCFS policy known as Section H. ¶17.

### 1. *Adoption of Section H*

In 2015, DCFS adopted an internal policy that deemed Vitamin K shots and the administration of eye ointment on newborns "medically necessary." ¶131; *see also* DCFS Procedure 300, App. B, Alleg. 79(b)(2) Section H.[3] This policy ("Section H") stated:

> For purposes of child protection services, the administration of silver nitrate or ophthalmic solution and Vitamin K shots or pills to newborns is considered medically necessary. Calls received at SCR concerning a parent or guardian denying consent for the administration of these treatments shall be taken as reports of medical neglect.

¶132. If a parent refused a Vitamin K shot or application of the eye ointment for their newborn, the parent would be reported to DCFS for medical neglect without any determination from a doctor that the refusal was medically harmful to the baby. ¶131.

---

[3] As an internal DCFS policy or procedure, Section H was not promulgated as a DCFS regulation under the Illinois Administrative Procedure Act. *See* 5 Ill. Comp. Stat. 100/1-1 *et seq.* Illinois courts have concluded that such DCFS procedures do not establish enforceable legal standards; courts must look to the underlying ANCRA and properly-promulgated regulations for the applicable standards. *Slater v. Dep't of Children & Family Servs*., 953 N.E.2d 44, 53 (Ill. App. Ct. 1st Div. 2011) (declining to apply "blatant neglect" standard only found in DCFS procedure because the "standard is not contained in the Act or in the regulations promulgated pursuant to the Act, but is found in a document explaining DCFS's internal procedures").

Around that time, defendant Dr. Jill Glick was a pediatrician and member of DCFS's Children and Family Services Advisory Council. ¶134. In that role, Glick reviewed Section H. *Id.* Glick was also a member of defendant Illinois Chapter of the American Academy of Pediatrics (ICAAP). *Id.* Glick specifically sought to have DCFS adopt Section H as an official policy. ¶136. Along with other members of ICAAP, Glick disseminated Section H widely to pediatricians and hospitals, informing those medical providers that they could use Section H to coerce parents into accepting the Vitamin K shot, eye ointment, and other newborn medical procedures. ¶137.

In 2017, members of the Perinatal Advisory Committee of the Illinois Department of Public Health ("PAC") and other Illinois pediatricians expressed concerns about Section H. ¶¶138, 140. These pediatricians recognized that Section H considered refusals of these prophylactic procedures as *per se* medical neglect, regardless of the doctor's own medical opinion about the necessity of the medical procedures. ¶140. The pediatricians also expressed concerns about inconsistencies in reporting across hospitals. ¶141.

DCFS officials came to a PAC meeting in June 2017 at the PAC's request. ¶141-42. At that meeting, Dr. Paula Jaudes, DCFS Medical Director, and defendant Nora Harms-Pavelski, DCFS's then-Deputy Director of Child Protection, stated that DCFS was reversing its position. According to Jaudes and Harms-Pavelski, DCFS would no longer consider reports of parents refusing newborn medical procedures as medical neglect, and DCFS would not conduct an investigation if it received such a report. ¶142.

### 2. *Reaffirmation of Section H*

Glick and ICAAP would not accept "no" for an answer. ¶143. Together, they began to work with DFCS officials to reverse its position again. ¶144. Glick and ICAAP pushed DCFS to adopt an even stricter policy of "indicating" reported parents for child abuse. ¶145. Glick's

purpose in pushing for these positions was to coerce parents into accepting the medical procedures. ¶¶146-47, 153-54. ICAAP joined in Glick's mission, and in September 2017 circulated two letters to a wide network of pediatricians and to DCFS itself. ¶¶159, 161. One of the letters was one from ICAAP to DCFS; the other letter was from Glick to DCFS. ¶159. Both letters indicated DCFS should adopt a policy deeming Vitamin K refusal as *per se* "medical neglect" and requiring investigation by DCFS. ¶159-62, 165. DCFS officials, including Harms-Pavelski, then sent an email to the PAC in October 2017 that, once again, Section H was to be enforced and asking all hospitals to report refusal of Vitamin K as medical neglect. ¶162.

ICAAP and Glick then circulated this directive to Illinois hospitals and doctors, including defendants here, in October 2017. ¶163. Defendant hospitals and pediatricians then agreed to report refusal of the newborn procedures as *per se* medical neglect. ¶¶167, 172,174,179. In particular, defendant hospitals developed policies, both implied and express, that incorporated the Section H *per se* medical neglect reporting rule as the basis for their own policies. ¶¶181-88. Glick helped UCMC form its policy. ¶184. These policies are not available on the hospitals' websites. ¶¶181-88.

3. *Rescission of Section H*

In the summer of 2018, a rules analyst for the Joint Committee on Administrative Rules for the Illinois General Assembly inquired about Section H to DCFS. ¶195. A DCFS official responded to the analyst on July 23, 2018, stating that DCFS, effective immediately, would no longer enforce Section H because this policy was in conflict with ANCRA. *Id.* Despite this

promise, DCFS continued to enforce Section H, including against two of the plaintiff families. ¶194.[4]

It was not until August 2, 2018, that defendant B.J. Walker, the former DCFS acting director, rescinded Section H. ¶200. In a letter, Walker wrote that DCFS would no longer consider refusal by parents to administer Vitamin K shots or eye ointment to be *per se* medical neglect because that procedure "improperly identifies what can and should be considered 'medically necessary' " and was therefore outside of DCFS's mission and judgment. ¶201.

## II.    STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). At this stage, the court accepts all well pleaded factual allegations as true and draws all reasonable inferences in favor of the plaintiff. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam).

## III.    ARGUMENT

In recounting with specific detail the threats and ridicule, the seizures of their newborn babies, the warrantless searches of their homes by law enforcement and DCFS personnel, and the agreement among the defendants to coerce the plaintiffs into accepting unwanted and unnecessary medical procedures on their babies, the plaintiffs have plausibly alleged violations of their constitutional rights. Despite the defendants' efforts to mischaracterize these claims, the plaintiffs have alleged sufficient facts to establish that the defendants violated their constitutional rights to family integrity, to be free from unreasonable searches and seizures, and to freedom of

---

[4] Two of the plaintiff babies in this case, Baby L (Leitschuh family) and Baby G (Anderson family) were born after July 23, 2018, when Section H was supposedly revoked. *See* Sections I.B.4 & 5.

religious expression. None of the defendants can escape liability through qualified immunity or any of the other bases set forth in their motions. The motions to dismiss should be denied.

### A. Defendants Violated Plaintiffs' Constitutional Right to Family Integrity.

The constitutional right to family integrity is fundamental and long-recognized within this Circuit. The defendants here violated plaintiffs' right to family integrity by initiating and carrying out DCFS investigations solely on the *per se* basis of the parents' refusal rather than any reasonable suspicion of medical neglect. Based on these facts, the plaintiffs' claims survive.

> 1. *The state may not interfere with the constitutionally-protected right to family integrity absent probable cause or reasonable suspicion of past or imminent abuse.*

The Fourteenth Amendment to the Constitution includes substantive due process rights, which provide "heightened protection against government interference with certain fundamental rights and liberty interests." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (internal quotations omitted). "[P]erhaps the oldest of the fundamental liberty interests" recognized by the Supreme Court is "the interest of parents in the care, custody, and control of their children." *Id; see also Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (noting "[the Supreme] Court's historical recognition that freedom of personal choice in matters of family life is a fundamental liberty interest"). Parents have the fundamental right to "bear and raise their children," and children have "the substantive due process right . . . to be raised and nurtured by [their] parents." *Brokaw v. Mercer Cty*, 235 F.3d 1000, 1018 (7th Cir. 2000). This liberty interest "has its source, and its contours are ordinarily to be sought . . . in intrinsic human rights." *Smith v. Org. of Foster Families For Equal. & Reform*, 431 U.S. 816, 845 (1977); *see also Hernandez v. Foster*, 657 F.3d 463, 478 (7th Cir. 2011) ("A family's right to remain together without the coercive interference of the awesome power of the state is the most essential and basic aspect of familial

privacy.") (internal quotations omitted). This fundamental right belongs to both the parent and the child. *Brokaw*, 235 F.3d at 1019.

>    2.    *The defendants lacked even reasonable suspicion to justify their interference in the plaintiffs' right to family integrity.*

While the liberty interests of parents in raising their children, and the concomitant right for children to be raised by their parents, are of the highest magnitude, they are not absolute. The liberty interest in familial privacy and integrity is "limited by the compelling governmental interest in the protection of children particularly where the children need to be protected from their own parents." *Doe v. Heck*, 327 F.3d 492, 520 (7th Cir. 2003) (internal quotations omitted). Thus, the liberty interest "does not include the right to be free from child abuse investigations." *Id.* But such an investigation must be premised on a sufficient basis such that the intrusion into family life is warranted. *Brokaw*, 235 F.3d at 1019.

The Seventh Circuit has evaluated government intrusion into family life based on the justification for the intrusion and the intrusion itself. To justify an investigation at the outset, there must be reasonable suspicion of child abuse. *Brokaw*, 225 F.3d at 1019. To justify the seizure of a child from her parent, there must be probable cause. *Id.* at 1010; *see also Hernandez*, 657 F.3d at 474. Caseworkers and other state actors must have "evidence to support a reasonable suspicion of past or imminent abuse before they may take a child into protective custody." *Siliven v. Ind. Dep't of Child Servs.,* 635 F.3d 921, 928 (7th Cir. 2011) (internal quotations omitted); *see also Hernandez*, 657 F.3d at 480 (concluding that once "the defendants no longer had a reasonable suspicion that Jaymz had been abused or was in imminent danger of abuse . . . the state had no interest in keeping him in protective custody and away from his

parents").[5]  Reasonable suspicion and probable cause "are two points on a 'continuum in which the necessary degree of confidence increases with the degree of intrusion.' "  *Glickman v. Vill. of Morton Grove*, No. 18-cv-4931, 2019 WL 1754091, at *5 (N.D. Ill. Apr. 19, 2019) (*quoting United States v. Burton*, 441 F.3d 509, 512 (7th Cir. 2006)).  The same legal standard applies in evaluating Fourth Amendment and Fourteenth Amendment claims for the removal of children. *See Brokaw*, 225 F.3d at 1019.

The nature and immediacy of the state's concern at issue, and the efficacy of the means employed by the state to meet the concern, "must be considered in tandem."  *Heck,* 327 F.3d at 521.  But if there is no evidence that a child is abused or in imminent danger of abuse, "neither the state nor its officials have any interest whatsoever in protecting children from their parents, and no further inquiry (i.e., balancing of interests) is necessary."  *Id.* (internal quotations and citation omitted).

Both the reasonable suspicion standard and the probable cause standards are objective. *Sebesta v. Davis*, 878 F.3d 226, 233 (7th Cir. 2017); *Siliven*, 635 F.3d at 927.  To qualify as a "reasonable suspicion," caseworkers and other state actors must have "more than a hunch but less than probable cause."  *Xiong v. Wagner*, 700 F.3d 282, 291 (7th Cir. 2012).  And, if reasonable suspicion or probable cause dissipates, the continued withholding of a child from his parents may constitute a constitutional violation.  *Id.* at 291-92.

In *Brokaw,* for example, the Seventh Circuit, as here, was faced with both a Fourth Amendment seizure claim and a Fourteenth Amendment family integrity claim.  In setting forth the Fourth Amendment seizure standard, the court noted, "[i]n the context of removing a child

---

[5] While *Siliven* and *Hernandez* suggest that DCFS may take a child into protective custody based only on reasonable suspicion, the plaintiffs submit that protective custody constitutes a seizure of the type requiring probable cause, a court order, or exigent circumstances.  *See Brokaw*, 225 F.3d at 1010-11.

from his home and family, a seizure is reasonable if it is pursuant to a court order, if it is supported by *probable cause*, or if it is justified by exigent circumstances, meaning that state officers have reason to believe that life or limb is in immediate jeopardy." *Id.* at 1010 (emphasis added) (internal quotations omitted). However, later in addressing the substantive due process claim, the court noted, "a state has no interest in protecting children from their parents unless it has some definite and articulable evidence giving rise to a *reasonable suspicion* that a child has been abused or is in imminent danger of abuse." *Id.* at 1019 (emphasis added).

Thus, temporary interferences with family integrity that do not rise to the level of a seizure, such as a non-consensual but brief interview of the parents, should be evaluated for a reasonable, articulable suspicion that a child has been abused or is in imminent danger. *See Brokaw*, 235 F.3d at 1019. An interference that results in the seizure of a child should be evaluated for probable cause.[6] In this case, the defendants did more than simply interview the plaintiffs; they took newborn babies from their parents or threatened to do so. *See* Section III.A.3, *infra.* And, as alleged in the complaint, DCFS had no basis to seize the newborns or threaten to do so. *Id.* There was neither reasonable suspicion nor probable cause to believe the children were abused or in imminent danger.

The Seventh Circuit's long line of cases reiterating this point – that a child abuse investigation by the state must be premised on reasonable suspicion of actual abuse or imminent danger of abuse – is in keeping with the Supreme Court's continued recognition of America's "strong tradition of parental concern for the nurture and upbringing of their children." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972).

---

[6] See *Smith v. Ball State Univ.*, 295 F.3d 763, 768 (7th Cir. 2002) (explaining the difference between the two standards).

23

3.       *Reports were not based on reasonable suspicion or probable cause.*

Plaintiffs have alleged facts showing that the defendants' basis for calling DCFS, threatening to call DCFS, and separating or threatening to separate newborn babies from their families was based solely on a *per se* policy and not on a reasonable suspicion of abuse.  For example, with respect to the Boughers, Skalski did not believe there was any specific need for Baby B to receive a Vitamin K shot.  ¶247.  Kitakis indicated that the report would be unfounded for child abuse during her very first visit with the Boughers in the hospital.  ¶258. None of this amounts to reasonable suspicion sufficient to support either the threat or the actual separation that the Bougher family faced when Silver Cross, Kozuch, and Skalski separated newborn Baby B from her parents in the hours after her birth solely on the basis of the Boughers' refusal of the medical procedures.  ¶¶227, 236.

With respect to the Holderman-Hill family, Schulte did not call DCFS on the basis of Vitamin K or erythromycin refusal but because they refused the newborn screen.  ¶¶300, 306.[7] Schulte told the Holderman-Hill family that she *had no problem* with the Vitamin K or erythromycin refusal.  *See* ¶285.  This is a textbook example of a lack of reasonable suspicion of neglect.

The Koseks signed a pre-printed waiver form regarding their refusal of the medical procedures and were informed even before their baby's birth that DCFS would be called as a result of their refusal.  ¶331.  After Baby K's birth and the Koseks refused the medical procedures, hospital staff called DCFS to report the Koseks for medical neglect, and they were threatened that their baby could be taken from them and they would have to go to court to get

---

[7] The Newborn Metabolic Screening Act contains a religious exemption.  410 ILCS 240/3.  The Holderman-Hill family refused the newborn metabolic screen on religious grounds under that exemption.  ¶¶300, 306

their baby back.  ¶¶333, 344.  The medical staff and DCFS caseworker knew that the couple's pediatrician had no issue with the refusal of these prophylactic medical procedures – instead, the basis of the report was hospital policy.  ¶¶348-353.  Again, there was no medical professional articulating a reasonable suspicion that a child was being medically neglected; instead, everyone was just following the *per se* policy.

A nurse told the Leitschuh family that it was Advocate Christ's policy to call DCFS for refusal of Vitamin K shots, and DCFS was called based on that express policy, not on any medical professional's judgment.  ¶¶367, 369.  In fact, the medical staff agreed that the choices were reasonable due to Emily Leitschuh's health history.  ¶369.  And the Leitschuhs' pediatrician did not believe that the refusals were medical neglect and provided this opinion to the DCFS caseworker.  ¶¶383-85.  Similarly, Baby G's pediatrician informed DCFS that there were no medical issues with Anderson's refusal to administer the Vitamin K shot.  ¶¶401, 435. There cannot be reasonable suspicion of neglect when a medical professional expressly states that there is no medical neglect at all.[8]

These facts, as alleged, do not support the conclusion that DCFS had "more than a hunch" that medical neglect was occurring.  *Xiong*, 700 F.3d at 291.  Finally, DCFS's own statements regarding the rescission of Section H – that the policy "improperly identifies what can and should be considered 'medically necessary'" – support the only conclusion that can be drawn on these facts: the reports made to DCFS were not based on reasonable suspicion of medical neglect.  ¶201.

---

[8] Medical professionals can reasonably disagree about whether Vitamin K and eye ointment are, in certain instances, medically necessary, which shows that objectively there could be no reasonable suspicion of medical neglect solely on the basis of refusal.  *Sebesta*, 878 F.3d at 233; ¶¶138, 140, 285, 383-85.

Further, opening a DCFS investigation is not "reasonably related in scope to the circumstances which [allegedly] justified the interference in the first place." *Heck*, 327 F.3d. at 520 (internal quotations omitted and alteration in original). DCFS investigations are only properly opened when DCFS has a reasonable suspicion of abuse or neglect. *See id.* at 524. Taking a child into protective custody, as happened to the Boughers, is even less proportionate. *Siliven,* 635 F.3d at 928; *Hernandez*, 657 F.3d at 480-81. Protective custody demands "a reasonable suspicion of *past or imminent abuse,"* which is entirely absent here. *Siliven,* 635 F.3d at 928 (internal quotations omitted and emphasis added). The facts presented in the complaint more than plausibly allege that defendants lacked reasonable suspicion.[9]

*Doe v. Heck* is squarely on point. In that case, the Bureau of Milwaukee Child Welfare ("BMCW") initiated an investigation for child abuse after receiving a letter describing corporal punishment at a private religious school. *Heck*, 327 F.3d at 500. The BMCW interviewed several children and opened "mandatory" investigations of abuse by the children's parents on these allegations alone. *Id.* at 500-05. BMCW also threated to remove children from their parents. *Id.* at 505-06. Among other claims, the parents brought claims of interference with their constitutional right to familial relations based on the investigation and for the threats to remove the children from the parents' custody. *Id.* at 508.

The Seventh Circuit held that the parents' constitutional rights had been violated. *Heck*, 327 F.3d at 524. "[B]ecause the defendants had no evidence giving rise to a reasonable suspicion that the plaintiff parents were abusing their children, or that they were complicit in any such abuse, the defendants violated the plaintiffs' right to familial relations." *Id.* at 524. Reasoning that there is a "constitutional presumption that fit parents act in the best interest of

---

[9] And, insofar as the court needs to make a determination as to whether or not reasonable suspicion existed, that is a quintessential jury question.

their children," the court concluded that the "defendants not only failed to presume that the plaintiff parents would act in the best interest of their children, they assumed the exact opposite." *Id.* at 519, 521 (internal quotations omitted).

The Seventh Circuit specifically rejected BMCW's policy of investigating allegations of "corporal punishment as child abuse *per se.*" *Heck*, 327 F.3d at 522. The court did so for two reasons: (1) because the policy disregarded the constitutional presumption that parents act in the best interest of their children, and (2) because the policy contradicted the BMCW's *own investigation standards*, which stated that corporal punishment by itself does not constitute child abuse. *Id.*

The Seventh Circuit also held that "the defendants' threat to remove John Jr. and his sister from the custody of their parents violated the Does' right to familial relations, which includes a liberty interest in the maintenance of the family unit." *Heck*, 327 F.3d at 524. The court reasoned that "[t]his protection is especially important where, as here, we are concerned with the most essential and basic aspect of familial privacy – the right of the family to remain together without the coercive interference of the awesome power of the state." *Id.* (internal quotation omitted). The interests being protected were not only that of the parent "in the companionship, care, custody and management of his or her children," but also "of the children in not being dislocated from the emotional attachments that derive from the intimacy of daily association, with the parent." *Id.* (internal quotations and citations omitted).

Much like the *per se* policy regarding corporal punishment in *Doe v. Heck*, the defendants' policies and practices mandating reporting of parents who refused the newborn medical procedures to DCFS disregarded the presumption that parents act in the best interest of their children. *Heck*, 327 F.3d at 524. The Section H and parallel hospital policies negated the

minimum requirement of reasonable suspicion that is constitutionally required before violating a family's right to family integrity. *Id.* And the *per se* policy contradicts DCFS's own regulation defining medical neglect, which defines "Medical Neglect" as follows:

> Lack of medical or dental treatment for a health problem or condition that, if untreated or not treated as prescribed, could become severe enough to constitute serious or long-term harm to the child . . . . It must be verified that the child has/had an untreated health problem, or that a prescribed treatment plan was implemented. The verification must come from a physician, registered nurse, dentist, or by a direct admission from the alleged perpetrator. It must further be verified by a physician, registered nurse or dentist that the problem or condition, if untreated, could result in serious or long-term harm to the child.

89 Ill. Admin. Code § 300 Appendix B Allegation 79; SAC ¶123; *see also supra* Section I(A).

This DCFS regulation requires much more than the mere refusal of prophylactic medical procedures to investigate a parent for medical neglect, just as the BMCW's policies required more for an investigation for corporal punishment.[10] *See Heck*, 327 F.3d at 524. Like in *Doe v. Heck*, the defendants' *per se* medical neglect policies and practices resulted in an unconstitutional presumption of unfit parenting and contradicted DCFS's own internal policies.

### 4. *Threats were not based on reasonable suspicion either.*

Contrary to defendants' assertions that threats are not enough to establish constitutional violations, children do not have to be physically removed from their parents for a constitutional violation to occur. In *Doe v. Heck*, the Seventh Circuit specifically noted that the threat of taking children away was alone sufficient: "Although it is true the defendants did not make good on their threat, the threat alone implicates the Does' liberty interest in familial relations." *Heck*, 327

---

[10] The plaintiffs acknowledge that DCFS further defines "proper and necessary preventive health care" as including newborn screening tests. Ill. Admin. Code § 300 Appendix B Allegation 79. However, Illinois law allows for a religious exemption to newborn screening tests, which the Holderman-Hills properly invoked. 410 ILCS 240/3; ¶¶295, 297. And Baby H was otherwise deemed healthy, with no medical issues, conditions, or problems by Schulte and other hospital staff. ¶¶317-18. There was no reasonable suspicion of medical neglect.

F.3d at 524. This was because "the defendants had no reason whatsoever to suspect that Mr. and Mrs. Doe were abusing their children." *Id.* The Seventh Circuit has more recently reiterated the conclusion that "a threat that parents cannot see their child unless they agree to something is extremely coercive." *Hernandez*, 657 F.3d at 482.

Here, the individual medical defendants threatened to call DCFS, or stated that the parents' children might be removed from their custody, solely on the basis of their refusal of the newborn medical procedures.[11] Some of the caseworkers also made such threats, working in concert with the medical defendants. These threats were not based on reasonable suspicion of past or imminent child abuse, but rather on a *per se* policy.

These threats are detailed in the complaint. For example, Kozuch told the Boughers, "I am taking your baby to the nursery, and I'm reporting you to DCFS due to your refusal." ¶226. And DCFS was called as a result of the Boughers' refusal. ¶250. Schulte told the Holderman-Hill family that their refusal to do the newborn screening would result in her calling DCFS. ¶¶293, 300. And Schulte called DCFS. ¶306.

Various nurses told the Koseks that DCFS would be called based on their refusal to have their baby receive a Vitamin K shot and erythromycin. ¶332. And DCFS was called. ¶335. A doctor at Silver Cross told the Koseks that the baby could be taken away from them. ¶¶340, 344. A hospital administrator also told the Koseks that the hospital could forcibly take the baby and administer the medical procedures. ¶351. When DCFS caseworker Allen called the Leitschuhs, she told them that she was going to take custody of both the newborn baby and their older child, and that the children would be separated and not allowed to stay with family members. ¶372. Anderson was told by two different UCMC pediatricians, including Lysouvakon, co that the

---

[11] Other defendants conspired with the individual defendants through their coordinated efforts to develop and implement the *per se* medical neglect policies at issue here. *See* Section D, *infra.*

hospital would take away her baby if she refused the Vitamin K shot. ¶¶402, 409. Lysouvakon further threatened to take the baby into protective custody and administer the Vitamin K shot without Anderson's consent. ¶¶409, 411. UCMC called DCFS and reported Anderson for medical neglect. ¶427.

These allegations, taken as true, establish that defendants, including Kozuch, Schulte, Skalski, Allen, Taylor-Williams, Rodgers, and Lysouvakon, called DCFS, threatened to call DCFS, or investigated the plaintiffs solely because they refused the newborn medical procedures, not on any probable cause or reasonable suspicion. As in *Doe v. Heck* and *Hernandez*, these actions and threats constitute a violation of the plaintiffs' right to familial relations and familial integrity. 327 F.3d at 524; 657 F.3d at 482. The complaint therefore states a claim for a violation of the plaintiffs' constitutional right to family integrity.

5.     *Defendants' counterarguments are unavailing.*

The defendants make several counterarguments. None of them are sufficient to overcome the Seventh Circuit's precedent. Ignoring the well-established fundamental constitutional right to familial integrity, the defendants repeatedly mischaracterize and belittle the constitutional violations at issue. Defendants contend that plaintiffs have alleged a violation of the right to refuse medical procedures[12] (UCMC Br. 8, Dkt. 71); the right to be free from harassment (UCMC Br. 8-9, Dkt. 71); the right to refuse state-mandated procedures (UCMC Br.

---

[12] The Seventh Circuit has not opined whether there is a freestanding right of parents to direct children's medical care. However, the Ninth Circuit has ruled that the Supreme Court has long ago established such a right. "The right to family association includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state." *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000) (citing *Parham v. J.R.*, 442 U.S. 584, 602 (1979)). This issue need not be decided, though, because the defendants are not being sued based on their non-acceptance of the parents' rights to make these informed medical choices. Rather, the defendants are being sued based on their threats, seizures, and investigations, all of which were baseless and substantially interfered with the plaintiffs' well-established right to family integrity.

10-11, Dkt. 71)[13]; the right to be free from child abuse investigations (Schulte Br. 13, Dkt. 78; DCFS Br. 14, Dkt. 93); and the right to be free from coerced medical procedures (Skalski Br. 7, Dkt. 77). As stated above, plaintiffs make a well-substantiated claim for the violation of family integrity, which defendants cannot wave away by pretending that the claim is for some other violation.

The UCMC defendants attempt to distinguish *Hernandez* in their mischaracterization of the plaintiffs' claim as one of mere harassment. UCMC contends that the difference in the two cases is that the *Hernandez* plaintiffs "capitulated under pressure" while the plaintiffs here did not. UCMC Br. 9, Dkt. 71. UCMC also contends that the Seventh Circuit found the removal, rather than the threat, the constitutional violation. *Id.* UCMC is incorrect.

In *Hernandez*, the Seventh Circuit specifically stated that the threat is what mattered: "[W]here an official makes a threat to take an action that she has no legal authority to take, that is duress; and it is improper to obtain consent to a safety plan through duress or other illegal means." 657 F.3d at 482. The court went on to conclude that "a threat that parents cannot see their child unless they agree to something is extremely coercive." *Id.*; *see also Heck*, 327 F.3d at 524 ("Although it is true the defendants did not make good on their threat, the threat alone implicates the Does' liberty interest in familial relations."). *Hernandez* supports the plaintiffs, not the defendants.

While misconstruing the constitutional violations as the right to be free from child abuse investigations and coerced medical procedures, Skalski and Schulte similarly claim that there were no constitutional violations because the violations were only *attempted*, as the medical

---

[13] This is a particularly erroneous characterization of the violation at issue here. The Vitamin K shot and the eye ointment are *not* vaccinations that are required to protect public safety; there is no broader contagion concern that results from the parents' refusal. The only risks and benefits that result from the refusal are to the individual child.

procedures were never administered.  Skalski Br. 5-7, Dkt. 77; Schulte Br. 11, Dkt. 78.  But under *Hernandez* and *Heck*, there is no question that a threat of investigation or removal is a violation in itself.  The plaintiffs have sufficiently alleged threats of investigation and removal to establish the constitutional violation.  Skalski and Schulte's arguments regarding attempt are unavailing.

### 6.    *DCFS defendants fail to show how the complaint is insufficient.*

The DCFS caseworkers simply conclude that they did not violate plaintiffs' constitutional rights because the babies were not taken into protective custody (DCFS Br. at 17-20, Dkt. 93), the investigation was ultimately determined to be unfounded (*id.*), the babies were not given the medical procedures (*id.*), and the investigators followed state procedure in their investigations (*id. at* 19-20).  None of these conclusory arguments is a basis to dismiss the plaintiffs' complaint; none of these arguments refutes the constitutional violations alleged.

First, DCFS's brief fails to advance any persuasive legal analysis or argument, and as the plaintiffs established above, the right to family integrity includes the right to be free from investigations not based on reasonable suspicions of abuse.  *See supra* at Section III(A)(1).  Many of DCFS's arguments are actually factual disputes.  For example, DCFS claims "there is no evidence that the call to the DCFS hotline was fabricated" in the Boughers' case.  *See* DCFS Br. 17, Dkt. 93.  This is an argument for the jury, not for a motion to dismiss.  And in a real sense, plaintiffs contend that the call to DCFS *was* "fabricated" because there was no reasonable suspicion of medical neglect.

And finally, merely following state law does not absolve the DCFS caseworkers of constitutional violations.  *Hernandez*, 657 F.3d at 480 ("The federal Constitution is the supreme

law of the land; state law cannot trump federal constitutional rights.").[14]  The federal civil rights statute at issue in this case, 42 U.S.C. § 1983, specifically prohibits the deprivation of constitutional rights "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia."  Through this argument, DCFS concedes one of the elements of the violation: that DCFS was acting "under [the] color of any statute [or] . . . regulation."  42 U.S.C. § 1983.

The DCFS defendants asserted their power to investigate in these cases too broadly. Here, the DCFS defendants went well beyond initiating an investigation.  They threatened to take away babies and their siblings.  Plaintiffs' claims for violations of their constitutional right to family integrity survive on these grounds.

### B.    The Defendants Violated Plaintiffs' Constitutional Right to Be Free From Unreasonable Searches and Seizures.

The plaintiffs also allege violations of their Fourth Amendment rights.  Most assert violations of their rights against unreasonable search and seizure: the Boughers against defendants Kozuch, Skalski, Silver Cross, and Kitakis; the Leitschuhs against Allen; Danielle Anderson against Rodgers; and the Koseks against Taylor-Williams.  The Holderman-Hills assert a claim of unreasonable seizure against defendant Schulte.  These claims are plausibly alleged and survive the motions to dismiss.

#### 1.    *The Fourth Amendment prohibits unreasonable searches and seizures.*

The Fourth Amendment, incorporated by the Fourteenth Amendment, provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const., amend. IV; *Brokaw*, 235 F.3d at 1009.

---

[14]  In any event, as explained above, *see* Section I(C)(1) n.3, the DCFS defendants were not following state law because Section H was an internal DCFS procedure or policy without the force of law.

A search means "[t]o look over or through for the purpose of finding something; to explore; to examine by inspection; as, to *search* the house for a book; to *search* the wood for a thief." *Heck*, 327 F.3d at 509-10 (internal quotations omitted). A seizure occurs when "in view of all of the circumstances surrounding the incident, a reasonable person would not have believed that he was free to leave." *Id.* at 510.

"[A] search or seizure carried out on . . . [private] premises without a warrant is per se unreasonable, unless the [government] can show that it falls within one of a carefully defined set of exceptions based on the presence of exigent circumstances." *Heck*, 327 F.3d at 511 (internal quotations omitted). And a visit to a location by DCFS workers for the specific purpose of gathering information is "an activity that most certainly constitutes a search under the Fourth Amendment." *Id.* at 510. "In the context of removing a child from his home and family, a seizure is reasonable if it is pursuant to a court order, if it is supported by probable cause, or if it is justified by exigent circumstances, meaning that state officers have reason to believe that life or limb is in immediate jeopardy." *Brokaw*, 235 F.3d at 1010 (internal quotations omitted).

> 2. *The complaint properly alleges that the plaintiffs' Fourth Amendment rights were violated.*

The plaintiffs here suffered unconstitutional searches of their homes, unconstitutional seizures and threats of the seizures of their babies, as well as unconstitutional seizures of the parents. The plaintiff parents did not feel free to leave during the home investigations and were forced to extend their hospital stays or separate from each other as a result of the demands of the investigation. The complaint sufficiently alleges Fourth Amendment violations.

a. *The Boughers*

The Boughers allege that defendants Kozuch, Skalski, and Silver Cross violated their right to be free from illegal seizure and that defendant Kitakis violated their right to be free from an illegal search. The Boughers have alleged facts sufficient to show that the seizure of Baby B at the hospital was unreasonable: there was no court order, it was not supported by probable cause but rather on a *per se* basis for the refusal of the newborn medical procedures, and it was not justified by exigent circumstances. *See* ¶¶ 226-40, 250-58.

The Boughers allege that Skalski knew the baby was separated from its parents and refused to allow the Boughers to see Baby B, thus prolonging the seizure. ¶¶232-33. Silver Cross and Skalski offer no reason to dismiss the Fourth Amendment claims, barely mentioning them in their briefs. Silver Cross Br. 5, Dkt. 67 (recounting claims); Skalski Br. 1, 6, Dkt. 77 (recounting claims). Skalski suggests that his lack of personal involvement in the seizure justifies dismissal of the claim, but the Boughers have adequately alleged his involvement to defeat a Rule 12(b)(6) motion. *See* ¶¶226-40, 250-58.

The Boughers additionally allege that Kitakis caused police officers to illegally search their home and children. ¶¶273-275, 489-90. The Boughers had an expectation of privacy in their home, did not consent to a search, and the police officers did not have a warrant to enter the home. ¶274. In fact, the Boughers' attorney had told the DCFS supervisor to get a warrant if anyone wanted to come into the couple's home. ¶268. The police were called by DCFS. ¶274. The police conducted a search when they laid eyes on the children, because the purpose of the search was to see the children. *Id.* Directing an unconstitutional search is sufficient to attach liability. *See Ryan v. Mary Immaculate Queen Ctr.,* 188 F.3d 857, 859 (7th Cir. 1999). The Boughers have stated a claim against Kitakis for illegal search.

DCFS argues that its caseworkers were statutorily obligated to conduct the home visits for all plaintiffs, including for the Boughers, and so the in-home visit was a reasonable search. DCFS Br. 21-23, Dkt. 93. However, as discussed above, § 1983 is specifically designed to address situations in which state law authorizes constitutional violations. *See* Section III(A)(6), *supra*. And a "home visit" is nothing more than a euphemism for a search. It is the burden of the person conducting the warrantless search to "show that it falls within one of the carefully defined set of exceptions based on the presence of exigent circumstances." *Heck*, 327 F.3d at 511 (internal quotations omitted). Here, the DCFS defendants do not even attempt to argue they had exigent circumstances.

The DCFS defendants claim that "the plaintiffs have pled no facts that the home visits were not related in scope to a child neglect investigation." DCFS Br. 23, Dkt. 93.[15] But the plaintiffs have pled facts supporting exactly that theory: If the basis of the investigation was the refusal of parents to administer certain treatments to their newborns – the alleged "medical neglect" – then viewing the other children is outside the scope of that investigation, as no information would be gained about the parents' refusal or the newborn's health from viewing the other children.

In the Boughers' case in particular, DCFS states that its use of the Joliet Police Department to conduct the home visit was authorized because the DCFS investigator was "denied reasonable access to a child" when "Brian and Angela 'made it clear they would not consent to a home visit.'" Br. 23, Dkt. 93 (quoting Am. Compl. ¶ 490). Regardless of whether

---

[15] Again, DCFS states that "[t]here is no evidence which suggests that the home visits were anything but routine and ordinary or that they were overly burdensome or intrusive." DCFS Br. 23 Dkt. 93. Not only are plaintiffs not required to provide "evidence" at this stage – as opposed to allegations supporting a viable legal claim – DCFS's assertion that the search was not overly burdensome is relevant only to the degree of harm caused by the constitutional violation, not the violation itself.

the Boughers' refusal constituted the denial of reasonable access to a child, the Joliet Police Department's search of the Bougher home and the Bougher children was unreasonable. There was no reasonable suspicion of medical neglect, and the search was beyond the scope of any claim of medical neglect based on the refusal of Vitamin K or eye ointment.

The DCFS defendants also attempt misdirection by improperly assuming the reasonableness of the investigation. They rely on *Darryl H. v. Coler*, 801 F.2d 893 (7th Cir. 1986) for this proposition. *See* Dkt. 93 at 22-23. *Coler* does not support their contention, however, as the first inquiry that must be made in Fourth Amendment analysis is not whether the *search* – the home visit – was justified at its inception; it is whether the *investigation* was justified at its inception, thereby allowing the search to be "reasonably related in scope to the circumstances." *See id.* at 903; *see Heck*, 327 F.3d at 520.[16]

Furthermore, a non-consensual home visit requires more than the reasonable suspicion necessary to initiate the investigation. *Heck,* 327 F.3d at 513. In *Heck*, the Seventh Circuit concluded that the "warrantless search of the school . . . [is] presumptively unreasonable, and can only be upheld if either falls within one of the few specifically established and well delineated exceptions to the Fourth Amendment's warrant and probable cause requirements." *Heck*, 327 F.3d at 513. And the plaintiffs' privacy interest in their *homes* is far greater than the privacy interest in a private school – the privacy interest in the home is "at the very core" of the Fourth Amendment. *Kyllo v. United States*, 533 U.S. 27, 31 (2001). "The Fourth Amendment's protection of the home has never been tied to measurement of the quality or quantity of

---

[16] *Coler* can also be distinguished on the facts and procedural posture of the case, as *Coler* addressed the search of a child's body on a motion for a preliminary injunction. *Coler,* 801 F.2d at 903. While the Seventh Circuit concluded that DCFS could possibly support its basis for the investigation on the merits, the court also noted that the justification for the search in that case was not necessarily reasonable, as the search was based on the vague and imprecise rules set out in the DCFS handbook at issue. *Id.*

information obtained." *Id.* at 37. In fact, "there is no exception to the warrant requirement for the officer who barely cracks open the front door and sees nothing but the nonintimate rug on the vestibule floor." *Id*. This applies even when the reason for the search is a child abuse investigation.

Simply put, DCFS caseworkers, like any other governmental officials, may not enter into a private home without a warrant or exigent circumstances, and, in fact, this has been well-established in the Seventh Circuit since at least 2003 in *Doe v. Heck*. *See Breitweiser v. Ind. Dep't of Child Serv*., 1:15-cv-01687-TWP-MJD, 2016 WL 6989773, at *7-8 (S.D. Ind. Nov. 10, 2016) (denying qualified immunity defense at the pleading stage for a child-services case worker for entering the plaintiff's home without a warrant or exigent circumstances on basis of *Heck*). Each of the plaintiffs was subjected to a non-consensual, warrantless search of his or her home, except the Holderman-Hills, who were allowed to do their follow-up visit outside of the home. The entry into the Boughers' home was done by police, but the DCFS defendants admit that they caused the police to conduct the search (DCFS Br. 23, Dkt. 93).

### b. The Leitschuhs

The Leitschuhs allege that Allen caused Emily and Baby L to be illegally seized when her instructions to the hospital to keep Baby L prevented Emily and Baby L from leaving the hospital. ¶¶385-392. Because a seizure occurs when "a reasonable person would not have believed that he was free to leave," *Heck*, 327 F.3d at 510, Emily and Baby L were seized when they could not leave the hospital solely on the grounds that Baby L had not received the Vitamin K shot. The complaint sufficiently alleges facts that support a conclusion that Allen's instructions were not based on probable cause or even reasonable suspicion, but rather on an unreasonable, *per se* medical neglect policy that has no basis in the actual medical condition of Baby L. ¶¶365-70, 385-92.

DCFS contends that Emily and Baby L were not seized because a reasonable person would have felt free to leave when her obstetrician medically cleared her. DCFS Br. 24-25, Dkt. 93. But the Leitschuhs allege that Emily did not feel free to leave without her baby, who was detained at the hospital. Merely because Emily was not physically restrained or prevented from leaving by police officers does not mean she was not seized. The Leitschuhs also allege an illegal search of their home by Allen when she conducted the home visit. ¶390. The Leitschuhs have a reasonable expectation of privacy in their home, did not consent to a search, and Allen did not have a warrant to enter the home. These allegations sufficiently allege a Fourth Amendment violation.

c.      *Danielle Anderson and the Koseks*

Danielle Anderson and the Koseks both allege that the defendant caseworkers who conducted their home visits illegally searched their homes. ¶¶429-31 (Anderson), 355-56 (Koseks). Like the other plaintiffs, these plaintiffs had a reasonable expectation of privacy in their homes, did not consent to the search, and the caseworkers did not have warrants. There was no reason, other than the *per se* medical neglect reporting policy, for the caseworkers to conduct a search of the plaintiffs' homes. Because the respective DCFS reports were not based on reasonable suspicion, the caseworkers' searches were unreasonable.

DCFS provides no specific argument in response to the allegations of Anderson and the Koseks but argues that the home visits were justified, routine, followed state law, and were reasonably related in scope to the circumstances that justified the investigation. *See* DCFS Br. 22-25, Dkt. 93. As stated above, the warrantless home searches were conducted without exigent circumstances. That the home visits were routine or conducted in accordance with state law is insufficient to overcome the unconstitutional search at the outset; and the searches were not reasonably related in scope because there was no reason to believe that the families' homes or

39

other children had *anything* to do with the parents' refusal to administer prophylactic treatments to their newborns *in the hospital*.

     *d.*   *Holderman-Hills*

   The Holderman-Hill family alleges a violation of their Fourth Amendment right to be free from unreasonable seizure against Schulte. ¶483. The complaint alleges that Hill did not reasonably feel free to leave the hospital until the on-site DCFS investigation, initiated by Schulte, was complete. ¶314; *see Heck*, 327 F.3d at 510. These allegations, taken as true, are sufficient to plead a claim for violation of Hill's right to be free from unreasonable seizure, as a reasonable person would not have felt free to leave the hospital without her baby. The Holderman-Hills do not bring a Fourth Amendment claim against any DCFS defendant, and Schulte does not challenge the sufficiency of Hill's allegation that she was seized, instead choosing to rely on other arguments.[17]

### C. Defendant Schulte Violated the Holderman-Hills' First Amendment Rights.

   The Holderman-Hill family has also sufficiently stated a claim for the violation of their First Amendment right to free exercise of religion against Schulte. *See* ¶¶289-304.

    1.  *The First Amendment provides for the free exercise of religion.*

   "The Free Exercise Clause protects against indirect coercion or penalties on the free exercise of religion." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S.Ct. 2012, 2022 (2017). Placing a substantial burden on a person's exercise of religion violates the Constitution because a substantial burden "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016). When a

---

[17] If Schulte attempts to argue on reply that the complaint did not sufficiently state a seizure, or that she did not cause the seizure, this argument should be considered waived. *See G & S Holdings LLC v. Cont'l Cas. Co.,* 697 F.3d 534, 538 (7th Cir. 2012).

policy aimed at a child is claimed to present a burden to the parents' religion, "the parents must show that the [policy] has a coercive effect that operates against the parents' practice of their religion." *Fleischfresser v. Directors of Sch. Dist. 200*, 15 F.3d 680, 689-90 (7th Cir. 1994).

2.    *Schulte violated the Holderman-Hills' right to free exercise.*

The Holderman-Hills plausibly allege that Schulte's action had a coercive effect that operated against their practice of their religion. *See* ¶¶289-304. Schulte repeatedly refused to acknowledge the religious exemption to the newborn screening test and mocked the couple's religious beliefs. ¶¶293, 295, 297-300. As a result, the couple felt coerced into not practicing their religion – *i.e.*, coerced into accepting a test that violated their religious beliefs. These allegations are sufficient to survive a motion to dismiss the complaint.

Schulte claims that mere mocking of religious beliefs does not constitute a constitutional violation. Schulte Br. 12, Dkt. 78. Schulte cites two cases in support: *Tatum v. Lucas*, No. 11-C-1131, 2019 WL 652854 (E.D. Wis. Feb. 15, 2019) and *Bonner v. McCallum*, No. 01-C-487-C, 2001 WL 34373164 (W.D. Wis. Nov. 16, 2001). In those cases, the courts held that the mere mockery of the religion was not actionable. But the Holderman-Hills do not rely on Schulte's mockery as the sole basis of their claim; rather, it was the mocking *and* the denial of the valid, religious exemption that burdened the practice of their religion. *See* ¶¶289-304. As the Seventh Circuit concluded in *Thompson v. Holm,* "uncertainty" that "put pressure on [a plaintiff] to resign himself" to violating his religious beliefs can constitute a First Amendment violation. 809 F.3d at 380. Just as in *Thompson*, the uncertainty, and the resulting pressure to violate beliefs, is a violation of the Holderman-Hills' First Amendment rights. The Holderman-Hills have plausibly pled their First Amendment claims.

41

### D.    The Defendants Conspired to Deprive Plaintiffs of Their Constitutional Rights.

The plaintiffs plausibly allege that the defendants participated in a conspiracy to deprive them of their constitutional rights.  To prevail on a conspiracy claim, "the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018).  In other words, the plaintiffs must "show an underlying constitutional violation" and "demonstrate that the defendants agreed to inflict the constitutional harm." *Id.*

The plaintiffs have pled sufficient facts to plausibly support the underlying constitutional violation of their rights to familial integrity and freedom from unreasonable search and seizure, as established in Section III.A & B, *supra*.  The plaintiffs' allegations also "demonstrate that the defendants agreed" to violate the plaintiffs' rights.  *Daugherty*, 906 F.3d at 612.  For example, the complaint alleges that defendants Glick, ICAAP, and DCFS coordinated to develop Section H, ¶¶ 154-66.[18]  The complaint alleges that defendant hospitals took action to enforce Section H at the behest of Glick and ICAAP, despite Section H being an internal DCFS policy, in part by enacting hospital policies that required *per se* medical neglect DCFS reports for refusals of newborn treatments.  ¶¶ 164-67, 172, 174, 179-88.  DCFS officials adopted and supported Section H and emailed the PAC with its position that refusal of Vitamin K and eye ointment should be medical neglect.  ¶ 162.  This directive was then circulated to many Illinois hospitals and pediatricians, and DCFS's position was used by Glick and ICAAP to convince other pediatricians and hospitals to also report parental refusal of Vitamin K or eye ointment as *per se* medical neglect.  ¶¶ 162-67, 172.  These allegations support the inference that there was a

---

[18] The complaint cites numerous emails and meetings that support the inference that there was ample opportunity for a meeting of the minds.

meeting of the minds as to what should happen when a pediatrician faced parental refusal of a Vitamin K shot or eye ointment: All defendants were in agreement that the parents should be reported for medical neglect to DCFS, regardless of the actual medical necessity of the treatments.

            1.     *Private defendants' counterarguments fail.*

            a.     *Glick*

The private defendants generally argue that they were not part of a conspiracy. Glick argues that there was no plausible conspiracy between her and DCFS officials because at times they disagreed and the DCFS officials did not "respond favorably" to Glick's ideas. UCMC Br. 20, Dkt. 71.[19] But this misstates the facts alleged: the allegations state that DFCS *did adopt* Glick's position after her entreaties in the October 24, 2017 email. ¶¶ 150-62. The series of communications alleged between Glick, DCFS, and other pediatricians plausibly supports the claim that Glick conspired with the other defendants to deprive families of their constitutional rights. *See id.*

            b.     *Advocate Christ*

Advocate Christ contends that the conspiracy pleading against it is also inadequate. AC Br. 11-12, Dkt. 64. Advocate Christ cites an unreported, non-precedential case, *Sarkan v. Kane-Kendale Mental Health Center*, but that case is inapposite. 1987 WL 11833 (N.D. Ill. 1987). In *Sarkan*, the complaint contained one sentence stating that the hospital acted in concert with DCFS by one communication regarding the emergency admission of minors and by having the minor admitted to the hospital pursuant to those procedures even though they knew she did not need hospitalization. *Id.* at *2. Here, the complaint contains multiple descriptions of the

---

[19] Glick also argues that the *Noerr-Pennington* doctrine protects her, discussed *infra.*

defendants working together to develop Section H, Advocate Christ adopting its own policy modeled after Section H, and Advocate Christ ultimately using that policy to infringe a family's constitutional rights. *See* ¶¶ 131-79, 186. These facts support the plaintiffs' conspiracy claim against Advocate Christ and exceed the minimal pleading contained in *Sarkan*.

#### c.   ICAAP

ICAAP claims that no actionable conspiracy has been pled because the agreement was not covert and no mutual benefit was rendered. ICAAP Br. 10-13, Dkt. 59. Neither is required in this Circuit for a §1983 conspiracy, which requires only that "the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Daugherty*, 906 F.3d at 612.[20] Plaintiffs have pled facts to support the claim that ICAAP committed overt acts that deprived plaintiffs of their rights.

#### d.   Lysouvakon

Lysouvakon argues that the claims of conspiracy are not properly pled against him, as the complaint actually alleges a "disagreement between a private individual and state authorities" because Anderson called the police to stop Lysouvakon from seizing her child and administering unwanted injections to the newborn. UCMC Br. 13, Dkt. 71 (emphasis omitted). Lysouvakon seems to argue that this shows there was no meeting of the minds between him and the state. This characterization of the allegations is absurd. The facts supporting the conspiracy alleged in the complaint describe an agreement between Lysouvakon, UCMC, Glick, and DCFS, not

---

[20] The "covert" language was used as dicta in one opinion in this district in a lead-in to the well-accepted proposition that a conspiracy may be pled with circumstantial rather than direct evidence. *Manning v. Dye*, No. 02 C 372, 2004 WL 2496456, at *10 (N.D. Ill. Nov. 5, 2004); the cases ICAAP cites for the "mutual benefit" proposition are from the District of Nevada and the District of Hawaii.

between Lysouvakon and the police. *See* ¶¶408-22. Lysouvakon acted with the blessing and imprimatur of UCMC's express and implied policies regarding Vitamin K refusals. The conspiracy is plausibly alleged as against him.

### 2. *DCFS counterarguments fail.*

DCFS argues that defendants Walker and Harms-Pavelski were not personally involved in the constitutional deprivation. DCFS Br. 12-13, Dkt. 93. But as DCFS notes, plaintiffs have already acknowledged that Walker and Harms-Pavelski were not personally involved. *See* FAC ¶446. The complaint alleges that Walker and Harms-Pavelski participated in the *conspiracy* to deprive plaintiffs of their constitutional rights by undertaking the overt act of developing the Section H policy – which DCFS admits, DCFS Br. at 14, Dkt. 93 (describing how "while Defendant Walker was the acting director, the Department developed the Vitamin K policy") – and forming an agreement with other defendants to deprive plaintiffs of their constitutional rights. *See* ¶¶169-79.

DCFS's conclusory counterargument – that even if the Section H policy was the cause of the investigations, because the investigations were determined to be unfounded, there was no deprivation caused by Walker and Harms-Pavelski – also fails. DCFS Br. 14, Dkt. 93. DCFS provides no argument or legal support at all for this point, and as stated above, it is the *inception* of an investigation without reasonable suspicion of abuse that is a constitutional violation. *See supra* at Section III(A); *see also Heck*, 327 F.3d at 520.

DCFS also argues that Walker and Harms-Pavelski are not liable because "Walker and Harms-Pavelski have no authority over hospitals with respect to what those institutions believe is abuse or neglect." DCFS Br. 15, Dkt. 93. Rather, DCFS implies it was the "hospital policies and medical opinions" that prompted the calls to DCFS that started the investigation. *Id.* But this argument is insufficient. At motion to dismiss stage, all factual allegations in the complaint

are accepted as true. Plaintiffs have alleged that it was a joint effort between DCFS—including Walker and Harms-Pavelski—ICAAP, and the hospitals to establish Section H and the parallel hospital policies.

### E. Private Defendants Acted Under Color of State Law.

Plaintiffs have asserted § 1983 claims against the private, non-DCFS defendants as state actors. The private defendants – UCMC, Advocate Christ, Silver Cross, Glick, ICAAP, Kozuch, Lysouvakon, Skalski, and Shulte – all claim that they were not state actors, and therefore are not liable under § 1983. But the facts as alleged sufficiently state a claim that these defendants acted under color of state law.

To establish § 1983 liability against an individual, a plaintiff must show that the defendant (1) acted under color of state law, and (2) violated the plaintiff's rights under the Constitution or laws of the United States. *Armato v. Grounds*, 766 F.3d 713, 719–20 (7th Cir. 2014). The facts as alleged support a conclusion that every private defendant – both individuals and organizations – was acting under color of state law when they violated plaintiffs' constitutional rights.

> 1. *Individual defendants were jointly engaged with the state and were personally involved in the constitutional deprivation.*

"Anyone whose conduct is fairly attributable to the state can be sued as a state actor under § 1983." *Filarsky v. Delia*, 566 U.S. 377, 383 (2012) (internal quotation marks omitted). Private action may be deemed governmental (1) when private actors conspire or are jointly engaged with state actors to deprive a person of constitutional rights, *Dennis v. Sparks*, 449 U.S. 24, 27–28, (1980), or (2) when the state compels the act or controls the private actor, *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). The Supreme Court has noted that "these different tests" may just be "different ways of characterizing the necessarily fact-bound inquiry that confronts

the Court in such a situation." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 939 (1982). "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Id.*

Courts have considered private actors to be "jointly engaged" when they communicated to a police officer to arrest a white woman who was eating with African Americans in a segregated diner, *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 152 (1970), when they have bribed judges, *Dennis,* 449 U.S. at 28–29, and when they gave false information to state officials who acted upon that information (knowing it was false) to remove children from their parents' custody, *Brokaw,* 235 F.3d at 1016.

Furthermore, "individual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago,* 851 F.3d 649, 657 (7th Cir. 2017). A plaintiff must "demonstrate a causal connection between (1) the sued officials and (2) the alleged misconduct." *Id.*

### a. Glick

The complaint properly alleges that Glick was jointly engaged with state actors in disseminating and enforcing the *per se* medical neglect Section H policy. As a DCFS "reviewer," an ICAAP member, and as UCMC's Medical Director for Child Advocacy and Protective Services, Glick crafted the policy specifically to remove discretion from medical personnel, pressed for its adoption by DCFS, and then circulated the internal DCFS policy beyond DCFS to pediatricians and hospitals so that pediatricians and hospitals would consider mandatory *per se* medical neglect reporting for Vitamin K refusal. *See, e.g.,* ¶¶134, 143-46, 150, 161-81, 184.

Glick was jointly engaged with the state insofar as she worked with state officials to impose a *per se* policy that removed discretion from state officials. The Supreme Court has

recognized that if the police promise to arrest anyone a shopkeeper designates, then the shopkeeper is exercising the state's function and is treated as if he were the state. *Adickes,* 398 U.S. at 158; *see also Gramenos v. Jewel Companies, Inc.,* 797 F.2d 432, 435 (7th Cir. 1986). Glick's policy effectively places her in the position of the shopkeeper: her personal position has replaced the DCFS and physician discretion about whether or not a particular set of circumstances constitutes medical neglect. The complaint also alleges continued personal involvement by Glick in the enforcement and review of the Section H policy that removed state and medical discretion. ¶¶ 154-80.

b.    *Medical Professionals*

Defendants Schulte, Skalski, Kozuch, and Lysouvakon[21] were also "jointly engaged with state officials to deprive a person of constitutional rights." *Dennis,* 449 U.S. at 27–28. The plaintiffs allege that Section H – as circulated to pediatricians and hospitals by Glick, ICAAP, and DCFS, and incorporated into individual hospital policies – induced the individual private defendants to threaten to report or to report the plaintiffs to DCFS on the basis of medical neglect for their refusal to administer Vitamin K shots when there was, in fact, no reasonable suspicion of medical neglect. *See* Section I(C), *supra* (describing allegations regarding Section H in the complaint). This was a constitutional violation undertaken as a result of the individual defendants' decision to follow the unconstitutional policies of DCFS and defendant institutions.

The choices of these medical professionals to report were not mandated by law. *Cf. Evans v. Torres*, No. 94 C 1078, 1996 WL 5319, at *5 (N.D. Ill. Jan. 4, 1996). Section H did

---

[21] Lysouvakon claims to not be a state actor by virtue of his non-participation in the conspiracy. *See* UCMC Br. at 12-13, Dkt. 71. However, he is also a state actor for the reasons stated here: he was jointly engaged with state actors to deprive Anderson of constitutional rights by threatening to take her baby.

not require *medical professionals* to report Vitamin K refusal as medical neglect, only that *DCFS* would *treat* reports of Vitamin K and eye ointment refusal as *per se* medical neglect. ¶132.[22] Rather, providers were informed via email, word of mouth, and hospital policy that "[DCFS is] asking all hospital [sic] to report the refusal as medical neglect." ¶162. The complaint alleges that the choice of the individual defendant medical providers to report was not based on any reasonable suspicion of medical neglect from their own medical knowledge. *See* Section I(C). And as discussed above, the individual medical providers were personally involved in threatening to call or calling DCFS, resulting in the constitutional violations. *See* Section I(B). Therefore, the complaint adequately alleges facts to support the plausible conclusion that individual providers were jointly engaged in action with DCFS to deprive plaintiffs of their constitutional rights.

Schulte, Skalski, and Kozuch contend that they are not state actors because merely making a report to a state agency does not make the reporter a state actor. Schulte Br. 6, Dkt. 78; Skalski Br. 9-10, Dkt. 77; Silver Cross Br. 7-10, Dkt. 67. All fail to address the plausible allegations that they were not merely reporting suspected neglect but were instead following an unconstitutional policy that subjected families to DCFS intervention without any reasonable suspicion of neglect.[23]

---

[22] To the extent that any medical professionals assert that they were *required* to report refusals of Vitamin K or other procedures to DCFS as mandated reporters or otherwise under ANCRA, this assertion (1) conflicts with the direct text of ANCRA, which directs how medical professionals are supposed to make determinations of medical neglect and (2) makes them state actors under the "state compulsion" test for state action, where the state "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum*, 457 U.S. at 1004.

[23] And again, to the extent that defendants claim that their actions were compelled by the state, they are state actors. *See Blum*, 457 U.S. at 1004-05.

The cases Schulte, Skalski, and Kozuch cite are inapposite. Schulte cites two cases about private citizens calling the police. *Rodgers v. Lincoln Towing Serv., Inc.*, 596 F.Supp. 13, 21 (N.D. Ill. Mar. 29, 1984) held that a private towing company that suspected the plaintiff of throwing paint on its building and called the police was not a state actor. *Knight v. Foreman*, No. 1:15-CV-3-2 JVB, 2015 WL 9093977, at *1 (N.D. Ind. Dec. 16, 2015), held that a witness who later recanted her testimony that resulted in the plaintiff being charged with a crime was not a state actor. Neither of these cases addresses the fact pattern here, where private medical professionals took unconstitutional actions based on hospital and state policy that was developed as a joint public-private effort. Skalski and Kozuch cite other out of circuit cases that fail to support their claims. *See* Skalski Br. at 9-10, Dkt. 77 (citing 5th Circuit and SDNY cases); Silver Cross Br. at 8-9, Dkt. 67 (citing multiple non-precedential decisions).

The defendants also cite *Evans v. Torres* and *Goetz v. Mt. Sinai Hospital*, among others, for the proposition that doctors examining and reporting potential cases of abuse to DCFS are not state actors. Schulte Br. 6-9, Dkt. 78. In *Evans*, the court concluded that the defendant was not a state actor merely for making a medical judgment, albeit at the request of DCFS, because that was not a traditional function of the state. *Evans*, 1996 WL 5319, at *6, *7; *see also Goetz v. Mt. Sinai Hosp.*, No. 91 C 5723, 1995 WL 107130, at *7 (N.D. Ill. Mar. 8, 1995) (same); *Rangel v. Reynolds*, 607 F. Supp. 2d 911, 926 (N.D. Ind. 2009) (same). But that is not the case here, where the defendants were *not* making independent medical judgments but were rather enforcing a *per se* policy that was the result of a joint public-private effort. Furthermore, it was the defendants' actions under the *per se* policy that initiated the unsubstantiated investigations; in the cited cases, DCFS sought the defendants' medical judgment after the allegations had been made by someone

50

else.  *See Evans,* 1996 WL 5319, at *1; *Goetz,* 1995 WL 107130, at *7; *Rangel*, 607 F. Supp. 2d at 926.

Nor is *C.H. v. Grossman* applicable here, where there are no allegations that assert state action merely on the basis of state funding or a prior relationship.  No. 14 C 8174, 2015 WL 4554774, at *2 (N.D. Ill. July 28, 2015).  And *Dickman v. Rosado* is also inapposite, because the complaint merely alleged that defendants conspired to fabricate allegations of abuse.  Here, the plaintiffs have detailed allegations of the ways in which private and public defendants agreed and worked together to create and enforce an unconstitutional *per se* policy.  No. 16 C 9448, 2019 WL 3728698, at *2 (N.D. Ill. Aug. 1, 2019).  The defendants' citations to these cases fail to support their contentions that they were not state actors.

        2.    *Institutional defendants were jointly engaged with the state and had unconstitutional policies.*

Likewise, the plaintiffs adequately allege facts to support the inference that the private institutional defendants – ICAAP and the hospitals – were state actors.  To establish §1983 liability against a private organizational defendant, a plaintiff must show that the organization has an unconstitutional custom or policy under what is known as *Monell* liability, *Brokaw*, 235 F.3d at 1013, and that the organization either "operates as a willful participant in joint activity with the State or its agents" or "the State provides significant encouragement, either overt or covert" to the organization.  *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001).  Plaintiffs have sufficiently alleged that the private organizations here – ICAAP, UCMC, Silver Cross, and Advocate Christ – have unconstitutional *per se* medical neglect reporting policies and have willfully participated in a joint activity with DCFS through those policies.

The Seventh Circuit has recognized that *Monell* liability can attach to a private entity. *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 786 (7th Cir. 2014).[24]  *Monell* liability will attach where "the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself."  *Id.* at 789.[25]  The plaintiffs must "show an impermissible policy or a constitutionally forbidden rule or procedure" of the defendants, "which was the moving force of the constitutional violation." *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982).

A "custom" or "policy" for *Monell* liability can take one of three forms: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a "custom or usage" with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policy-making authority. *Brokaw*, 235 F.3d at 1013.  The plaintiffs allege both express policies (¶¶ 183, 186) and implied policies (¶¶ 188, 333-34, 427) of the organizational defendants.

Each organizational defendant had either an express or implied policy that, when enforced, caused a constitutional violation.  ICAAP expressly took the position that refusal of Vitamin K shots was *per se* medical neglect.  ¶¶ 136, 144, 145.  ICAAP then agreed to work with DCFS, DCFS officials, and Glick to implement the policy, ensuring that the policy was adopted and enforced.  ¶¶ 161-63, 167, 179.  UCMC developed an express, written policy that authorized

---

[24] In *Shields*, the Seventh Circuit also called into question its prior precedent of not recognizing *respondeat superior* liability for private corporations for an employee's constitutional violations and instead applying *Monell* standards.  746 F.3d 792-95.  The plaintiffs argue, in the alternative, that the defendant hospitals should be held liable on a *respondeat superior* theory of liability for their employees' constitutional violations; however, the plaintiffs are also aware that the Seventh Circuit has not overturned its prior precedent on this issue.

[25] Advocate Christ seems to contend that *Monell* theories of liability only apply to municipalities. AC Br. 9, Dkt. 64.  This is incorrect.  *See Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378 (7th Cir. 2017) (reiterating that "entity liability . . . is not limited to municipal corporations" but may also apply to "private corporation[s]").

hospital staff to take newborns into protective custody and administer the medical procedures against the wishes of the parents. ¶183. UCMC also had an implied policy that referred cases of refusal of Vitamin K shots to DCFS. ¶427. Advocate Christ developed an express policy – formalized in May 2018 – that refusal of Vitamin K shots would result in a referral to DCFS. ¶186. Silver Cross had both implied policies of taking babies into protective custody when parents refused Vitamin K shots or eye ointment, ¶188, and of reporting refusals to DCFS for investigation, ¶¶333-34. As discussed in Section III(A), *supra*, threats of reporting families to DCFS, reporting families to DCFS, or taking babies into protective custody without reasonable suspicion of abuse is a constitutional violation. The complaint sufficiently alleges that the organizational defendants each had an express or implied policy that caused constitutional violations.

Private organizations can be held liable for § 1983 violations under *Monell* when the unconstitutional action was the result of joint activity between the state and the private entity. *Lugar,* 457 U.S. at 941. In *Lugar*, for example, a private corporation attached and executed a lien on a debtor's property through an unconstitutional state statute that allowed for *ex parte* seizure of property. *Id.* The Supreme Court concluded that the debtor had been deprived of his property through state action (as the sheriff seized the property), and the private corporation was acting under color of law when it participated in the unconstitutional deprivation. *Id.* at 942. The Supreme Court has repeatedly emphasized that the state actor test is fact-intensive; there are "a host of facts that can bear on the fairness of such an attribution" of state action to a private entity. *Brentwood Acad.*, 531 U.S. at 296.

Here, the complaint alleges that each organizational defendant's policy was the result of joint activity between state and private conduct. *See* ¶¶179-88. The hospitals' policies followed

and, in certain instances, went beyond Section H's requirements. *Compare* ¶132 with ¶¶183, 186, 188, 333-34, 427. And the defendants relied on DCFS to *enforce* the *per se* medical neglect policies. When hospital staff called DCFS to report parental refusal of Vitamin K or eye ointment, DCFS initiated investigations of every plaintiff. *See* Section I(B), Section III(A)(3) & (4).

UCMC contends that it can only be found to be a state actor if the private character of the entity is entwined with the public, citing and discussing *Brentwood Academy.* UCMC Br. 15, Dkt. 71. But UCMC misses the mark. First, the Supreme Court has recognized multiple theories under which a private actor may become a state actor – including in *Brentwood* – and only one of those is entwinement. *See Brentwood*, 531 U.S. at 295-96 (noting that "the criteria lack rigid simplicity" and listing almost a dozen examples of analysis). Second, *Brentwood* is factually inapposite to the case at hand: *Brentwood* addressed the public nature of a regional athletic association based on participation from various public schools. *Id.* at 298-99. As the *Brentwood* court noted, "no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient." *Id.* at 295. UCMC fails to acknowledge the other ways, discussed *supra*, in which its actions are state actions.

Advocate Christ seems to contend, in a scattershot series of arguments, that it is not a state actor because reporting neglect under state law does not transform a hospital into a state actor (AC Br. 9-10, Dkt. 64), or that following Illinois law does not make a hospital a state actor (*id.* at 10), or that Advocate Christ's actions do not shock the conscience and so therefore the hospital is not a state actor (*id.*). None of these arguments are supported with appropriate case law or analysis, and all fail. As explained above, the plaintiffs contend that Advocate Christ is a

state actor based on multiple theories that courts have recognized can establish the "color of law" requirement.

### F.     Defendants Are Not Entitled to Qualified Or Other Immunity.[26]

Defendants Schulte, Glick, and Lysouvakon all claim that if they are deemed state actors, qualified immunity bars suits against them.[27]  Schulte Br. 14, Dkt. 78 & UCMC Br. 21-22, Dkt. 71.  The DCFS defendants (Harms-Pavelski, Walker, and the investigators) also claim that qualified immunity protects them from suit.  DCFS Br. 25-28, Dkt. 93.  The doctrine of qualified immunity does not apply to any of these defendants, however, because they (1) violated the plaintiffs' constitutional rights and (2) the constitutional right was clearly established for each constitutional violation.

> 1.     *Qualified immunity is not available because the constitutional rights were violated and were clearly established.*

The doctrine of qualified immunity protects government officials or state actors "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  Courts must analyze two factors: "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right" and "whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.  *Id.*  at 232.  The factors may be analyzed in any order.  *Id.*

---

[26] Any defendant who has not raised qualified immunity or any statutory good faith defense under ANCRA has waived the defense.  *See Walsh v. Mellas,* 837 F.2d 789, 799 (7th Cir. 1988). Furthermore, affirmative defenses aside from qualified immunity are not a basis for dismissal for a failure to state a claim.  *See Jones v. Bock*, 549 U.S. 199, 216 (2007); *see* Silver Cross Br. at 9, Dkt. 67.

[27] Advocate Christ likewise asserts a defense of qualified immunity.  *See* AC Br. 5-8, Dkt. 64. But it is well-established that "[q]ualified immunity is a personal defense" that does not apply to institutional defendants.  *Glover v. Carr*, 949 F.3d 364, 368 (7th Cir. 2020).  Advocate Christ cannot invoke this defense.

> a.    *Plaintiffs' rights were violated.*

As discussed in Section III(A), *supra*, the complaint alleges facts that "make out a violation of a constitutional right" – in particular, the violation of the plaintiffs' rights to familial integrity, to freedom from unconstitutional searches and seizures, and to the free exercise of religion.

> b.    *The right to family integrity was clearly established.*

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Day v. Wooten*, 947 F.3d 453, 460 (7th Cir. 2020) (internal quotations and emphasis omitted).  Furthermore, the right must be "defined with specificity," *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019), and "be particularized to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (internal quotations omitted).

The constitutional right at issue here is the right to be free from government intrusion into the family in the form of a DCFS investigation where there is no reasonable suspicion of abuse. This right was clearly established in the Seventh Circuit, and "a reasonable person would have known" of this right. *Pearson*, 555 U.S. at 231.  This right also is "particularized to the facts of the case." *White*, 137 S. Ct. at 552 (internal quotations omitted).

The right to family integrity first was articulated by the Seventh Circuit in the 2000 case *Brokaw v. Mercer Cty.*, where the court stated that "a state has no interest in protecting children from their parents unless it has some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." 235 F.3d at 1019.  In that case, a sheriff and other government actors conspired with malicious family members to take children away from their parents, because of their disagreement with the parents' religious practice. *Id*.  Furthermore, the court noted that while qualified immunity is often available in

child abuse cases because the state and family interests are so nebulous, "when the facts of a case place it squarely on the end of the continuum where the state's interest is negligible and where the family privacy right is well developed in jurisprudence from this circuit and the Supreme Court, a defendant's defense of qualified immunity, based on a claim that the right to family integrity was not clearly established, will fail." *Id.* at 1023.

A few years later, in 2003, the Seventh Circuit addressed this issue again in *Doe v. Heck*. As discussed in Section III.A, *supra*, the case involved the opening of child protection cases without a reasonable suspicion of abuse. *Heck*, 327 F.3d at 510. Of note, the court there held that "the defendants' threat to remove the Does' children from their custody is sufficient, in and of itself, to support the Does' claims because the defendants had no reason whatsoever to suspect that Mr. and Mrs. Doe were abusing their children." *Id.* at 524.

The right is particularized, tailored, and on all fours with the facts of this case: The Seventh Circuit clearly stated that a threat of DCFS investigation, not based on a reasonable suspicion of abuse, is a constitutional violation. In *Heck*, the defendants' questioning of the children was based only on another child's word, *Heck*, 327 F.3d at 510; in *Brokaw*, the investigation was opened where the defendants knew that the report was false, 235 F.3d at 1019. Here, defendants all knew that the basis of the report to DCFS was *not* a reasonable suspicion of medical neglect, but rather a *per se* policy based on the refusal of the Vitamin K shot or the eye ointment. This case contains great similarities to both *Heck* and *Brokaw*: as alleged, the report was made on grounds that all defendants knew did *not* constitute medical neglect (as in *Brokaw*) and there was no reason whatsoever to suspect that the parents had committed medical neglect (as in *Heck*). The right at issue here, therefore, is clearly established, particularized, and sufficiently tailored to the specific facts of this case to defeat qualified immunity.

2.    *The right to be free from unreasonable searches and seizures was clearly established.*

The right to be free from unconstitutional searches and seizures was also clearly established at the time defendants unreasonably searched plaintiffs' homes and seized plaintiffs. In 2003, the Seventh Circuit recognized that a child welfare agency's visit to a place while seeking information was "an activity that most certainly constitutes a search under the Fourth Amendment." *Heck*, 327 F.3d at 510.  Again, in *Heck*, the search by the child welfare agency was found to be unreasonable in part because there was not "some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Id.* at 515.  The defendants therefore had notice that investigating, threatening to seize, and actually seizing children required, at a minimum, individualized reasonable suspicion, which is lacking in this case based on the decision to make the refusals *per se* medical neglect.    And regarding the unconstitutional "home visits," these, too were deemed unconstitutional since at least 2003, also in *Heck*.  *See id.*; *see also  Breitweiser*, 2016 WL 6989773, at *8 (denying qualified immunity defense at the pleading stage for a child-services case worker for entering the plaintiff's home without a warrant or exigent circumstances).

3.    *Defendants' counterarguments are unavailing.*

a.    *Private Defendants*

The private defendants' claims of qualified immunity (if they are found to have acted under color of law) are largely conclusory and unpersuasive.  They argue that the constitutional right at stake was not clearly established and not sufficiently particularized.  For example, Schulte states only that no clearly established constitutional right was violated because plaintiffs have no "right to be free from child abuse investigations."  Schulte Br. 14-15, Dkt. 78.  And Glick and Lysouvakon summarily state that "the right to be free from harassment at the hospital"

58

and "the right to refuse prophylactic medical procedures for children" and "the right to be free from public advocacy with which one disagrees" are not clearly established. UCMC Br. 22, Dkt. 71. But for the reasons stated above, *see* Section III(F)(1) & (2), *supra*, (1) the constitutional right is the right to family integrity, which includes the right to be free from DCFS investigations not based on a reasonable suspicion of neglect; and (2) that right is particularized in the prior case law and applies squarely to the facts of this case; and (3) that right is clearly established in the Seventh Circuit in *Heck* and *Brokaw*.

### b. DCFS

DCFS summarily claims that Walker and Harms-Pavelski are entitled to qualified immunity because "[t]he Vitamin K policy was developed based upon the consultation of various health organizations and on the Infant Eye Disease Act and the Department of Public Health Administrative Rules and Regulations" and "there is no caselaw that would provide [defendants] reasonable notice that the Vitamin K policy violated the Constitution." DCFS Br. 27, Dkt. 93. But the Seventh Circuit case law regarding the need for reasonable suspicion to start a child protection investigation *had* been well-established by the time DCFS enacted the Section H policy. *See* Section III(F)(1), *supra*.

The DCFS defendants also cannot claim they were legally required to implement Section H due to these hospital licensing requirements. These regulations do not apply to DCFS, cannot be reasonably interpreted as mandating parents to accept the procedures, and as Walker herself acknowledged in August of 2018 when she rescinded the policy, Section H was implemented outside of DCFS's mandate.

Similarly, the DCFS investigator defendants claim – in a conclusory fashion – that the substantive due process constitutional right was not clearly established, nor was the Fourth Amendment right. DCFS Br. 27-28, Dkt. 93. The Fourth Amendment case law discussed above

59

was also clearly established. *See* Section III(B); Section III(G)(2); *Breitweiser*, 2016 WL 6989773, at *8 ("Breitweiser's constitutional right to have her home be free from a warrantless search by a DCS caseworker where the caseworker knew there could be no immediate danger to the children was therefore clearly established long before Defendant Hunt searched Breitweiser's home without a court order in January 2015.").

<blockquote>4.    *Schulte cannot claim witness immunity.*</blockquote>

Schulte asserts that she can claim witness immunity on the grounds that her report to DCFS was the basis of the investigation. Schulte Br. 13-14, Dkt. 78. But unlike in the cases she cites, Schulte did not issue a written report. *See Vanwinkle v. Nichols*, No. 1:15-cv-01082-JMS-MJD, 2015 WL 9275671, at *9 (S.D. Ind. Dec. 18, 2015) (providing immunity for actions related to written report and later in-court testimony regarding report); *Mohil v. Glick*, 842 F. Supp. 2d, 1072, 1079 (N.D. Ill. 2012) (providing immunity for "claims of damage from the introduction of the report at the hearing"). Neither of these non-precedential cases is relevant here, where Schulte did not submit any written report, or testify in any proceeding – and in fact, her actions were based on the *per se* policy rather than any substantiated report, written or otherwise, of neglect.

In support of her tenuous argument, Schulte further claims that plaintiffs could suffer no harm without a judge first agreeing. Schulte Br. 14, Dkt. 78. But as the Seventh Circuit case law makes clear, the threat or report to DCFS when there is no reasonable suspicion of abuse is a harm in and of itself. *See Heck*, 327 F.3d at 524. Schulte is ineligible for witness immunity.

## G.    DCFS Cannot Claim Sovereign Immunity Under the Eleventh Amendment.

DCFS contends that the Eleventh Amendment bars the claim for injunctive relief against DCFS Acting Director Marc Smith, and so the complaint should be dismissed for lack of subject matter jurisdiction because a federal court cannot "order[] state officials to conform their conduct

to state law" "where there is no claimed continuing violation of federal law."  DCFS Br. 29, Dkt. 93.[28]  Here, plaintiffs assert that there is a continuing violation of federal law.  Every time a DCFS investigation is opened merely as a result of Vitamin K or eye ointment refusal, the family's constitutional rights are violated.  *See* Section III(A) *supra.*  DCFS continues to open investigations on this basis, and so plaintiffs seek injunctive relief from these unconstitutional investigations.  DCFS's cited cases, and the resulting arguments, are therefore completely inapposite.  And plaintiffs do not seek to have DCFS merely follow state law, nor do they claim that DCFS violated state law.  The claims here are entirely federal, constitutional claims.

### H.    Defendants' Conduct Is Not Political Advocacy.

Defendants Glick and ICAAP invoke the *Noerr-Pennington* doctrine, contending that it immunizes their participation in the constitutional violations against plaintiffs.  But Glick and ICAAP's actions go beyond speech to specific, concerted action that directly led to the violation of plaintiffs' constitutional rights.

### 1.    *The Noerr-Pennington doctrine exists to protect speech.*

The *Noerr-Pennington* doctrine originated to "extend[] absolute immunity under the antitrust laws to businesses and other associations when they join together to petition legislative bodies, administrative agencies, or courts for action that may have anticompetitive effects."

---

[28]  DCFS also grossly mischaracterizes plaintiffs' claim for injunctive relief.  Plaintiffs vehemently do not ask this Court to prohibit Illinois hospitals and medical professionals from calling DCFS *when they believe child abuse, neglect, or medical neglect is occurring*.  Plaintiffs merely ask this Court to require DCFS to notify hospitals that they are prohibited by law from taking a newborn into protective custody to administer the prophylactic medical procedures unless there is a specific and emergency medical need to do so; from coercing or threatening parents who refuse the medical procedures from referring the parents to DCFS for investigation unless, under the particular circumstances of the birth, the refusal rises to the level of medical neglect; and from initiating DCFS investigations of parents who refuse the medical procedures unless, under the particular circumstances of the birth, the refusal rises to the level of medical neglect.  ¶542(a)-(c).

*Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 841 (7th Cir. 2011) (internal quotation marks omitted). The *Noerr-Pennington* cloak of protection has been extended beyond antitrust to cover other areas of law, including claims under § 1983. *Tarpley v. Keistler*, 188 F.3d 788, 794 (7th Cir. 1999). However, that protection is not without limits.

The Seventh Circuit has noted that "[s]ection 1983 claims, as much as the antitrust laws, are not appropriate vehicles for proscribing traditional political activity such as attempts to persuade public officials." *Keistler*, 188 F.3d at 796. "Parties may petition the government for official action favorable to their interests without fear of suit, even if the result of the petition, if granted, might harm the interests of others." *Id.* at 794. For example, in *Mercatus Group, LLC v. Lake Forest Hospital*, the Seventh Circuit concluded that a hospital's statements to a local town board and to the public regarding the development of a competitor's healthcare facility were protected by the *Noerr-Pennington* doctrine. 641 F.3d at 841. Even though the hospital's negative publicity campaign resulted in other adverse consequences for the competing health care facility – beyond the government's denial of the development application – the hospital's speech was still within the realm of petitioning the government because the goal was to persuade the larger public to influence the development approval process. *Id.* at 849-50.

> 2. *Defendants' actions went beyond speech and into conspiracy.*

If Glick and ICAAP only petitioned DCFS for particular policy positions, or advocated publicly for these policy positions, the *Noerr-Pennington* doctrine would apply. But Glick's and ICAAP's actions went beyond mere lobbying; they conspired with DCFS and the other private defendants to deprive the plaintiffs of their constitutional right to family integrity through the *publication* and *enforcement* of Section H.

The complaint alleges that ICAAP worked in concert with Glick and DCFS to develop the Section H policy. ¶ 136. This, by itself, may not suffice to move the allegations beyond

lobbying.  But the complaint further alleges that ICAAP and Glick took the approved policy – which was intended only for internal DCFS use – and publicized it widely to pediatricians and hospitals with the intention that these pediatricians and hospitals would use the policy to report parents for unfounded medical neglect.  ¶ 137.  This circulation of the internal DCFS policy for the purpose of encouraging pediatricians and doctors to violate parents' constitutional rights is not protected by *Noerr-Pennington*, as it is not the type of legislative or political advocacy that the doctrine was intended to protect.  This circulation was aimed at inducing direct action against parents like the plaintiffs – not at encouraging public support of the policy position advocated by Glick and ICAAP.  *See, e.g.*, *Mercatus*, 641 F.3d at 849-50.

Defendants cite *Tarpley v. Keistler*[29] in support of their contention that *Noerr-Pennington* applies, but it is inapposite.  In that case, a Republican precinct worker was hired for a temporary plant maintenance position at a state-operated hospital as a result of a recommendation from a party chairperson.  188 F.3d at 789-90.  Such recommendations were lawful.  *Id.*  The temporary employee was later made a permanent employee after he and eight others interviewed for the permanent job.  *Id.* at 790.  One of the other interviewees sued under § 1983 for violation of his First Amendment rights, because use of political party affiliation as a criterion for public employment violates the First Amendment.  *Id.*

The Seventh Circuit concluded that there was no constitutional violation, because to so rule would infringe on the *party chairperson's* First Amendment right to petition the government.  *Id.* at 794.  The court held that asking for someone to be hired into a temporary position on the basis of political affiliation was petitioning the government.  *Id.*

---

[29] The other cases defendants cite, such as *Fredrickson v. Proviso Twp.*, 814 F. Supp. 2d 802, 806 (N.D. Ill. 2010), are also inapposite because they address exceptions to the *Noerr-Pennington* doctrine that are not applicable here, such as the sham exception.

This case is inapposite because ICAAP's and Glick's action went beyond petitioning the government to adopt Section H. The plaintiffs have no issue with ICAAP or Glick taking a policy position and advocating for the state to adopt that position. *See Keistler*, 188 F.3d at 795. But the defendants' actions in this case moved from petitioning the government to seeking and directing enforcement of the government's policy through private actors, including hospitals, doctors, and medical personnel.

## IV. CONCLUSION

The plaintiffs have adequately alleged plausible facts in support of their claims against defendants, and defendants' assertions of qualified immunity fail as a matter of law. Plaintiffs therefore respectfully request that this Court deny defendants' motions to dismiss.

Respectfully submitted,

s/*Megan Cunniff Church*

Richard Dvorak
Mariam Hai
DVORAK LAW OFFICES, LLC
6262 Kingery Highway, Suite 305
Willowbrook, Illinois 60527
630-568-3190
richard.dvorak@civilrightsdefenders.com
mariam.hai@civilrightsdefenders.com

Steven F. Molo
Megan Cunniff Church
Allison Mileo Gorsuch
MOLOLAMKEN LLP
300 N. LaSalle St.
Chicago, IL 60654
(312) 450-6700 (telephone)
(312) 450-6701 (facsimile)
smolo@mololamken.com
mchurch@mololamken.com
agorsuch@mololamken.com

*Attorneys for the Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Megan Cunniff Church, an attorney, certify that on July 6, 2020, a copy of the Plaintiffs' Consolidated Response to Defendants' Motions to Dismiss was served upon the attorneys for the Defendants through the Court's electronic filing system.

/s/*Megan Cunniff Church*