UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES F. HOLDERMAN III, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 19 C 6324 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| B.J. WALKER, former Acting Director of the | ) | |
| Illinois Department of Children and Family | ) | |
| Services, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

In the span of one year, various medical professionals reported five sets of parents

("Parents")[1] to the Illinois Department of Children and Family Services ("DCFS") for refusing

the administration of certain medical procedures for their minor children at birth. As a result,

DCFS investigated the Parents for medical neglect. In response, the Parents filed this lawsuit,

individually and on behalf of their minor children, alleging violations of their First, Fourth, and

Fourteenth Amendment rights. The Parents bring their § 1983 claims against current and former

DCFS employees,[2] the private Illinois hospitals where the children were born,[3] certain medical

---

[1] James F. Holderman III, Erin Courtney Hill, and Baby H; Pastor Brian Bougher, Angela Bougher, and
Baby B; Dr. Jason Kosek, Sarah Kosek, and Baby K; Brandon Leitschuh, Emily Vuckovich-Leitschuh,
and Baby L; and Danielle Anderson and Baby G.

[2] B.J. Walker, Former DCFS Director, in her individual capacity; Nora Harms-Pavelski, Former DCFS
Deputy Director of Child Protection, in her individual capacity; DCFS Caseworkers Gina Kitakis,
Shekeila Taylor-Williams, Lynette Allen, and Serena Rodgers, in their individual capacities; and Current
DCFS Director Marc D. Smith, in his official capacity.

[3] Silver Cross Hospital and Medical Center ("Silver Cross"), Advocate Christ Hospital and Medical
Center ("Advocate Christ"), and University of Chicago Medical Center ("UCMC").

professionals who interacted with the Parents at these hospitals,[4] and The Illinois Chapter of the

American Academy of Pediatrics ("ICAAP").

Below is a summary of the Parents' claims:

| Count | Claim | Parents | Defendants |
|-------|-------|---------|-----------|
| I | Fourteenth Amendment Substantive Due Process | All | Walker, Harms-Pavelski, Dr. Glick, and ICAAP |
| II | Fourteenth Amendment Substantive Due Process | Holderman, Hill, and Baby H | Dr. Schulte |
| III | Fourteenth Amendment Substantive Due Process | The Boughers and Baby B | Dr. Skalski, RN Kozuch, Silver Cross, and DCFS Caseworker Kitakis |
| IV | Fourteenth Amendment Substantive Due Process | The Koseks and Baby K | Dr. John Doe (Silver Cross), Silver Cross, DCFS Caseworker Taylor-Williams |
| V | Fourteenth Amendment Substantive Due Process | Leitschuh, Vuckovich-Leitschuh, and Baby L | Advocate Christ and DCFS Caseworker Allen |
| VI | Fourteenth Amendment Substantive Due Process | Anderson and Baby G | UCMC, Dr. Glick, Dr. Lysouvakon, and DCFS Caseworker Rodgers |
| VII | Fourth Amendment Illegal Seizure | Hill and Baby H | Dr. Schulte |
| VIII | Fourth Amendment Illegal Search & Seizure | The Boughers and Baby B | RN Kozuch, Dr. Skalski, and DCFS Caseworker Kitakis |
| IX | Fourth Amendment Illegal Search & Seizure | The Koseks | DCFS Caseworker Taylor-Williams |
| X | Fourth Amendment Illegal Search & Seizure | Leitschuh, Vuckovich-Leitschuh, and Baby L | DCFS Caseworker Allen |
| XI | Fourth Amendment Illegal Search & Seizure | Anderson | DCFS Caseworker Rodgers |
| XII | First Amendment Right to Free Exercise | Holderman and Hill | Dr. Schulte |
| XIII | Rule 23(b)(2) Class Action for Injunctive Relief | All Parents and Class of Similarly Situated Persons | Current DCFS Director Smith |

The Defendants now move to dismiss the Parents' Second Amended Complaint

("Complaint") [98] under Federal Rule of Civil Procedure 12(b)(6).  Because all alleged conduct

---

[4] Dr. Jill Glick, Dr. Suzanne G. Schulte, Dr. Miroslaw Skalski, Dr. John Doe (Silver Cross), Dr. Poj Lysouvakon, and Registered Nurse ("RN") Monika Kozuch.

by ICAAP relates to its petitioning of DCFS and public advocacy for a policy position, the Court dismisses without prejudice all claims against ICAAP as barred by the First Amendment. Because the Complaint fails to sufficiently plead that the private medical professionals and hospitals acted under color of state law, the Court dismisses without prejudice all claims against them. Finally, because the Complaint fails to sufficiently plead that DCFS Caseworker Allen violated the Parents' clearly established right to be free from illegal seizures, the Court dismisses without prejudice the illegal seizure claims against Allen within Count X as barred by qualified immunity. The remaining claims against the current and former DCFS employees withstand these motions to dismiss.

## BACKGROUND[5]

### I.       Medical Procedures at Issue

The Parents refused the administration of at least one of the following medical procedures for their newborn children: the intramuscular Vitamin K shot ("Vitamin K shot"), erythromycin eye ointment, the Hepatitis B shot, and Newborn Screening Tests ("NBS"). These procedures are meant to prevent, as opposed to treat, disease in newborns. There are health risks associated with the erythromycin eye ointment and Vitamin K and Hepatitis B shots.

The Vitamin K shot is a means of preventing Vitamin K Deficiency Bleeding ("VKDB") in newborns, which, if untreated, can cause intracranial hemorrhaging or gastrointestinal bleeding. According to a study in Malaysia, where 83% of infants do not receive prophylactic Vitamin K, VKDB is very rare. Healthy newborns without VKDB risk factors are at an even lower risk of developing VKDB. There are safety concerns and risks associated with the

---

[5] The Court takes the facts in the background section from the Complaint and presumes them to be true for the purpose of resolving each Defendant's motion to dismiss. *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013). The Court "may also take judicial notice of matters of public record." *Orgone Cap. III, LLC v. Daubenspeck*, 912 F.3d 1039, 1043–44 (7th Cir. 2019).

administration of a Vitamin K shot in newborns, including death in rare cases. Alternatives to the Vitamin K shot for preventing VKDB include supplementing breast milk with liquid drops of Vitamin K.

Medical professionals apply erythromycin eye ointment to a newborn's eyes to prevent an infection called ophthalmia neonatorum which, if untreated, can cause blindness in a small percentage of newborns. Infants born to mothers who do not have an active gonorrhea or chlamydia infection at the time of birth or who are born by caesarean are not at risk of exposure to ophthalmia neonatorum. There are health risks associated with the administration of erythromycin eye ointment in newborns including pain and temporary loss of vision.

The Hepatitis B shot may confer a degree of immunity to the Hepatitis B virus ("HBV"), which can cause cancer. In 2008, the mortality rate for Hepatitis B was 0.5 deaths per 100,000 population. Infants born to mothers who do not have Hepatitis B are not at risk of contracting HBV during childbirth. There are health risks associated with administration of the Hepatitis B shot in a newborn including irritability and fever.

NBS are a group of tests for genetic, metabolic, and congenital anomalies. Illinois law requires the tests for all newborns. To conduct the tests, medical professionals retrieve and test a small amount of blood through a minimally invasive, but painful, prick on the newborn's heel. The Newborn Metabolic Screening Act, which gives the Illinois Department of Public Health the authority to mandate NBS, contains a religious exemption for refusing NBS based on one's religious tenets and practices. 410 Ill. Comp. Stat. 240/3.

## II.    Statutory and Regulatory Background

DCFS is the sole Illinois agency charged with the responsibility of receiving and investigating reports of child abuse and neglect under the Illinois Abused and Neglected Child

Reporting Act ("ANCRA").  325 Ill. Comp. Stat. 5/7.3(a).  ANCRA requires medical

professionals to "immediately report" to DCFS "when they have reasonable cause to believe that

a child known to them in their professional or official capacities may be an abused child or a

neglected child."  325 Ill. Comp. Stat. 5/4(a), (a)(1).  In relevant part, ANCRA defines

"neglected child" as a child who "is not receiving the proper or necessary support or medical or

other remedial care recognized under State law as necessary for a child's well-being."  325 Ill.

Comp. Stat. 5/3.

Illinois law requires medical professionals to administer all procedures at issue except for

the Hepatitis B shot.  Illinois law requires all obstetric departments to administer "ophthalmic

ointment or drops containing tetracycline or erythromycin . . . into the eyes of the newborn"

within one hour of delivery "as a preventative against ophthalmia neonatorum."  Ill. Admin.

Code tit. 77, § 250.1830(g)(7); *see also* 410 Ill. Comp. Stat. 215/3.  Illinois law also requires

obstetric departments to administer "[a] single parenteral dose of vitamin K-1 . . . shortly after

birth, but usually within the first hour after delivery, as a prophylaxis against hemorrhagic

disorder in the first days of life."  Ill. Admin. Code tit. 77, § 250.1830(g)(8).  Similarly, Illinois

law requires medical professionals to promptly perform NBS on every newborn because of "the

nature and severity of some metabolic and endocrine disorders."  Ill. Admin. Code tit. 77,

§ 661.20(h).

Medical personnel that knowingly and willfully fail to report abuse or neglect as required

under ANCRA are subject to criminal liability.  325 Ill. Comp. Stat. 5/4(m).  In return, ANCRA

provides "immunity from any liability, civil, criminal or that otherwise might result by reason of

such actions" to any person that submits a report in good faith.  325 Ill. Comp. Stat. 5/9.

ANCRA also requires a presumption of good faith on behalf of reporters.  *Id.*

Once DCFS receives a report, it must "protect the health, safety, and best interests of the child in all situations in which the child is vulnerable to child abuse or neglect." 325 Ill. Comp. Stat. 5/2(a). To do so, DCFS staff must conduct an initial investigation to determine whether there is reasonable cause to believe child neglect exists. Ill. Admin. Code tit. 89, § 300.100(a). In relevant part, DCFS defines "medical neglect" as "[l]ack of proper or necessary health care recognized under State law as necessary for the child's well-being" or "[p]roper and necessary preventive health care to include preventive health care, such as HIV and newborn screening tests that place children at serious risk of illness due to lack of early detection and treatment." Ill. Admin. Code tit. 89, § 300 app. B, allegation 79.

The initial investigation must include "in-person contact with all alleged child victims." Ill. Admin. Code tit. 89, § 300.100(b)(1). If DCFS determines there is reasonable cause to believe child neglect exists, then a formal investigation will begin. 325 Ill. Comp. Stat. 5/7.4(b)(3). At the conclusion of an investigation, DCFS must determine whether the initial report was "an indicated report," meaning that "credible evidence of the alleged abuse or neglect exists," 325 Ill. Comp. Stat. 5/3, or "an unfounded report," meaning that "no credible evidence of abuse or neglect exists," *id.* 325 Ill. Comp. Stat. 5/7.12. Reports of neglect remain in DCFS custody for five years after the investigation concludes and certain authorities who have legal access to such information can access the reports.

ANCRA also dictates the process for taking temporary protective custody of a child:

> An officer of a local law enforcement agency, designated employee of [DCFS], or a physician treating a child may take or retain temporary protective custody of the child without the consent of the person responsible for the child's welfare, if (1) he has reason to believe that the child cannot be cared for at home or in the custody of the person responsible for the child's welfare without endangering the child's health or safety; and (2) there is

> not time to apply for a court order under the Juvenile Court Act of
> 1987 for temporary custody of the child.

325 Ill. Comp. Stat. 5/5. DCFS clarifies that temporary protective custody is appropriate if there

is reason to believe that "leaving the child in the home or in the care and custody of the child's

caregiver presents an *imminent danger to the child's life or health*." Ill. Admin. Code tit. 89,

§ 300.120(a)(1) (emphasis added).

### III.    DCFS Procedure at Issue

The Parents challenge the constitutionality of a section of an internal DCFS procedural

guide, intended to aid DCFS employees in managing and investigating reports of child abuse and

neglect. The challenged procedure ("Section H"), adopted in October 2015, reads:

> For purposes of child protection services, the administration of
> silver nitrate or ophthalmic solution and Vitamin K shots or pills to
> newborns is considered medically necessary. Calls received at
> SCR concerning a parent or guardian denying consent for the
> administration of these treatments shall be taken as reports of
> medical neglect.

Doc. 98 ¶ 132. Prior to its adoption, parents could refuse the administration of the Vitamin K

shot and/or erythromycin eye ointment for their newborns if they signed an informed-consent

refusal form.

Dr. Glick is a pediatrician licensed to practice medicine in the State of Illinois and the

Medical Director for Child Advocacy and Protective Services at UCMC. Dr. Glick is a

prominent member of ICAAP, a professional organization of approximately 2,300 pediatricians

in Illinois, and is part of ICAAP's Committee on Child Abuse and Neglect ("COCAN"). Dr.

Glick is also a member of DCFS' Children and Family Services Advisory Council. The

Governor of Illinois appoints the members of this DCFS Council. In this capacity, in 2014 and

2015, Dr. Glick was a "reviewer" of DCFS Procedure 300, which included Section H. *Id.* ¶ 134.

### A.      Challenges to Section H

In 2017, some members of the Perinatal Advisory Committee of the Illinois Department of Public Health ("PAC") vocalized concerns about Section H.  In May 2017, the PAC chairman requested a meeting with DCFS officials to discuss these concerns.  In June, then-DCFS Director, Dr. Paula Jaudes (now deceased), and then-DCFS Deputy Director of Child Protection, Harms-Pavelski, met with PAC officials.  Dr. Jaudes and Harms-Pavelski told PAC officials that DCFS would not consider refusal of a Vitamin K shot *per se* medical neglect and that such a refusal did not mandate a call to DCFS.  Dr. Jaudes and Harms-Pavelski said that if DCFS received a call based solely on refusal of a Vitamin K shot, there would not be a DCFS investigation.

High-ranking ICAAP members disagreed with this decision.  On June 20, 2017, Dr. Glick emailed Dr. Jaudes to voice her disagreement, specifically noting that "[r]efusal of Vitamin K is not a religious matter," *id.* ¶ 148, and DCFS intervention may "change [a parent's] mind but the timing is crucial," *id.* ¶ 146.  On August 10, Dr. Glick emailed high-ranking DCFS officials, including Harms-Pavelski, stating that the members of COCAN were "in agreement" that DCFS should allow pediatricians to take newborns into protective custody to administer the Vitamin K shot if the parents refused the treatment.  *Id.* ¶ 151.  Dr. Glick also said that parents who refused Vitamin K shots for their newborns should be *per se* "indicated" as child abusers because "'a very clear message' needs to be sent."  *Id.* ¶ 153.  Dr. Glick further noted the large role Section H played in drafting UCMC's policy.  Dr. Glick included ICAAP officials on this August 10 email as well.

In a letter dated September 25, 2017, the COCAN co-chairs requested a meeting with DCFS Officials.  The letter, addressed to then-Director Walker and copying Dr. Jaudes, said it

was the "consensus" of the COCAN members that DCFS should consider Vitamin K refusals medical neglect and continue to investigate them as such. *Id.* ¶ 155. On September 29, ICAAP emailed this letter and an undated letter from Dr. Glick to Dr. Jaudes, who shared them with Harms-Pavelski. The undated letter from Dr. Glick said that the COCAN members "support[ed] [the] child welfare decision to define Vitamin K refusal as a reportable act." *Id.* ¶ 156. The letter also said that COCAN's group of child-abuse pediatricians was better positioned than PAC to determine what constitutes medical neglect. ICAAP simultaneously sent the two letters to dozens of Illinois pediatricians at various hospitals saying, "Attached please find the letter to DCFSsent [sic] on behalf of COCAN regarding their decision to define Vitamin K refusal as a reportable act, as well as Dr. Glick's letter regarding DCFS [sic] response and management of hotline reports for Vitamin K refusal by parents." *Id.* ¶ 159.

On October 24, 2017, Dr. Jaudes emailed PAC leadership saying, "We are asking all hospital [sic] to report the refusal as medical neglect." *Id.* ¶ 162. Illinois hospitals, including Lurie Children's Hospital, UCMC, Silver Cross, and Advocate Christ, and Illinois pediatricians, including Dr. Glick, Dr. Lysouvakon, Dr. Doe, Dr. Schulte, and Dr. Skalski, received this directive. In November 2017, outside of the formal administrative-rule-making process, then-Director Walker adopted this October 24 directive as the official policy of DCFS.

Thereafter, Illinois hospitals began to create their own policies regarding what to do if a parent refused the Vitamin K shot and/or erythromycin eye ointment. In October 2017, UCMC, with the help of Dr. Glick, developed a written policy that authorized taking newborns into temporary protective custody to administer either treatment against the will of parents. In May 2018, Advocate Christ created a written policy that instructed physicians to inform parents that if

they refuse the Vitamin K shot, hospital staff will report the refusal to DCFS.  Silver Cross appears to have a similar policy based on the experiences of two sets of Parents in this lawsuit.

### B.     Rescission of Section H

In May 2018, Holderman, one of the Parents in this lawsuit, became a vocal advocate for the rights of parents to refuse unnecessary prophylactic medical procedures for their children.  A group of concerned parents, including Holderman, lobbied the Illinois legislature for help in rescinding Section H.  On June 14, Holderman confronted PAC members about Section H at a PAC meeting.  The PAC members told Holderman that DCFS was solely responsible for the neglect reports and investigations.  In response, Holderman confronted high-ranking DCFS officials, including Harms-Pavelski.  Around this time, a Rules Analyst for the Joint Committee on Administrative Rules ("JCAR") in the Illinois General Assembly emailed an official at DCFS' Office of Children and Family Policy, Bruce Dubre, to inquire about Section H.  On July 23, Dubre responded:

> DCFS does not take reports of medical neglect for a parent refusing to have their child vaccinated; however, until recently we have accepted reports of parents who refuse to have their newborn treated with silver nitrate eye drops and vitamin K shots.  Both of these treatments must be administered within the first 24 hours of life or they no longer have efficacy.  The reason DCFS took these situations as the basis for medical neglect is due to the Infant Eye Disease Act [410 Ill. Comp. Stat. 215/3] requiring the application of the silver nitrate solution and because vitamin K shots are required via Title 77 Section 250.1830.  Both of the rule and law apply to nursing staff and are not in ANCRA.  As there is no mention of these procedures in Rule 300, we have issued an Action Transmittal immediately revoking the Department's policy of using a parent's failure to approve of either treatment as a basis for an allegation of medical neglect.

*Id.* ¶ 195.

Eight days after this email, on July 31, 2018, hospital staff reported a set of Parents in this lawsuit to DCFS for refusing administration of both the Vitamin K shot and erythromycin eye ointment and in response, DCFS investigated the Parents.  As a result, Holderman informed a DCFS official that he was considering filing a lawsuit to seek injunctive relief for rescission of Section H.  On August 2, 2018, then-DCFS Director Walker rescinded Section H via a letter to "DCFS staff and stakeholders."  *Id.* ¶ 201.  The letter announced that, effective immediately, DCFS would no longer consider a parent's refusal of the Vitamin K shot and/or erythromycin eye ointment for their newborns as *per se* medical neglect.  Continuing, the letter said, "In effect since 2015, this procedure inappropriately identifies what can and should be considered 'medically necessary.'  Making that kind of determination falls outside the confines of our statutory and professional mission and judgement."  *Id.*

## IV.  Incidents at Issue

### A.  Pastor Brian Bougher, Angela Bougher, and Baby B

Baby B was born to Brian and Angela Bougher on February 7, 2018 at 6:42 a.m. at Silver Cross.  The Boughers did not want Baby B to receive the Vitamin K shot or erythromycin eye ointment because, based on their own research, they did not believe the treatments were necessary and additionally, the Vitamin K shot was inconsistent with their religious beliefs. Prior to Baby B's birth, Silver Cross personnel assured the Boughers that they could refuse the Vitamin K shot and erythromycin eye ointment for Baby B if they signed a waiver form.

There was no indication Baby B had medical problems at birth.  Shortly after Baby B's birth, RN Kozuch informed the Boughers that she would administer erythromycin eye ointment and the Vitamin K shot.  Angela refused both treatments and said that the couple "already agreed to sign the form."  *Id.* ¶¶ 221, 224.  Kozuch did not administer either treatment and in response

said, "I am taking your baby to the nursery, and I'm reporting you to DCFS due to your refusal." *Id.* ¶ 226. Kozuch then left the hospital room with Baby B. About an hour after Baby B's birth, Dr. Skalski entered the Boughers' room and told them Baby B's blood sugar was low. When the couple requested to breastfeed Baby B, Dr. Skalski told them that Angela could come to the nursery to breastfeed Baby B once the newborn "was cleared." *Id.* ¶ 233. Brian repeatedly asked Silver Cross staff when the couple could see Baby B, but he did not receive a definitive answer. Ultimately, the staff allowed the Boughers to go to the nursery to hold Baby B and for Angela to breastfeed. In the nursery, a nurse told the Boughers that once Baby B's glucose levels were above 50, she could return to the couple's room. After breastfeeding, Baby B's glucose levels rose to 66 and the nurse informed the Boughers that "hopefully, within a couple of hours" Baby B could return to their room. *Id.* ¶ 239. The Boughers returned to their room to wait for Baby B.

At some point within the next couple of hours, Dr. Skalski discussed the Vitamin K shot and erythromycin eye ointment with the Boughers. The couple offered to show Dr. Skalski their religious exemption letter but Dr. Skalski said that was not necessary and noted that he was not concerned about their refusal of the ointment. Dr. Skalski "ridicule[d] the couple's religious beliefs and called their scientific research 'stupid' and 'wrong.'" *Id.* ¶ 245. Later in the afternoon, two nurses told Angela that if she signed an informed consent waiver, the couple would get Baby B back and the DCFS call "would be reversed." *Id.* ¶ 249. Angela agreed to sign the form. About an hour later, a nurse told the Boughers that the nurses were incorrect—they could not reverse the DCFS call. Dr. Skalski then returned to the Boughers' room, criticized the couple's refusals, and "mocked their religious beliefs." *Id.* ¶ 252. At 8:00 p.m., after about thirteen hours of separation, Baby B returned to the Boughers' room.

12

The next day, Friday, February 8, hospital staff told Angela that a DCFS caseworker was coming to the hospital. About two hours later, at 2:00 p.m., DCFS Caseworker Kitakis entered Angela's room. Brian, who had gone home to care for the couple's other children, arrived about halfway through the conversation. Kitakis told Angela that the DCFS report would ultimately be determined to be unfounded but she still had to ask some questions. Kitakis asked about the couple's other children and the Boughers said they were uncomfortable with these questions. In response, Kitakis said "I am one of the 17 people in this State of Illinois that can come into your child's school and talk to them at any time without your permission." *Id.* ¶ 261. Kitakis then said that, to close the case, it was mandatory that she visit all the couple's children in their home. The Boughers argued that there was no basis for this and asked for time to speak with a lawyer.

Kitakis called her supervisor to inform him that the Boughers were refusing the home visit. Angela tried to loudly tell the supervisor that that was not correct. The Boughers then spoke with a lawyer who instructed them not to speak with DCFS personnel any further. The lawyer also told the DCFS supervisor to get a warrant and stop harassing the Boughers. However, Kitakis continued to harass the Boughers, told them the home visit would likely take place on Tuesday, took a photograph of Baby B, and then left their room.

The following week, the couple's thirteen-year-old son answered the door and found a Joliet police officer who asked the boy to get his parents. Angela then saw three Joliet police cars outside and two officers inside her home. One of the officers indicated they had received a call from DCFS and needed to see the couple's children. Angela said she did not want them in the house and in response, the police indicated they simply "had to lay eyes" on the children. *Id.* ¶ 274. After seeing all of Angela's children, the officers left. The next day, Angela received a call informing her that the report was determined to be unfounded and that DCFS would close

the case. A few weeks later, the couple received a letter that confirmed the DCFS investigation determined the allegation was unfounded.

**B.      James F. Holderman III, Erin Courtney Hill, and Baby H**

Baby H was born on May 21, 2018 to James Holderman III and Erin Courtney Hill at AMITA Health Adventist Medical Center ("AMITA Health"). Prior to Baby H's birth, the couple planned to refuse all newborn procedures, including the four at issue here. Baby H was born healthy. About twelve hours after Baby H's birth, Dr. Schulte entered the couple's hospital room to perform an infant check-up. Dr. Schulte told the couple that the only refusal that would result in her seeking DCFS intervention was the refusal of the NBS. In response, Holderman went home and printed out the text of the religious exemption within the Newborn Metabolic Screening Act and brought it back to the hospital.

After midnight on May 22, a nurse informed the couple that there was a note in Baby H's chart to call DCFS, but the nurse said she refused to do so. In response, the couple requested to speak to Dr. Schulte. The couple showed Dr. Schulte the exemption and explained that their religious beliefs were the primary reason for their refusal. Dr. Schulte scoffed and asked about their religion. After Holderman responded, Dr. Schulte said she would contact the hospital social work department and implied the hospital staff would make a call to DCFS. Dr. Schulte asked an AMITA Health social worker named Melanie Heap to call DCFS, but Heap refused. The couple met with Heap later that morning and gave her a written statement claiming a religious exemption from the NBS, as required by the statute.

Later, Dr. Schulte called DCFS and said the couple was refusing "'90 percent' of the 'medical care.'" *Id.* ¶ 308. The DCFS intake worker who spoke with Dr. Schulte noted the refusals of the Vitamin K shot and erythromycin eye ointment as the basis for the alleged

14

medical neglect. In response to the report, a DCFS supervisor called Dr. Anubha Mittal, a pediatrician working at AMITA Health, to gather information about Baby H. Dr. Mittal expressed concern with the couple's NBS refusal and told the DCFS supervisor that the family was still at the hospital. At the direction of Dr. Schulte, hospital security officers stood near the exit of the Mother Baby Unit of the hospital. Later, DCFS Caseworker Christi Layton entered the couple's room despite their attempts to prevent her from doing so. Hospital staff told Hill that Layton could not leave until she saw Baby H.

After seeing Baby H, Layton conducted multiple interviews of medical staff who confirmed Baby H was healthy and that the NBS were "'routine tests' that were 'not medical necessities.'" *Id.* ¶ 319. However, to close the DCFS case, Holderman had to bring the couple's older son to the DCFS Agency Office on May 25 so Layton could interview him. In July 2018, DCFS closed the investigation and determined the report to be unfounded. The final reports noted: "Does not appear to be a good faith report." *Id.* ¶ 324.

### C. Dr. Jason Kosek, Sarah Kosek, and Baby K

Baby K was born on June 14, 2018 to Dr. Jason and Sarah Kosek at Silver Cross. Prior to Baby K's birth, the Koseks informed a Silver Cross nurse of their plan to refuse the Vitamin K shot, the Hepatitis B shot, and erythromycin eye ointment. In response, Silver Cross staff told the couple that hospital staff would call DCFS to seek intervention and gave them an informed consent waiver form. At Baby K's birth, when the Koseks refused the treatments, a Silver Cross nurse said the hospital would call DCFS even though the Koseks had signed the informed consent waiver form. A different nurse then commented that Baby K was to receive "no eyes and thighs," referring to the process by which medical personnel administer erythromycin ointment in the eyes and the Vitamin K and Hepatitis B shots in the thighs. *Id.* ¶ 334.

About one hour after Baby K's birth, a nurse asked the Koseks to again sign the informed consent waiver form. Minutes later, DCFS Caseworker Taylor-Williams entered the couple's hospital room. Taylor-Williams told the Koseks that DCFS received a report of medical neglect regarding the Koseks and the couple was in danger of losing custody of Baby K. Taylor-Williams then left to speak with a hospital administrator and shortly thereafter, the Head of Pediatrics at Silver Cross, Dr. John Doe, entered the room. Dr. Doe spoke to the couple for about thirty minutes regarding the refused treatments. The Koseks made it clear to Dr. Doe that they refused the treatments because they were unnecessary and carried possible adverse side effects. Dr. Doe told the Koseks that the hospital could take Baby K away from them because of the refusals and the couple would have to go to court to regain custody. Alternatively, Dr. Doe said the hospital could administer the treatments and then return Baby K to the Koseks. In both scenarios, Dr. Doe said he would administer the refused treatments. However, if the couple agreed to allow Baby K to receive the treatments, Dr. Doe said he would leave and there would be no more issues.

In response, Jason said the couple would agree to the treatments if Dr. Doe signed a document guaranteeing that there were no health risks associated with them and that Dr. Doe would accept all liability for any resulting harm. Dr. Doe refused to do so. Taylor-Williams was present for this conversation and told the Koseks that she did not see any harm with the treatments and encouraged them to go along with the demands. The Koseks told Dr. Doe and Taylor-Williams that they had previously consulted with their own pediatrician who had no issue with the refusals. As he was leaving the room, Dr. Doe told the Koseks that he would contact hospital administration and they would "continue the process." *Id.* ¶ 350.

About a half hour later, a hospital administrator came into the room and said she could take Baby K, administer the treatments, and then return Baby K to the couple or the couple could go to court to regain custody of Baby K. The administrator indicated that the process of taking custody of Baby K would continue and then left the room. Approximately half an hour later, a different hospital administrator entered the couple's room. This administrator told the Koseks that the hospital did not want to take custody of Baby K; instead, they only wanted to ensure the couple understood the risks associated with their refusals. The administrator also noted that the staff was "just following hospital protocol." *Id.* ¶ 353. In response, Taylor-Williams asked, "So we aren't taking custody of the baby?" *Id.* The administrator replied, "No, not at this time." *Id.* Taylor-Williams told the couple that the DCFS investigation would continue, including a home visit and contacting references. As described, DCFS contacted family members and employers regarding the investigation and in September 2018, Taylor-Williams conducted a home visit. The same month, the Koseks received a letter stating that the report of medical neglect was unfounded.

### D. Brandon Leitschuh, Emily Vuckovich-Leitschuh, and Baby L

Baby L was born on July 31, 2018 at Advocate Christ to Brandon Leitschuh and Emily Vuckovich-Leitschuh. Prior to Baby L's birth, the couple planned to refuse the administration of erythromycin eye ointment, the Vitamin K shot, and the Hepatitis B shot. Vuckovich-Leitschuh and the couple's other daughter both have allergies and auto-immune disorders. Specifically, Vuckovich-Leitschuh is allergic to erythromycin. Therefore, both the erythromycin eye ointment and the Vitamin K shot could potentially cause allergic reactions in Baby L. Additionally, the couple did not believe either treatment was necessary because Vuckovich-Leitschuh delivered Baby L by cesarean and prior to the birth, Vuckovich-Leitschuh tested

negative for sexually transmitted diseases and Hepatitis B. The couple also told hospital staff they were willing to give oral Vitamin K drops to Baby L in lieu of the shot.

After arriving at the hospital, the couple signed refusal forms for all three treatments. A nurse told the couple that if they refused the Vitamin K shot, Advocate Christ's policy required staff to call DCFS. However, the nurse indicated that because the couple had a valid medical reason for the refusal, there should not be an issue. Hospital staff called DCFS to investigate, even though Vuckovich-Leitschuh's medical records indicated that her medical conditions made the refusals appropriate. About twenty-four hours after Baby L's birth, a Cook County DCFS Caseworker visited the couple at the hospital and told them that Will County would investigate the case, including a home visit. At this time, according to DCFS spokesperson Dubre, DCFS had revoked Section H through an Action Transmittal.

The next evening, on August 1, Will County DCFS Caseworker Allen called the couple and threatened to take custody of their children. Allen said the couple's family would not be able to take custody of the children and that, most likely, the children would not stay together. Allen encouraged the couple to allow administration of the Hepatitis B shot because it was already too late for the other treatments. Allen also told the couple she was hoping and praying that Baby L would not die because of their medical neglect. Vuckovich-Leitschuh told Allen about her medical conditions, but Allen said Vuckovich-Leitschuh had to prove that Baby L had the same medical conditions. A hospital social worker entered the couple's room to listen to the call because she could hear Allen yelling at the couple. Allen told the couple that if they continued to refuse the treatments, the medical staff at DCFS would need to come to their house every week or month to check on the family.

18

Vuckovich-Leitschuh asked Allen what she could do to prevent losing custody of her children. Allen responded that it was not too late to allow Baby L to receive the Hepatitis B shot. The hospital social worker shook her head at this, indicating it was not necessary. Allen insisted that Baby L receive the Hepatitis B shot before the couple could leave the hospital. The couple told Allen that their pediatrician was aware of their planned refusals and had no issues with them. In response, Allen asked the couple to provide a letter from the pediatrician stating that their refusals did not constitute medical neglect. Allen spoke with the couple's pediatrician and received the requested letter. However, Allen still told the hospital social worker that Baby L could not leave the hospital until after Allen conducted a home visit. Crying, Vuckovich-Leitschuh said to the social worker: "Tell me she can't take my kids." *Id.* ¶ 386. The social worker responded, "She can." *Id.*

Leitschuh went home that night to take care of the couple's other daughter while Vuckovich-Leitschuh stayed at the hospital with Baby L. The next morning, hospital staff cleared Vuckovich-Leitschuh to discharge but they told Vuckovich-Leitschuh that Baby L could not leave until DCFS conducted a home visit. Leitschuh wanted to come to the hospital that day but had to stay home with the couple's other daughter to wait for the home visit. Allen refused to complete the home visit until Vuckovich-Leitschuh re-signed the refusal forms, because Vuckovich-Leitschuh had written in the margins on the first forms. Allen ultimately conducted the home visit and Vuckovich-Leitschuh and Baby L returned home that evening. Months later, the couple received a letter from DCFS stating that the report of medical neglect was unfounded.

### E. Danielle Anderson and Baby G

Baby G was born on February 5, 2019 at UCMC to Danielle Anderson. Before Baby G's birth, Anderson planned to refuse the Vitamin K and Hepatitis B shots. Baby G was born

19

healthy.  Immediately after the birth, Anderson told hospital staff that she did not want them to administer the Vitamin K or Hepatitis B shots or any other injections.  Within an hour of the birth, a pediatrician entered Anderson's hospital room and told her that if she did not allow the hospital to administer the Vitamin K shot, the hospital would take Baby G away.  Later that morning, a different pediatrician gave Anderson materials regarding the Vitamin K shot and discussed them with her.  That afternoon, doctors and nurses frequently tried to convince Anderson to allow administration of the Vitamin K shot.

That evening, Anderson contacted a doula to learn about her right to refuse the Vitamin K shot.  The next morning, on February 6, doctors and other staff continually harassed Anderson about the Vitamin K shot and one doctor told her that under state law, she could not refuse the shot.  At about 7:30 a.m., Dr. Lysouvakon, Medical Director of the Infant Nursery, entered Anderson's room.  Anderson told him that if he was there to discuss the Vitamin K shot, he should leave because she did not want to discuss the issue.  Dr. Lysouvakon told Anderson they were going to take Baby G into "protective custody" and that administration of the shot would take about seven minutes.  *Id.* ¶ 409.  In response, Anderson told Dr. Lysouvakon to leave and he did.  About thirty minutes later, the doula arrived.

Shortly after, Dr. Lysouvakon returned with three other staff members.  Dr. Lysouvakon told Anderson that he had the legal right to physically take Baby G from her to administer the Vitamin K shot.  In response, the doula called 311, who instructed her to call 911.  Anderson asked Dr. Lysouvakon to get his legal team.  Dr. Lysouvakon left and then returned with hospital security and a nurse, saying that he was going to take Baby G now.  When Anderson asked where the legal team was, Dr. Lysouvakon said he called the legal team and that he had the right to physically remove Baby G from Anderson's custody.  In response, Anderson stood up, told

20

the doula to call 911 because the situation was going to get physical, and told the hospital staff to leave immediately, which they did.

Two police officers arrived shortly after. Anderson told the officers that Dr. Lysouvakon was threatening to take custody Baby G and that she had the right to refuse the Vitamin K shot, showing the officers Director Walker's letter rescinding Section H as support. The officers told Dr. Lysouvakon to leave the room and stop harassing Anderson. When Dr. Lysouvakon returned to Anderson's room, she told him to get the discharge papers ready because she was "ready to leave once the tests were done." *Id.* ¶ 424. Anderson and Baby G left the hospital at about 3:30 p.m. that afternoon.

Director Walker rescinded Section H about six months before Baby G's birth. On February 15, 2019, nine days after their discharge, DCFS Caseworker Rodgers called Anderson to inform her that DCFS was investigating a report of medical neglect based on a referral from UCMC. Rodgers conducted two home visits because during the first, Anderson's other child was not present. At one point during the investigation, Rodgers called Anderson to tell her that they were going to indicate her for medical neglect unless she allowed Baby G to receive the Vitamin K shot. Anderson asked Rodgers to put this requirement in writing and in response, Rodgers said she changed her mind and that the report would be determined to be unfounded. Rodgers contacted Baby G's pediatrician, Dr. Jasmine Scott, who confirmed there were no medical problems with Baby G and that it was Anderson's right to decline these treatments. Months after Baby G's birth, DCFS closed the investigation and determined that the report of medical neglect was unfounded.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not

its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir.

1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in

the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's

favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule

12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to

the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th

Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Iqbal*, 556 U.S. at 678.

## ANALYSIS

### I.     Private Defendants

### A.     *Noerr-Pennington* Immunity

Count I alleges that Dr. Glick and ICAAP conspired with then-DCFS Director Walker

and then-Deputy Director Harms-Pavelski to implement and enforce Section H, which

proximately caused the violation of the Parents' rights. Dr. Glick and ICAAP argue that the First

Amendment, through the *Noerr-Pennington* doctrine, protects them from any liability based on

their petitioning of DCFS to implement Section H. The *Noerr-Pennington* doctrine provides

private citizens with immunity from civil liability for petitioning the government to take official

action favorable to their interests, even if the results might harm others. *Tarpley v. Keistler*, 188

F.3d 788, 794 (7th Cir. 1999). The Parents concede that if Dr. Glick and ICAAP "only

petitioned DCFS for particular policy positions, or advocated publicly for these policy positions, the *Noerr-Pennington* doctrine would apply." Doc. 99 at 70. However, the Parents argue that Dr. Glick and ICAAP went beyond petitioning by "conspir[ing] with DCFS and the other private defendants to deprive the plaintiffs of their constitutional right to family integrity through the *publication* and *enforcement* of Section H." *Id.*

The only allegation the Parents cite to support this argument is that Dr. Glick and ICAAP "agreed to take [Section H] and give it widespread publication to many Illinois pediatricians and hospitals so that these pediatricians and hospitals could use this policy . . . to coerce parents and even seize their children upon refusal of the Vitamin K shot and/or erythromycin eye ointment." Doc. 98 ¶ 137. This allegation, however, fails to carry the day for the Parents. The Parents concede that the First Amendment protects public advocacy of a policy position and fail to plausibly explain how "widespread publication" differs from public advocacy. Additionally, no factual allegations in the Complaint support that Dr. Glick or ICAAP publicized or enforced Section H; the allegations only support that they petitioned DCFS and publicly advocated in favor of their policy position.

The Complaint does contain factual allegations regarding Dr. Glick's role in implementing UCMC's policy, which form the basis for Anderson and Baby G's substantive due process claim against Dr. Glick within Count VI. These allegations do not relate to Dr. Glick's petitioning of DCFS; thus, the Court will address them in the next Section. Because all the alleged conduct by ICAAP relates to its petitioning of DCFS and public advocacy to advance a policy position, the Court finds *Noerr-Pennington* immunity applies and dismisses all claims against ICAAP without prejudice. To the extent the Parents claim Dr. Glick has liability for her

actions in petitioning DCFS and publicly advocating for a policy position, the Court dismisses those claims as well without prejudice.

### B.    Under Color of State Law

"In order to state a claim under Section 1983, a plaintiff must allege that the defendants deprived him of a right secured by the Constitution or laws of the United States, and that the defendants acted under color of state law." *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1009 (7th Cir. 2000) (citation omitted). Dr. Glick, Dr. Schulte, Dr. Skalski, Kozuch, Dr. Lysouvakon, Silver Cross, Advocate Christ, and UCMC move to dismiss the claims against them, arguing that the Complaint fails to sufficiently allege they acted under color of state law. In response, the Parents argue that these private actors are subject to § 1983 liability because they jointly acted or conspired with DCFS. The question then is whether the Complaint sufficiently alleges that the private Defendants jointly acted or conspired with DCFS to violate the Parents' constitutional rights.

"[M]erely private conduct, no matter how discriminatory or wrongful," cannot lead to § 1983 liability. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (citation omitted). However, "[a] private defendant acts 'under color of' state law for purposes of Section 1983 when [it] is a 'willful participant in joint action with the State or its agents.'" *Tom Beu Xiong v. Fischer*, 787 F.3d 389, 398 (7th Cir. 2015) (quoting *Malak v. Associated Physicians, Inc.*, 784 F.2d 277, 281 (7th Cir. 1986)). To subject a private actor to § 1983 liability, there must be "evidence of a concerted effort" between the State and private actors. *Spiegel v. McClintic*, 916 F.3d 611, 616 (7th Cir. 2019) (quoting *Fries v. Helsper*, 146 F.3d 452, 457 (7th Cir. 1998)). The Seventh Circuit calls this the "'conspiracy theory' of § 1983 liability." *Id.*

24

To establish § 1983 liability for a private actor based on this theory, "a plaintiff must demonstrate that: (1) a state official and private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights, and (2) those individual(s) were willful participants in joint activity with the State or its agents." *Brokaw*, 235 F.3d at 1016 (quoting *Fries*, 146 F.3d at 457). "It is not sufficient to allege that the (private and state) defendants merely acted in concert or with a common goal. There must be allegations that the defendants had directed themselves toward an unconstitutional action by virtue of a mutual understanding." *Tarkowski v. Robert Bartlett Realty Co.*, 644 F.2d 1204, 1206 (7th Cir. 1980) (quoting *Sparkman v. McFarlin*, 601 F.2d 261, 268 (7th Cir. 1979)).

"[M]ere allegations of joint action or a conspiracy do not demonstrate that the defendants acted under color of state law and are not sufficient to survive a motion to dismiss." *Spiegel*, 916 F.3d at 616 (quoting *Fries*, 146 F.3d at 458). Such allegations must "be supported by some factual allegations suggesting such a 'meeting of the minds.'" *Tarkowski*, 644 F.2d at 1206 (quoting *Sparkman*, 601 F.2d at 268). Circumstantial evidence can establish a conspiracy, but speculation cannot. *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003). The Court addresses the sufficiency of the "under color of state law" allegations involving each of the Defendants in turn.

### 1. Dr. Glick[6]

Count VI alleges that Dr. Glick "was instrumental in implementing" a policy at UCMC that proximately caused the violations of Anderson and Baby G's substantive due process rights. Doc. 98 ¶ 479. Dr. Glick argues that the Complaint fails to allege how she, as a private citizen

---

[6] The Parents, in their response, abandon any argument that Dr. Glick was a state actor as an employee of DCFS through either her position on the DCFS Advisory Council or DCFS-funded "task force." Thus, the Court limits its analysis to whether the Complaint plausibly alleges that Dr. Glick operated "under color of state law" as a private actor.

employed by a private hospital, was jointly acting or conspiring with the State when helping to implement this policy. In response, the Parents argue the Complaint plausibly alleges that Dr. Glick conspired with DCFS to develop Section H and was jointly engaged with DCFS in circulating and enforcing Section H.

However, as previously discussed, the First Amendment protects Dr. Glick from liability for any actions related to her petitioning of DCFS and public advocacy for Section H. Therefore, the only factual allegations that can form the basis of liability for Dr. Glick are: (1) she helped form UCMC's policy, and (2) Section H "helped frame the paradigm" for and encouraged the adoption of UCMC's policy. Doc. 98 ¶ 154. The other allegations, although numerous, either relate to Dr. Glick's petitioning DCFS and public advocacy for Section H or are conclusory.

These two factual allegations merely suggest that the private (Dr. Glick and UCMC) and state (DCFS) parties acted with a common goal by creating similar policies. This falls short of suggesting a "meeting of the minds" between Dr. Glick and DCFS. *Tarkowski*, 644 F.2d at 1206 (quoting *Sparkman*, 601 F.2d at 268). The Complaint, therefore, does not sufficiently allege Dr. Glick jointly acted or conspired with DCFS. As a result, the Court dismisses all claims against Dr. Glick.

### 2. Other Medical Professionals

The Complaint alleges that Dr. Schulte, Dr. Skalski, RN Kozuch, Dr. Doe,[7] and Dr. Lysouvakon violated the Parents' substantive due process rights; that Dr. Schulte, Dr. Skalski,

---

[7] The Parents named Dr. John Doe as a Defendant. Because the issues raised in Dr. Schulte, Dr. Skalski, Kozuch, and Dr. Lysouvakon's motions to dismiss apply equally to Dr. John Doe and Parents had an adequate opportunity to respond, the Court extends consideration of Dr. Schulte, Dr. Skalski, Kozuch, and Dr. Lysouvakon's arguments to include Dr. John Doe. *See Malak*, 784 F.2d at 280 (court may *sua sponte* enter judgment in favor of additional non-moving defendants if motion by one defendant is equally effective in barring claim against other defendants and plaintiff had adequate opportunity to respond to the motion); *Roberts v. Cendent Mortg. Corp.*, No. 1:11-CV-01438-JMS, 2013 WL 2467996, at *5 (S.D. Ind. June 7, 2013) (although defendants had not entered appearances and it was not clear if they received

and Kozuch violated the Parents' Fourth Amendment rights; and that Dr. Schulte violated Holderman and Hill's First Amendment rights. The medical professionals argue that the Complaint fails to allege how they, as private citizens employed by private hospitals, jointly acted or conspired with the State when committing these alleged violations. In response, the Parents maintain that the Complaint plausibly alleges that "[a]ll defendants were in agreement that the parents should be reported for medical neglect" and the medical professionals were following an unconstitutional DCFS policy when they violated the Parents' rights. Doc. 99 at 51.

To support this argument, the Parents point to the section of the Complaint discussing the adoption and re-affirmation of Section H. In relevant part, the Complaint alleges that Dr. Glick, ICAAP officials, "certain Illinois pediatricians," and "some Illinois hospitals" agreed to publicize Section H to "many Illinois pediatricians and hospitals," Doc. 98 ¶ 137, and all the Defendant doctors and hospitals received DCFS' 2017 directive "asking all hospital [sic] to report the refusal [of the Vitamin K shot] as medical neglect," *id.* ¶¶ 162–63.

The Complaint also alleges that all the Defendant doctors and hospitals "agreed to respond to parent refusals of these prophylactic medical procedures at issue herein as *per se* 'medical neglect' to justify and initiate DCFS investigations," *id.* ¶ 165, "formed this agreement [with DCFS] to deny parents these fundamental choices, and took overt acts ensuring the implementation and enforcement of Section H," *id.* ¶ 167. To survive this motion to dismiss, factual allegations must support these conclusory allegations of an agreement between DCFS and all the Defendant doctors and hospitals to enforce an unconstitutional policy.

---

notice, court could impute arguments made by other defendant to all of them and dismiss claims against all defendants).

At most, the factual allegations specific to each medical professional suggest that they either threatened to report the Parents to DCFS, did report the Parents, or played a role in reporting the Parents. But these actions, standing alone, are not enough to allege joint action or conspiracy between the medical professionals, who are mandatory reporters, and DCFS. *See Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir. 2009) (upholding dismissal of § 1983 claim for failure to show that a private therapist was conspiring with a state actor where the complaint merely alleged the therapist reported the plaintiff to the child welfare authority); *Brokaw*, 235 F.3d at 1016 (finding no issue with the principle that "merely filing a report of child neglect with a state actor, even if false, is insufficient to create liability under Section 1983"); *Mueller v. Auker*, 700 F.3d 1180, 1191–92 (9th Cir. 2012) (finding that a private hospital "did not become a state actor simply because it complied with state law requiring its personnel to report possible child neglect to [child welfare agency]") (citations omitted); *Brown v. Newberger*, 291 F.3d 89, 93 (1st Cir. 2002) (finding a social worker required by state law to report suspected abuse was not a state actor for simply complying with that law); *Dickman v. Rosado*, No. 16 C 9448, 2019 WL 3728698, at \*2 (N.D. Ill. Aug. 1, 2019) (noting "courts have held that hospitals and their employees who report suspected child abuse are not state actors simply because they are legally required to cooperate with the state" and finding a private doctor who participated in a custody removal action with DCFS was not a state actor (quoting *Evans v. Torres*, No. 94 C 1078, 1996 WL 5319, at \*5) (N.D. Ill. Jan. 4, 1996))).

The specific allegations relating to Dr. Schulte fare no better. The Complaint alleges that Dr. Schulte illegally seized Hill and Baby H and in doing so, violated Holderman and Hill's First, Fourth, and Fourteenth Amendment rights because Holderman and Hill refused the NBS. The Complaint also suggests that Dr. Schulte based the call to DCFS solely on the couple's

refusal of the NBS.  Section H, however, does not include the NBS as one of the treatments for which parental refusal would be reportable grounds for child neglect and the Complaint does not allege that any of the DCFS officials thought refusal of the NBS would qualify as *per se* medical neglect and thus, a reportable violation.  Because Section H focused only on the administration of silver nitrate or ophthalmic solution and Vitamin K as medically necessary treatments for newborns, the Parents cannot base a joint conspiracy theory of liability on Dr. Schulte's actions regarding the NBS where DCFS did not consider the NBS a medically necessary treatment and its refusal a ground for a finding of medical neglect.  There is no "meeting of the minds" between the private actor (Dr. Schulte) and the state actor (DCFS) when the private actor based a decision on a ground the state actor did not contemplate.  The Complaint, therefore, does not plausibly allege that Dr. Schulte was jointly acting or conspiring with DCFS when committing these violations.

Finally, turning the specific allegations relating to the remaining medical professionals, the Complaint alleges that Kozuch, Dr. Skalski, Dr. Doe, and Dr. Lysouvakon threatened to or did take custody of Baby B, Baby K, and Baby G in violation of the Fourth and Fourteenth Amendments.  According to the Complaint, the alleged agreement between DCFS and all Defendant doctors was that the doctors would "respond to" refusals of the Vitamin K shot or erythromycin eye ointment as "'medical neglect' to justify and initiate DCFS investigations." Doc. 98 ¶ 165.  As an initial matter, these allegations do not apply to Kozuch because she is a nurse, not a doctor.  And while the alleged agreement between the medical professionals and DCFS contemplated the initiation of DCFS investigations based on parental refusals of these medical treatments, it did not extend to permitting physicians to take custody of the newborns in response to these refusals.  In fact, the Complaint suggests that even after ICAAP and Dr. Glick

29

petitioned DCFS to adopt such a policy, DCFS did not do so and Section H contains no reference to permitting medical professionals to take newborns into protective custody in order to administer either of these medical treatments.  Therefore, any allegations relating to taking custody of the newborns do not support joint action between the medical professionals and DCFS because again, there is no "meeting of the minds" where one party takes an action the other party has either expressly disavowed or at best, simply not contemplated.  As a result, the Complaint does not plausibly allege that Kozuch, Dr. Skalski, Dr. Doe, or Dr. Lysouvakon was jointly acting or conspiring with DCFS in threatening to or actually taking custody of the newborns after their parents refused administration of the Vitamin K shot or erythromycin eye ointment.

### 3.     Medical Institutions

The Complaint alleges that Silver Cross, Advocate Christ, and UCMC violated the Parents' substantive due process rights by adopting formal or informal policies that proximately caused the violations of the Parents' rights.  However, the hospitals argue that the Complaint fails to allege how they, as private hospitals, were jointly acting or conspiring with the State by adopting these policies.  In response, the Parents argue that "each [hospital's] policy was the result of joint activity between state and private conduct" and further, that the hospitals relied on DCFS to enforce their policies.  Doc. 99 at 61.

To support this argument, the Parents point to the section in the Complaint discussing DCFS' directive to hospitals in 2017.  The Complaint merely alleges that "certain Illinois hospitals" were "so emboldened" by DCFS' 2017 directive that "a number of these hospitals began to create their *own* policies for coercing and/or forcing the administration of Vitamin K shots and erythromycin on babies against the express wishes of their parents."  Doc. 98 ¶ 181

(emphasis added). Without more, a private institution creating a policy modeled after state guidelines is not evidence of joint action or a conspiracy with the State. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) (noting that a private party who "seek[s] to rely on some state rule governing their interactions with the community surrounding them" cannot "fairly be said to be a state actor").

To survive this motion to dismiss, the Complaint must contain specific factual allegations that sufficiently support joint action or a conspiracy between each hospital and DCFS. The Complaint alleges that: (1) Silver Cross appears to have a "formal or informal policy that would allow for babies to be taken into 'protective custody,'" Doc. 98 ¶ 188; (2) Advocate Christ's policy "states that physicians should inform parents or guardians that if they refuse [the Vitamin K shot], hospital staff will contact DCFS to report the refusal," *id.* ¶ 186; and (3) UCMC's policy, formed "with the help and assent of" Dr. Glick, *id.* ¶ 184, and inspired by Section H, *id.* ¶ 154, asks physicians to report refusals of the Vitamin K shot and erythromycin eye ointment to DCFS, *id.* ¶ 525.

These allegations do not evidence a concerted effort between the hospitals and DCFS to deprive the Parents of their constitutional rights. First, the factual allegations regarding Silver Cross are insufficient to support joint action or a conspiracy with DCFS, because the Complaint does not allege that DCFS directed hospitals to take protective custody of newborns in these situations. Rather, any policy implemented by Silver Cross to take protective custody of newborns after parental refusal was a policy created only by Silver Cross which extended beyond the parameters of Section H. Doc. 99 at 53-54 ("The hospitals' policies followed, and in certain instances, went beyond Section H's requirements.") Repeating a familiar theme, there can be no "meeting of the minds" where one party has gone beyond what the other party contemplated.

31

Next, the allegations regarding Advocate Christ merely show that Advocate Christ asked its employees to follow DCFS guidelines. As noted above, this is insufficient to show a meeting of the minds or a mutual understanding between Advocate Christ and DCFS. *See Lugar*, 457 U.S. at 937. Turning to the allegations specific to UCMC, it is irrelevant that UCMC worked in concert with Dr. Glick to create its policy because the Parents concede that Dr. Glick is a private actor. *See* Doc. 99 at 47. Further, as explained earlier, the allegations that Section H "helped frame the paradigm" for and encouraged the adoption of UCMC's policy merely show that the private and state parties acted with a common goal, not that they had a meeting of the minds. Doc. 98 ¶ 154. Finally, the allegation that UCMC's policy asked its employees to report refusals to DCFS does not support joint action between UCMC and DCFS, for the same reasons it did not for Advocate Christ. Therefore, the allegations do not support joint action between UCMC and DCFS.

The Parents' argument that the hospitals "relied on DCFS to enforce" these policies does not further their cause. Doc. 99 at 62. The question is whether the hospitals *adopted* their policies jointly or in a concerted effort with DCFS, not whether the hospitals jointly acted with DCFS by reporting the refusals. *See Brokaw*, 235 F.3d at 1016 (finding no issue with the principle that "merely filing a report of child neglect with a state actor, even if false, is insufficient to create liability under Section 1983"); *Spiegel*, 916 F.3d at 617 ("We have repeatedly held that 'the mere act of furnishing information to law enforcement officers' does not constitute joint activity in an unconstitutional arrest." (quoting *Butler v. Goldblatt Bros.*, 589 F.2d 323, 327 (7th Cir. 1978))); *Dickman*, 2019 WL 3728698, at *2 ("[C]ourts have held that hospitals and their employees who report suspected child abuse are not state actors simply because they are legally required to cooperate with the state."). Because the Complaint does not

32

contain allegations that the hospitals drafted or adopted their policies in conjunction with DCFS, the Parents fail to allege that the medical institutions acted under color of state law so as to allege §1983 liability.

Finally, the Complaint alleges that Silver Cross, Advocate Christ, and UCMC are also liable under the *respondeat superior* theory for the constitutional violations of their employees and/or agents. The Parents concede, however, that current Seventh Circuit precedent does not recognize *respondeat superior* liability for private corporations for the constitutional violations of their employees and/or agents. *See* Doc. 99 at 60 n.24 (citing *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782 (7th Cir. 2014)). Therefore, this theory of liability fails as well. As a result, the Court dismisses all claims against Silver Cross, Advocate Christ, and UCMC.

To conclude, the Court finds that Complaint fails to sufficiently allege that the private medical professionals and medical institutions acted under color of state law and therefore, the Court dismisses all claims against them.

## II. DCFS Defendants

### A. Qualified Immunity

The DCFS Caseworkers, Walker, and Harms-Pavelski ("DCFS Defendants") move to dismiss the claims against them as barred by qualified immunity. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, --- U.S. ----, 137 S. Ct. 548, 551 (2017) (citation omitted) (internal quotation marks omitted). "In other words, qualified immunity shields from liability [DCFS employees] who act in ways they reasonably believe to be lawful." *Ewell v. Toney*, 853 F.3d 911, 919 (7th Cir. 2017) (citation omitted) (internal quotation marks omitted). Therefore, to survive this motion to dismiss, the Complaint must

plausibly allege that the DCFS Defendants violated the Parents' clearly established rights.  *See Hanson v. LeVan*, 967 F.3d 584, 592 (7th Cir. 2020).  However, the Complaint need not plead factual allegations that "anticipate and overcome" a qualified immunity defense.  *Reed v. Palmer*, 906 F.3d 540, 548 (7th Cir. 2018) (citation omitted).  In response to DCFS' motion to dismiss, the Parents argue that the Complaint sufficiently alleges that each DCFS Defendant violated the Parents' clearly established constitutional rights.  DCFS argues that no constitutional violations occurred, or in the alternative, that if violations occurred, the violations were not clearly established at the time.

"[C]ourts may analyze the clearly established prong without first considering whether the alleged constitutional right was violated."  *Reed*, 906 F.3d at 547 (citation omitted) (internal quotation marks omitted).  The plaintiff bears the burden of showing that a right is clearly established.  *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 915 (7th Cir. 2015).  "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent."  *Dist. of Columbia v. Wesby*, --- U.S. ----, 138 S. Ct. 577, 589 (2018).  "[I]t is not the simple existence of analogous case law that defeats the claim of qualified immunity; rather, these decisions must demonstrate that, at the time the defendants acted, it was certain that their conduct violated the law."  *Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 620 (7th Cir. 2002) (citation omitted).  Moreover, the rule "must clearly prohibit the [official's] conduct in the particular circumstances before him."  *Wesby*, 138 S. Ct. at 581.

### 1.    Fourth Amendment: Unreasonable Search and Seizure

The Complaint alleges that DCFS Caseworkers Kitakis, Taylor-Williams, Allen, and Rodgers illegally searched and/or seized the Parents and/or newborns.  DCFS argues that no clearly established law exists that would have put the DCFS Caseworkers on notice that

"conducting a routine home visit during a child protection investigation violated the Constitution" or that Allen's actions constituted seizures of Leitschuh, Vuckovich-Leitschuh, and Baby L. Doc. 93 at 33–34. In response, the Parents argue that DCFS caseworkers had notice, based on *Doe v. Heck*, 327 F.3d 492 (7th Cir. 2003), that "investigating, threatening to seize, and actually seizing children required, at a minimum, individualized reasonable suspicion" and that the home visits in this case were unconstitutional. Doc. 99 at 66.

The Fourth Amendment, as applied to the States by the Fourteenth Amendment, sets forth the right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. The prohibition against unreasonable searches and seizures applies to both civil and criminal investigations conducted by the government and therefore applies to DCFS employees. *Heck*, 327 F.3d at 509. The first question "in a Fourth Amendment inquiry is whether the governmental conduct in question constitutes a search or seizure within the meaning of the amendment's text." *Id.* In *Heck*, the Seventh Circuit determined that a DCFS investigation conducted at a private school constituted a search under the Fourth Amendment because the caseworkers "went to the school for the specific purpose of gathering information." *Id.* at 510. The court also determined that the DCFS caseworkers' interview of a child at a private school constituted a seizure under the Fourth Amendment because "no reasonable child would have believed that he was free to leave" when his principal escorted him from class to a room where two DCFS caseworkers questioned him in the presence of a uniformed police officer. *Id.*

The next question is whether the search and/or seizure was reasonable. *Id.* To answer this, the Court must assess "on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.* (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)).

However, the Supreme Court has explicitly distinguished between searches and seizures that take place on private property and those carried out elsewhere. *Id.* at 511. "[A] search or seizure carried out on . . . [private] premises without a warrant is *per se* unreasonable, unless the [government] can show that it falls within one of a carefully defined set of exceptions." *Id.* (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 474 (1971)). Further, a person must have a "legitimate expectation of privacy in the invaded place" to claim the protection of the Fourth Amendment. *Id.* (quoting *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)). "A reasonable expectation of privacy exists when: (1) the claimant exhibits an actual (subjective) expectation of privacy; and (2) the expectation is one that society is prepared to recognize as reasonable." *Id.* (citation omitted).

In *Heck*, the court concluded that both the school and the child had a reasonable expectation of privacy in the private school's premises and therefore, the DCFS caseworkers' warrantless search of the school and seizure of the child were presumptively unreasonable. *Id.* at 513. The court went on to note that, even if not presumptively unreasonable, the search and seizure at issue did not pass the reasonableness test because the government officials did not have "some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Id.* at 515 (quoting *Brokaw*, 235 F.3d at 1019). From this perspective, the Court will first determine whether the right to be free from unconstitutional searches and seizures clearly prohibited the DCFS Caseworkers' conduct in the particular circumstances before them in each incident, using *Heck* as a guide. Then, if necessary, the Court will determine whether each DCFS Caseworker violated the Parents' clearly established Fourth Amendment rights.

a.      **Home Visits**

A subset of the Parents brings Fourth Amendment claims against DCFS Caseworkers Kitakis, Taylor-Williams, Allen, and Rodgers for entering their homes, or causing others to enter their homes, to conduct home visits without warrants, consent, or a legal basis to do so.  The Complaint sufficiently alleges that the government officials went to the Parents' homes for the "specific purpose of gathering information" regarding the welfare of the children and therefore, the home visits as pleaded constitute searches under the Fourth Amendment.  *Id.* at 510. Because the Complaint alleges that the searches took place in the Parents' homes without warrants, the searches are *per se* unreasonable unless an exception, such as consent or exigent circumstances, applies.  *See id.* at 513.  This right was clearly established at the time the alleged home visits took place.

DCFS argues that the "Seventh Circuit has acknowledged that there are circumstances in which the law of warrant and probable cause do not work effectively in a child protection investigation" and therefore, these home visits were not clearly unconstitutional.  Doc. 93 at 33– 34.  Although it is true that "[i]n some instances, the line implicating Fourth Amendment concerns is blurred when it applies to the government and child abuse investigations," DCFS workers are "not exempt . . . from adhering to basic Fourth Amendment principles under non-exigent circumstances."  *Michael C. v. Gresbach*, 526 F.3d 1008, 1016 (7th Cir. 2008).

The next question then is whether the Complaint sufficiently alleges violations of this clearly established right.  At issue is whether an exception to the warrant requirement applied to any of the four home visits.  The Complaint alleges that each home visit took place without valid consent.  At this stage, drawing all reasonable inferences in the Parents' favor, the Court must conclude that each home visit was nonconsensual.  Further, at this stage, the Complaint

sufficiently alleges that exigent circumstances did not exist in these four situations, because the allegations in the Complaint do not provide reason to believe life or limb were in jeopardy. *See Michael C.*, 526 F.3d at 1016 ("Recognizing the sensitive nature of [child welfare] investigations, officials may make a search or seizure under exigent circumstances, where they have reason to believe life or limb is in jeopardy.").

One question remains regarding the home visit conducted at the Boughers' home: whether Kitakis can be liable for the violation even though she was not present when the search occurred. It is clearly established that § 1983 liability can attach to a government official who directs an illegal search. *See Brokaw*, 235 F.3d at 1012 (finding that an official causes a constitutional deprivation if the conduct causing the deprivation occurs at her direction). A reasonable inference can be drawn that Kitakis directed the illegal search of the Boughers' home because the Complaint alleges that Kitakis told the couple that a home visit would occur and the police officers conducting the visit indicated they received a call from DCFS. *See id.* at 1014 ("While [the DCFS caseworker] was not present during the actual seizure of [plaintiff], the allegations read in the light most favorable to [plaintiff] indicate that [the caseworker] directed those who removed the children to do so. That is enough to affix liability.").

Therefore, the Complaint sufficiently pleads that the home visits conducted at the homes of the Boughers, the Koseks, Leitschuh and Vuckovich-Leitschuh, and Anderson violated the Parents' clearly established Fourth Amendment rights. As a result, qualified immunity does not bar the illegal search claims within Counts VIII, IX, X, and XI against DCFS Caseworkers Kitakis, Taylor-Williams, Allen, and Rodgers at this time. Of course, this does not preclude the Court from granting qualified immunity at a later stage, if additional facts warrant it. *See id.* at 1023 (noting, on consideration of a 12(b)(6) motion to dismiss, "while the facts ultimately may

not support these claims, at this stage we must reject the defendants' qualified immunity defense").

### b.      Seizures of Leitschuh, Vuckovich-Leitschuh, and Baby L

In addition to the Fourth Amendment claim based on the home visit, Leitschuh, Vuckovich-Leitschuh, and Baby L bring Fourth Amendment illegal seizure claims against DCFS Caseworker Allen. Vuckovich-Leitschuh and Baby L allege that Allen illegally seized them at Advocate Christ by instructing hospital staff not to allow Baby L to leave the hospital until Allen completed the home visit. Leitschuh alleges that Allen illegally seized him at his home because he felt as though he had to stay there until Allen conducted the home visit. In response to DCFS' assertion of qualified immunity for these claims, the Parents fail to point to any analogous case in which a court found that similar circumstances—on private premises, with no police presence, and no alleged transfer of custody—constituted a seizure. The Court is not aware of such a case either. Therefore, a reasonable caseworker would not have been on notice that extending a hospital stay and informing parents of an upcoming home visit violated a clearly established constitutional right. As a result, the Court dismisses the Fourth Amendment illegal seizure claims against Allen in Count X as barred by qualified immunity.

### 2.      Fourteenth Amendment: Substantive Due Process

The Complaint alleges that the DCFS Defendants violated the Parents' substantive due process rights. In response to DCFS' assertion of qualified immunity, the Parents argue that "the right to be free from government intrusion into the family in the form of a DCFS investigation where there is no reasonable suspicion of abuse" was clearly established in the Seventh Circuit at the time of the alleged violations. Doc. 99 at 64. The Parents rely on *Brokaw* and *Heck* as support for this clearly established right.

39

The Fourteenth Amendment provides that no State may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. XIV, § 1. "The Supreme Court has long recognized, as a component of 'substantive' due process, that parents have a liberty interest in familial relations." *Heck*, 327 F.3d at 517 (citation omitted). However, this right is "limited by the compelling governmental interest in the protection of children particularly where the children need to be protected from their own parents," *Brokaw*, 235 F.3d at 1019 (citation omitted), and "does not include the right to be free from child abuse investigations," *Heck*, 327 F.3d at 520 (citation omitted). "Therefore, when analyzing a familial relations claim, a 'balance must be reached between the fundamental right to the family unit and the state's interest in protecting children from abuse.'" *Heck*, 327 F.3d at 520 (quoting *Brokaw*, 235 F.3d at 1019).

The Parents primarily rely on *Brokaw* for the following statement: "a state has no interest in protecting children from their parents unless it has some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Brokaw*, 235 F.3d at 1019. However, in *Brokaw*, the Seventh Circuit merely noted that when balancing the private and governmental interests in familial relations cases, courts have recognized that the government has no interest in such cases. *Id.* The court did not actually conduct the balancing inquiry in *Brokaw* because it lacked sufficient details at the pleading stage to decide whether the government was justified in taking action. *See id.* Therefore, this Court will focus primarily on *Heck*, which did conduct the relevant balancing analysis.

In *Heck*, the Seventh Circuit asserted that if the government's actions are not based on "some definite and articulable evidence giving rise to a reasonable suspicion that a child ha[d] been abused or [was] in imminent danger of abuse," the government has no interest in protecting the child. *Heck*, 327 F.3d at 521 (quoting *Brokaw*, 235 F.3d at 1019). The court went on to find

40

that because the child welfare workers in the case "had no evidence giving rise to a reasonable suspicion that the plaintiff parents were abusing their children, or that they were complicit in any such abuse, the defendants violated the plaintiffs' right to familial relations by conducting a custodial interview of [the child] without notifying or obtaining the consent of his parents and by targeting the plaintiff parents as child abusers." *Id.* at 524. The court also found that the caseworkers' threat to remove the children from the custody of their parents violated the parents' right to familial relations, even though the caseworkers did not act on the threat, because the caseworkers "had no reason whatsoever to suspect that [the parents] were abusing their children." *Id.* at 524.

Because the Parents rely on *Heck* to set forth a clearly established right, it is important to consider the allegations that led the court to this conclusion. In *Heck*, the caseworkers conducted a nonconsensual, custodial interview of a child primarily based on a report that the child's principal spanked him at school. *Id.* at 500–01. Importantly, the report did not claim that the spanking injured the child. During the interview, the child told the caseworkers that his parents also spanked him, which led the caseworkers to open a child abuse investigation of the child's parents. *Id.* at 504. During the investigation, the caseworkers threatened to remove the child and his sister from their parents' custody if the parents did not cooperate with the investigation. *Id.* at 506 (stating that if the parents' attorney did not contact the caseworker in twenty-four hours, the agency would "take steps to . . . protect the children in your home . . . under Chapter 48").

With this background in mind, the Court will first determine whether the right to familial relations clearly prohibited the DCFS Defendants' conduct in the particular circumstances before them in each incident, using *Brokaw* and *Heck* as guides. Then, if necessary, the Court will

determine whether each DCFS Defendant violated the Parents' clearly established substantive due process rights.

### a.     DCFS Caseworkers

A group of the Parents brings substantive due process claims against DCFS Caseworkers Kitakis, Taylor-Williams, Allen, and Rodgers for conducting child welfare investigations without a legal basis to do so. The Boughers, Leitschuh, and Vuckovich-Leitschuh further allege that Kitakis and Allen, respectively, violated their substantive due process rights by threatening them. DCFS argues that the law did not put the DCFS Caseworkers "on notice that . . . conducting an investigation following a call to the DCFS Hotline by a mandated reporter" clearly violated the Parents' substantive due process rights. Doc. 93 at 33. In response, the Parents assert that *Brokaw* and *Heck* clearly established "the right to be free from government intrusion into the family in the form of a DCFS investigation where there is no reasonable suspicion of abuse," Doc. 99 at 64, and that "a threat of a DCFS investigation, not based on reasonable suspicion of abuse, is a constitutional violation," *id.* at 65.

As previously explained, in *Heck*, the Seventh Circuit held that caseworkers violate parents' rights to familial relations "by targeting [them] as child abusers" through a child abuse investigation if the caseworkers have "no evidence giving rise to a reasonable suspicion that the plaintiff parents were abusing their children." *Heck*, 327 F.3d at 524. Therefore, the DCFS Caseworkers were on notice that conducting such an investigation was unconstitutional.

*Heck* also established that a caseworker's threat to remove children from the custody of their parents where there is "no reason whatsoever to suspect that [the parents are] abusing their children" is a violation of the parents' substantive due process rights, even if the caseworker does not act on the threat. *Id.* The Seventh Circuit extended this principle in *Hernandez ex rel.*

*Hernandez v. Foster*, 657 F.3d 463 (7th Cir. 2011), by finding that a caseworker "threatening to take action that [one] had no legal authority to take is improper and violates familial rights," *id.* at 484. *Hernandez* stated that in the context of protecting a child from her parents, the proper legal authority is "'some definite and articulable evidence giving rise to a reasonable suspicion' of past or imminent danger of abuse." *Id.* at 482 (citation omitted). Therefore, at the time the DCFS Caseworkers allegedly threatened the Parents, it was clearly established that if the Caseworkers had no legal authority to take the actions they threatened to take, the threat violated the Parents' substantive due process rights. Because these threats took place in the context of protecting a child from her parents, the required legal authority was evidence giving rise to a reasonable suspicion of abuse.

Accordingly, at issue here is whether a reasonable suspicion of abuse existed to initiate the investigations against the Parents and to threaten the Parents with certain governmental actions. This is a fact-intensive inquiry that the Court cannot determine at this stage. *See Brokaw*, 235 F.3d at 1019 (finding the court did not have sufficient factual details at the pleading stage to determine if the caseworkers' actions were justified). Therefore, taking the well-pleaded allegations of the Complaint as true, the Court must find that qualified immunity does not bar the Parents' alleged substantive due process claims. Again, this does not preclude the Court from granting the Caseworkers qualified immunity at a later stage if the facts and law so warrant.

**b.      Walker and Harms-Pavelski**

The Parents bring substantive due process claims against Walker and Harms-Pavelski for implementing Section H, which proximately caused the violation of the Parents' rights, without a legal basis. DCFS argues "[t]here is no caselaw that would provide Walker or Harms-Pavelski reasonable notice that [Section H] violated the Constitution." Doc. 93 at 33. In response, the

43

Parents assert that at the time DCFS implemented Section H, *Brokaw* and *Heck* clearly established "the need for reasonable suspicion to start a child protection investigation."  Doc. 99 at 67.  As previously explained, *Heck* clearly established the right to be free from child welfare investigations where there is no reasonable suspicion of abuse.  Because *Heck* occurred over ten years before DCFS implemented Section H, this right was clearly established at the time of the alleged violation.

The next question then is whether the Complaint sufficiently alleges that Walker and Harms-Pavelski violated this clearly established right.  First, DCFS does not dispute that Walker and Harms-Pavelski were involved in the implementation of Section H, Doc. 111 at 11, but argues that this is insufficient because they "did not personally cause or play a role in causing the deprivation of Plaintiffs' constitutional rights," *id.* at 10.  In response, the Parents argue the Complaint alleges that "Walker and Harms-Pavelski participated in the conspiracy to deprive plaintiffs of their constitutional rights by undertaking the overt act of developing [Section H]."  Doc. 99 at 53 (emphasis omitted).  Therefore, at issue is whether the Complaint sufficiently alleges that Walker and Harms-Pavelski's implementation of Section H caused the violation of the Parents' constitutional rights.

"[T]o establish personal liability in a § 1983 action, the plaintiff must show that the government officer caused the deprivation of a federal right."  *Hernandez*, 657 F.3d at 487 (quoting *Brokaw*, 235 F.3d at 1012).  An actor causes a constitutional violation if "he sets in motion a series of events that defendant knew or reasonably should have known would cause others to deprive plaintiff of constitutional rights."  *Id.* (quoting *Brokaw*, 235 F.3d at 1012).  Therefore, the Complaint must allege that Walker and Harms-Pavelski acted "with a deliberate

or reckless disregard of [Parents'] constitutional rights" when implementing Section H. *Brokaw*, 235 F.3d at 1012 (citation omitted).

The Complaint alleges that Walker and Harms-Pavelski knew Section H had no legal basis. It further alleges that in June 2017, after consulting with DCFS' legal department, Dr. Jaudes and Harms-Pavelski announced "that a Vitamin K shot refusal was *not* to be considered *per se* medical neglect." Doc. 98 ¶ 142. Then, in October 2017, Dr. Jaudes and Harms-Pavelski reversed their position and directed hospitals to report Vitamin K refusals as medical neglect, "knowing it was unconstitutional." *Id.* ¶ 167. Walker officially adopted this directive in November 2017. At this stage, these allegations suffice to show Walker and Harms-Pavelski "knew or reasonably should have known" that the 2017 directive "would cause others to deprive [Parents'] of [their] constitutional rights." *Hernandez*, 657 F.3d at 487; *see Doyle*, 305 F.3d at 615 (finding complaint sufficiently pleaded personal involvement of DCFS Director and Deputy Director where it alleged they created the policy that caused the constitutional deprivations).

DCFS further argues that the hospital policies and independent judgments of the medical professionals caused the constitutional violations at issue, not Section H or the 2017 DCFS directives. The Complaint alleges, however, that Walker and Harms-Pavelski directed hospitals to report refusals of the Vitamin K shot and that the Defendant hospitals and doctors received this directive. Therefore, the Complaint sufficiently alleges that Walker and Harms-Pavelski caused the alleged constitutional violations relating to the refusals of the Vitamin K shot. Additionally, the Complaint alleges that the Defendant hospitals created policies in response to Section H. So, to the extent the Complaint alleges that the hospital policies caused the deprivations, it sufficiently alleges that Walker and Harms-Pavelski caused them. And because the Court cannot determine the motivation behind each report made to DCFS at this early stage,

the Court finds that the Complaint sufficiently alleges that the hospitals and medical professionals reported the incidents to DCFS at least in part based on Section H or the Defendant hospitals' policies.

Because the Complaint sufficiently alleges Walker and Harms-Pavelski's personal involvement, the Court turns next to whether a constitutional violation occurred. Section H stated that DCFS should treat calls concerning parental refusals of erythromycin eye ointment and the Vitamin K shot as reports of medical neglect. Treating such calls as reports of medical neglect required DCFS caseworkers to initiate child neglect investigations of the parents who refused the treatments. Section H, therefore, effectively required DCFS caseworkers to initiate child neglect investigations each time the agency received a call reporting a refusal of erythromycin eye ointment or the Vitamin K shot. At this stage, the Court lacks sufficient details to determine whether reasonable suspicion of abuse or neglect existed to justify these investigations. Qualified immunity thus does not bar Count I against Walker and Harms-Pavelski at this time.

### B. Sovereign Immunity

DCFS argues that the Court must dismiss Count XIII against current DCFS Director Smith in his official capacity because the Complaint fails to adequately plead that the alleged constitutional violations are ongoing given that DCFS rescinded Section H in 2018. Generally, the Eleventh Amendment bars federal jurisdiction over claims against state officials in their official capacity. *Brokaw*, 235 F.3d at 1009; *Evans v. Torres*, No. 94 C 1078, 1999 WL 1010983, at *3 (N.D. Ill. Sept. 30, 1999) ("DCFS is treated the same as a State for the purposes of the Eleventh Amendment."). However, the "immunity is not absolute" and, under the *Ex Parte Young* doctrine, does not extend to claims to enjoin a state officer in his or her official

capacity from engaging in prospective action that will violate federal law. *Brown v. Budz*, 398 F.3d 904, 917–18 (7th Cir. 2005) (citation omitted). To determine whether the Complaint avoids the Eleventh Amendment bar, the Court must determine whether the it "alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 363 (2002) (citation omitted).

Accordingly, the first question is whether the Complaint sufficiently alleges an ongoing violation of federal law. The Complaint alleges DCFS rescinded Section H in August 2018, but that DCFS investigated Anderson for reported medical neglect in February 2019 because of her refusal of the Vitamin K and Hepatitis B shots. The Complaint further alleges that in the first three months after the rescission of Section H, DCFS conducted fifteen medical neglect investigations based on refusals of the Vitamin K shot in newborns and in April 2019, DCFS conducted six medical neglect investigations based on such refusals. These allegations sufficiently plead that the alleged constitutional violations are ongoing despite the rescission of Section H. The relief sought in Count XIII is also prospective, as it seeks a permanent injunction against Smith to prevent these alleged constitutional violations from continuing. Therefore, the Eleventh Amendment does not bar Count XIII.

## CONCLUSION

For the foregoing reasons, the Court grants the following motions to dismiss in full: ICAAP [58]; Advocate Christ [63]; Silver Cross and Kozuch [66]; UCMC, Dr. Glick, and Dr. Lysouvakon [70]; Dr. Skalski [74]; and Dr. Schulte [76]. The Court grants the DCFS Defendants' motion to dismiss [91] with respect to the illegal seizure claims against Allen within Count X and denies the remainder of the motion. Therefore, the Court dismisses without prejudice Counts II, VII, and XII in their entirety; Count I against Dr. Glick and ICAAP; Count

47

III against Dr. Skalski, Kozuch, and Silver Cross; Count IV against Dr. Doe and Silver Cross; Count V against Advocate Christ; Count VI against UCMC, Dr. Glick, and Dr. Lysouvakon; Count VIII against Kozuch and Dr. Skalski; and the illegal seizure claims against Allen within Count X. The Parents have until April 30, 2021 to amend these claims if they can do so in accordance with this Opinion and Federal Rule of Civil Procedure 11.

Dated: March 30, 2021

SARA L. ELLIS
United States District Judge